## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x

In re:                                                      Chapter 11

225 BOWERY LLC,[1]                                          Case No. 23-10094 (BLS)

      Debtor.

---------------------------------------------------------------- x

## DECLARATION OF NAT WASSERSTEIN, CHIEF RESTRUCTURING OFFICER OF DEBTOR 225 BOWERY LLC, IN SUPPORT OF DEBTOR'S PETITION AND FIRST DAY MOTIONS

I, Nat Wasserstein, pursuant to 28 U.S.C. § 1746, hereby state and declare under penalty of perjury that the following (this "Declaration") is true to the best of my knowledge, information and belief:

1. I am a principal at Lindenwood Associates, LLC ("Lindenwood"). I have held this position since 1998.

2. On January 24, 2023, Lindenwood was engaged by 225 Bowery, LLC (the "Debtor") to provide certain business and advisory services and immediately thereafter appointed me as the Debtor's chief restructuring officer (the "CRO").

3. I am over the age of eighteen (18) and am authorized by the Debtor to submit this Declaration.

4. I have extensive experience as a restructuring specialist, having spent over twenty-five years leading and managing distressed companies. I am intimately familiar with the chapter 11 process, having served many positions in bankruptcy cases, including as chief

---

[1] The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is 225 Bowery LLC (1333). The location of the Debtor's service address is: 187 Chrystie Street, New York, NY 10002.

restructuring officer, Subchapter V Trustee, plan administrator, liquidation trustee, and fraud examiner.

5. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtor's management team or the Debtor's legal counsel or other advisors, my initial review of relevant documents and information concerning the Debtor's operations, financial affairs and restructuring initiatives, or my opinion based upon my experience and knowledge.  If called as a witness, I could and would competently testify to the facts set forth in this Declaration.

6. Based upon the foregoing, and subject to my continuing review, I am generally familiar with the Debtor's day-to-day operations, and Debtor's verbal and documentary description of its prior and ongoing restructuring efforts.

7. I submit this Declaration: (a) to assist the Court and all parties in interest in understanding, among other things, the Debtor's operations, its corporate structures, and the circumstances that led to the commencement of this chapter 11 case (the "Chapter 11 Case"); (b) in support of the Debtor's petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed by Debtor on the January 24, 2023 (the "Petition Date"); and (c) in support of the relief that the Debtor requests from the Court pursuant to the motions (the "First Day Motions") described in this Declaration, including but not limited to the motion for use of cash collateral, the motion to continue using existing cash management system, the motion for authority to pay critical vendors, and the motion for authority to pay certain prepetition and postpetition taxes.

8. As of the date hereof, the Debtor continues to review and revise certain of the First Day Motions described herein. As such, this Declaration is intended to provide the Court

with the facts relevant to the most current version of each of the First Day Motions. In the event that, subsequent to the filing of this Declaration, the Debtor determines that additional material facts should be presented in support of any of the First Day Motions, I will file a supplement to this Declaration to account for same.

## I.      The Debtor's History and Business Overview

### A.  The Hotel

9.      In 2014, Northwind RE LLP ("Northwind") and Omnia Properties LLC ("Omnia") formed an alliance to acquire the property located at 223-225 Bowery, New York, New York with the intention of developing a hotel property (the "Hotel").  As discussed more fully below, this project required significant financing.  Construction of the Hotel was largely completed in 2019, and the doors opened shortly thereafter.

10.      The Debtor is the owner of the Hotel.  The Debtor itself is wholly owned by non-Debtor 225 Bowery Group, LLC ("Group").

11.      Located in the Lower East Side of Manhattan, the Hotel is properly described as a micro hotel, boutique with approximately two hundred fully functional, high-finished guest rooms whose square footage is less than a typical hotel room, along with communal spaces and restaurants which play an important role in guest engagement.  The Hotel is positioned to cater to budget conscious millennials who are willing to exchange guest room size for the experience of a lifestyle hotel at an affordable price.  The facility includes the hotel, a restaurant, lobby bar, and rooftop space, each of which provide services to the Hotel and can generate revenue for the Debtor separate and apart from Hotel occupancy revenue.

12.      Currently reservations at the Hotel are made solely through Airbnb, Inc. ("Airbnb") which, I have been advised and as discussed more fully in Section I.D(iii) below, has been the Debtor's exclusive booking channel since in or about August 2021.  For the calendar

3

year 2022, and based on my initial review of the Debtor's records, the Debtor's gross revenue was in excess of $10,000,000.00.

**B.  Financing the Hotel**

13.      The Debtor's current capital structure consists solely of a loan agreement it closed on or about March 4, 2019 with Bank Hapoalim B.M. ("BHI") that resulted in $68,000,000 of financing (the "BHI Loan").  The BHI Loan is governed by that certain Loan Agreement between the Debtor and BHI dated March 4, 2019 (the "Loan Agreement"), which is further evidenced by a Consolidated, Amended and Restated Promissory Note for up to $80,000,000 (the "Note"), and is secured by a Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents and Security Agreement (the "Mortgage" and together with the Loan Agreement, Note and other Financing Documents (as that term is defined in the Loan Agreement), the "BHI Loan Documents").[2]

14.      Among other things, the BHI Loan Documents (and in particular, the Mortgage) granted BHI a lien on and first priority security interest in "Personalty," which is defined in the Mortgage to include, *inter alia*, the Hotel, Equipment, and Accounts (the "BHI Security Interest").  It is my understanding that the BHI Security Interest was recorded with the NYC Department of Finance Office of the City Register on March 4, 2019, contemporaneously with the closing of the BHI Loan Documents. In addition, on March 14, 2019, BHI filed a UCC-1 with the Delaware Secretary of State describing the BHI Security Interest.

---

[2]      Prior to the BHI Loan, the Debtor obtained acquisition and construction financing from several sources.  Starting in 2014, the Debtor obtained financing from New York Community Bank in the principal amount of $17,000,000 (the "NYCB Loan").  The NYCB Loan was later assigned to Chase Bank, and the principal amount funded thereunder increased to $32,000,000.  In 2017, the Debtor refinanced with Bank of the Ozarks ("Ozarks"), whereby Ozarks extended a $42,000,000 facility (the "Ozarks Loan") closing out the existing facility with Chase Bank.  The BHI Loan served to refinance the Ozarks Loan (as well as close out a mezzanine facility provided by non-Debtor Northwind).

4

15.     On or about October 27, 2021, BHI sent a Notice of Default, stating that the Debtor had failed to make payments of principal and/or interest for the months of August, September and October 2021, totaling more than $2 million in the aggregate.

16.     When payment of the past due amounts was not received, BHI called an event of default under the BHI Loan Documents.  On or about November 3, 2021, BHI sent a Notice of Acceleration and Demand for Payment, which immediately called all amounts due and owing under the BHI Loan Documents, including the entire principal balance outstanding under the BHI Loan along with any and all accrued interest at the default rate.

17.     On or about April 28, 2022, BHI commenced a foreclosure action against the Debtor, Omnia, and David S. Paz ("Paz") in the Supreme Court of the State of New York, County of New York (Index No. 850096/2022) (the "Foreclosure Action")[3] along with a motion to appoint a receiver shortly thereafter [NYSCEF Doc. No. 1] (the "Foreclosure Receivership Motion").

18.     Separate and apart from the Foreclosure Action, on or about May 17, 2022, Northwind commenced a lawsuit against the Debtor and several non-Debtors–DSP Development LLC and Paz (as defendants) and KAL Realty Partners LLC ("KAL") , TLLULE LLC ("TLLULE"), and VNAA LLC ("VNAA"), Group and the Debtor (as nominal defendants)–by filing a complaint in the Supreme Court of the State of New York, County of New York (Index No. 656331/2022).  Contemporaneously with the filing of said complaint, Northwind submitted an order to show cause seeking to appoint a temporary receiver over the Debtor and certain non-Debtor affiliates (the "NW Receivership Motion" and together with the Foreclosure Receivership Motion, the "Receivership Motions").

---

[3]     References to "NYSCEF Doc. No. ●" shall refer to docket filings in the Foreclosure Action.

LEGAL02/42518638v15

19.     The parties were able to consensually resolve the Receivership Motions by,

among other things, entering into a stipulation (the "Stipulation") that provided, in relevant part:

a.    The Debtor shall deposit into its checking account (ending in 135501) maintained at BHI's New York branch (the "BHI Cash Account"), all funds in the Debtor's possession, custody or control at the time of the Stipulation or as of a date certain.

b.    From and after the date of the Stipulation, the Debtor shall take all steps necessary to have monies that are generated through the Debtor's operation of the Hotel deposited directly into the BHI Cash Account.

c.    The Debtor shall not spend, distribute or otherwise disburse any funds held in the BHI Cash Account, unless such expenditure is for the exclusive purpose of funding one of the expenses enumerated on Exhibit A to the Stipulation, *provided that* such expense does not exceed the Approved Operating Expenses (as that term is defined in the Stipulation).  Generally speaking, Exhibit A to the Stipulation detailed expenses customarily incurred in connection with the operation of the Hotel.

d.    Any expense that is not an Approved Operating Expense shall require prior written approval by BHI and Northwind, *provided that* prior approval is not required insofar as the Debtor seeks to spend or distribute amounts from the BHI Account to unrelated third-party vendors/service providers up to a limit of $10,000.00.

e.    After accounting for Approved Operating Expenses or other distributions authorized pursuant to the Stipulation, any balance remaining in the BHI Account above $650,000.00 shall be transferred to a separate account maintained at BHI's New York branch (the "BHI Suspense Account").

f.    The funds in the BHI Suspense Account are subject to application or release only by written consent of the parties to the Stipulation or further order of the court, *provided, however, that* if, after such a distribution, the remaining amount of funds in the BHI Cash Account are insufficient to pay for any Approved Operating Expenses, then the necessary funds to pay such Approved Operating Expenses shall be deposited into the BHI Cash Account.

20.     The Debtor appears to have operated under and consistent with the terms of the

Stipulation from May 2022 through the Petition Date.

21.     As of the Petition Date, BHI asserts that the total of approximately

$79,498,046.36 is owed under the BHI Loan, including $67,093,333.36 in principal,

$11,619,726.68 in interest, and $784,986.32 in late fees.

6

### C.  Management of the Hotel and the Impact of COVID

#### (i)      Ace Management

22.      On or about July 22, 2014, non-Debtor entities KAL, TLLULE, and VNAA

entered into a hotel management agreement (the "Hotel Management Agreement")[4] with Ace

Group Bowery LLC ( "Ace Management"), an operating company that is part of a larger

corporate family headed by Ace Group International LLC ("Ace International"), which owns and

operates hotels under certain brands, including the "Sister City" and "Ace Hotel" brands.

23.      Consistent therewith, Ace Management began operating and managing the Hotel

from its opening in 2019.  From the beginning, it appears that Ace Management and the Debtor

were at odds over the management strategy employed by Ace Management.

24.      Based upon documents and other pleadings I have reviewed, Hotel performance

in its first year under Ace Management was dramatically below pre-opening projections, having

generated only $2,500,000 in revenue against a projected $7,900,000, which required significant

capital infusions.  Ace Management continued as manager until the Hotel was forced to

temporarily close its doors due to the COVID-19 pandemic on or about March 20, 2020.

#### (ii)     COVID and its Impact on the Hotel

25.      Based upon documents and other pleadings I have reviewed, the COVID-19

global pandemic dramatically worsened what was already a difficult start for the Hotel.

Government orders effectively required that the Hotel, along with others around New York City,

completely suspend all services and temporarily shut its doors, forcing the Debtor to reduce

operations to subsistence levels in order to maintain crucial operations within the building.

---

[4]      It is my understanding that the Hotel Management Agreement was eventually assigned to the Debtor.

26.     Faced with limited options and constrained greatly by the pandemic that was affecting the world on a scale not seen in recent memory, the Debtor secured a deal with the City of New York (the "City") to pair with Bowery Residents' Committee, Inc. (www.brc.org), a City funded not-for-profit to provide its clients with pandemic suitable, less crowded housing to stop the spread of COVID-19.  The Debtor leased housing to unsheltered individuals, leasing all two hundred of the Hotel's rooms at a rate of $110/day, generating approximately $660,000.00 in gross revenue per month for the Debtor when, otherwise, revenue would have been essentially zero.  The lease initially contemplated a four-month term, with both sides having the right to terminate.  The lease was renewable and signed on or around June 4, 2020 (the "City Use Agreement").

27.     Ace Management was opposed to the Debtor's entry into the City Use Agreement and asserted that the deal with the City breached the Hotel Management Agreement.  This dispute was ultimately referred to and resolved through arbitration.  *See* Section II.B *infra*.

28.     In light of the change in relationship with Ace Management, on or about June 4, 2020, the Debtor retained BHT Management LLC ("BHT Management") to operate the Hotel. BHT Management operated the Hotel through the life of the City Use Agreement, ultimately bringing in approximately $6,000,000 in revenue over eleven months.  Nonetheless, the Hotel's significant shortfall persisted.

29.     As the City Use Agreement was expiring in June 2021, the Debtor and BHT Management continued to seek other opportunities for the Hotel to function in a manner that could generate revenue and limit operational costs.  Even though the severity of the COVID-19 pandemic had lessened since early 2020, the hospitality industry as a whole was still struggling,

8

and the future of hotels in the City was uncertain.[5]  The Debtor recognized that it must keep costs low and be creative in order to generate revenue.

### (iii)    Airbnb Conversion – Another Effort To Save The Hotel

30.    In another effort to generate revenue, the Debtor decided to operate the Hotel as an Airbnb site.  So as to comply with City regulations to operate as an Airbnb site, the Hotel had to undergo certain renovations prior to operations.  The Airbnb related renovations were concluded in or around August 2021, which remodeled the rooms to facilitate longer-term stays and Airbnb reservations.

31.    The Hotel has been successfully operating as an Airbnb site since around August 2021.  In fact, since August 2021 and through December 2022, the Hotel has generated revenue of approximately $13,315,890 through the Airbnb platform.    Annualized, the Hotel is projected to earn approximately $16,000,000 in 2023.

## II.    Events Precipitating Bankruptcy and Objectives for this Chapter 11 Case

## A.  Continued Troubled Outlook for Hospitality in New York City

32.    The Debtor finds itself in an industry that is still recovering from the pandemic. The hospitality industry in New York City (and across the world) has not completely rebounded from the effects of COVID-19.  With the virus continuing to spread, uncertain economic conditions, and unrest in parts of the world, there has been a shift in the hospitality industry's outlook that is seeing a decrease in consumer hotel bookings.  Albeit slightly offset by increased average room rates as compared to 2019, hotels in the City and across the globe are facing a slowdown in consumer demand.[6]

---

[5]    In fact, the hospitality industry continues to face many challenges in 2023.  *See* Section II.A.
[6]    *See,* for example, Warren Marr and Jeanelle Johnson, *U.S. Hospitality Directions: November 2022,* PRICEWATERHOUSECOOPERS (https://www.pwc.com/us/en/industries/consumer-markets/hospitality-leisure/us-hospitality-

### B.  Ace Litigation

33.      As previewed above, Ace Management opposed the Debtor's decisions to generate income through the City Use Agreement with the City and to partner with Airbnb.  As a result, Ace Management sought legal recourse alleging several claims for breach of the Hotel Management Agreement.

34.      Pursuant to the Hotel Management Agreement, the Debtor and Ace Management were required to arbitrate as a means of dispute resolution.  An arbitration was conducted before a fast track ICC panel in New York City with a "merits hearing" taking place on June 17, 20, 21 and 22, 2022.  The arbitration panel ultimately found that the Debtor did in fact breach certain contractual obligations under the Hotel Management Agreement and awarded Ace Management damages in the amount of $10,474,628.18 (the "Arbitration Award").  It is my understanding that the Arbitration Award reflects the discounted present value of all of the management fees that Ace Management would have collected had the Hotel Management Agreement not been breached and terminated (plus interest and certain costs and expenses).

35.      Ace Management moved swiftly after the arbitration panel issued the Arbitration Award to seek confirmation thereof in the Supreme Court of the State of New York, County of New York.  Judgment on account of the Arbitration Award was entered against the Debtor on October 28, 2022 (the "Ace Judgment").

36.      After entry of the Ace Judgment, and based on documents filed in the Foreclosure Action, Ace Management initiated an aggressive litigation campaign against the Debtor and various parties in business with the Debtor.  For example, Ace Management filed crossclaims in the Foreclosure Action seeking, among other things, damages and a declaratory judgment that

---

directions.html#:~:text=The%20Fed's%20continued%20increases%20in,outlook%2C%20increasing%20to%20 62.8%20percent) (highlighting the trends and economic headwinds that hotels may face in 2023).

LEGAL02/42518638v15

the Ace Judgment somehow has priority over the BHI Security Interest.  [*See* NYSCEF Doc. No. 73].  The Debtor and BHI, as the Debtor's senior secured lender and only party with a properly perfected security interest in cash and accounts, vehemently disagree with Ace Management's unfounded assertion of priority.   Notwithstanding the lack of any legal or factual basis for its position, Ace Management plowed forward with its strategy in the Foreclosure Action causing additional and unnecessary litigation and, equally important, upheaval and gridlock to the Debtor's efforts to operate and the manage the Hotel in the ordinary course.[7]

37.     Indeed, Ace Management has disrupted the Debtor's business since obtaining the Ace Judgment by, among other things, issuing a number of statutory restraints on the accounts of the Debtor designed to "cut off" the Debtor's cash flow and life-line.  Critically, Ace Management's strategy included placing a restraint on funds received on the Debtor's behalf by Airbnb, which currently serves as the Debtor's sole source of revenue at the Hotel.

38.     Because Ace Management has not shown any support for its position that the Ace Judgment is senior in priority to the properly perfected BHI Security Interest, and in light of Ace Management's extremely litigious behavior seemingly aimed at destroying value for all stakeholders other than itself, the Debtor has been forced to seek relief in the Bankruptcy Court.

39.     To that end, on the Petition Date, the Debtor commenced an adversary proceeding against Ace Management and Ace International seeking to avoid any lien arising from the Ace Judgment in and against the Hotel as an avoidable preference and, I am informed, also intends to seek all other appropriate damages and relief against Ace Management and Ace International available under the law and at equity.

---

[7]     Importantly, BHI recently filed a motion to dismiss Ace Management's cross claims.  [*See* NYSCEF Doc. No. 105].

### C.  Chapter 11 Case

40.     In light of the continuing default under the BHI Loan, entry of the Ace Judgment and Ace Management's destructive and counter-productive behavior, including the restraints it placed on the Debtor's access to cash, the Debtor, along with its principal equity holders and with the written consent of the Debtor's independent manager, reasonably determined that filing for chapter 11 protection was necessary and in the best interests of the Hotel.

41.     The Debtor intends to utilize the breathing room afforded by chapter 11 to continue to stabilize operations, to continue building its long-term business plan and develop a path to reorganizing and exiting chapter 11 as efficiently and as quickly as possible. The Hotel is a very valuable asset that will continue to generate significant revenue and be the foundation of a chapter 11 plan and emergence from this Chapter 11 Case.

## THE FIRST DAY MOTIONS

42.     As noted above, the Debtor expects to file a number of First Day Motions shortly seeking orders granting various forms of relief intended to preserve value as the Debtor seeks to stabilize its business, facilitate the efficient administration of this Chapter 11 Case, obtain authority to use cash collateral, lessen the impact of the Chapter 11 Case on the Debtor's day-to-day operations, and facilitate a successful chapter 11 plan for the Debtor.  I believe that this Court's approval of the relief requested in the First Day Motions is essential to avoid immediate and irreparable harm to the Debtor and its estate, to provide the Debtor with an opportunity to continue to meet its obligations in the ordinary course of business, to provide for a smooth transition into chapter 11, and to provide for the efficient and swift administration of this Chapter 11 Case.

43.     Subject to the caveat noted earlier in this Declaration that the Debtor continues to review and revise certain of the First Day Motions, a list along with a current description of the First Day Motions is set forth below.

**A.  Motion for Use of Cash Collateral**

44.     The Debtor intends to file the *Debtor's Motion for Interim and Final Orders (A)Authorizing Use of* Cash *Collateral and Granting Adequate Protection, (B) Authorizing Use of Reserve Account Cash, (C) Scheduling a Final Hearing, and (D) Granting Related Relief* (the "Cash Collateral Motion").  Through the Cash Collateral Motion, the Debtor intends to request entry of interim and final orders, authorizing the Debtor's use of Cash Collateral (as such term is defined in section 363 of the Bankruptcy Code) and granting adequate protection to BHI. Importantly, the Debtor anticipates that BHI will consent to the Debtor's use of its cash collateral, and the Debtor is proposing an adequate protection package to BHI that will protect it from any diminution in value.

45.     The Debtor requires immediate access to liquidity to ensure it is able to continue operating its business during this Chapter 11 Case, preserve the value of the estate for the benefit of all parties in interest, and administer a value-maximizing chapter 11 process.  However, all of the Debtor's cash is Cash Collateral and, without prompt access to such Cash Collateral, the Debtor would be unable to, *inter alia*, satisfy obligations owed to its critical vendors, satisfy trade payables incurred in the ordinary course of business, preserve and maximize the value of its estate, and fund the administration of this Chapter 11 Case, which would cause immediate and irreparable harm to the value of the Debtor's estate to the detriment of all stakeholders.

46.     During this Chapter 11 Case, the Debtor will generate cash from its operations and will need to use such cash to satisfy critical vendor obligations, maintain insurance coverage, pay taxes, and make other payments essential to the continued management, operation and

preservation of the Hotel.  The ability to satisfy these expenses as and when due is essential to the Debtor's continued operation of its businesses during the pendency of this Chapter 11 Case. Other than the Cash Collateral, the Debtor does not have access to funds sufficient to continue operation of its business.

47.     The Debtor is in the process of finalizing a 13-week budget (the "Budget"), which, subject to customary permitted variances and roll forwards, will set forth the amounts that the Debtor will be authorized to spend during the course of this Chapter 11 Case.  I have been working with the Debtor's personnel and its professionals to ensure that the Budget includes those amounts that will be necessary to preserve and maximize the value of the Debtor's estate, including by ensuring that goods and services needed to operate the Hotel can be obtained and that the Debtor delivers a positive guest experience.  The Cash Collateral Motion will only seek authority to expend amounts in the Budget during the period prior to a final hearing on the motion that will avoid any immediate and irreparable harm to the Debtor and the Hotel from a failure to have access to the goods and services used in running the Hotel and the personnel and professionals that the Debtor is relying on in this Chapter 11 Case.

48.     For the foregoing reasons, the Debtor's continued use of Cash Collateral is necessary to preserve the value of its estate and maximize its value for the benefit of all stakeholders.

**B.  Motion to Continue Using Existing Cash Management System**

49.     The Debtor intends to file the *Motion of the Debtor for Interim and Final Orders (I) Authorizing Continued Use of Existing Cash Management System, Bank Accounts, Credit Card and Business Forms, and Payment of Related Prepetition Obligations, (II) Waiving Certain*

14

*Investment and Deposit Guidelines and (III) Granting Related Relief* (the "<u>Cash Management</u>

<u>Motion</u>").

50.     Prior to the Petition Date, and in the ordinary course of its business, the Debtor

maintained a cash management system designed to, among other things, efficiently collect,

concentrate, and disburse the funds generated by the Debtor's business operations (the "<u>Cash</u>

<u>Management System</u>").

51.     If the Debtor is unable to maintain its Cash Management System, the Debtor's

operations will be severely impeded.  The Debtor, with the assistance of its advisors, have

implemented reasonable protocols to ensure that only claims arising post-petition and certain

claims arising prepetition (if payment of such prepetition claims is approved by this Court) will

be paid by the Debtor.

52.     From time to time, and in the ordinary course of business, the Debtor incurs

obligations for the maintenance of the Cash Management Systems. These obligations primarily

consist of amounts owed to the Banks for the maintenance of and services related to the Cash

Management Bank Accounts (the "<u>Bank Fees</u>**").**  The Bank Fees fluctuate each month,

depending upon account activity.

53.     It is my understanding that the Debtor further uses various business forms, such as

checks, invoices, letterhead, and other business and marketing materials in the ordinary course of

its business (the "<u>Business Forms</u>").  Because the Business Forms were used prepetition, they do

not reference the Debtor's current status as a debtor in possession. Requiring the Debtor to

change its existing Business Forms would unnecessarily distract the Debtor from its restructuring

efforts and impose needless expenses on the estates. Thus, the Debtor requests that it be

authorized to use its existing Business Forms without placing a "Debtor In Possession" legend on each.

54.     Requiring the Debtor to adopt a new, segmented cash management system during this Chapter 11 Case would be burdensome and unnecessarily disruptive to the Debtor's operations.  Any disruption of the Cash Management System could have severe adverse effects on the Debtor's restructuring efforts, the cost of which would ultimately be borne by the Debtor's creditors and other stakeholders.  Maintaining the current Cash Management System will facilitate the Debtor's smooth transition into and operation in chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies.

**C.  Motion for Authority to Pay Critical Vendors**

55.     The Debtor intends to file the *Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Prepetition Claims of (A) Critical Vendors and Service Providers, and (B) 503(b)(9) Claimants; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests; and (III) Granting Related Relief* (the "Critical Vendors Motion").  Through the Critical Vendors Motion, the Debtor seeks the authority to pay amounts to certain vendors or claimants that the Debtor determines are necessary or appropriate to ensure that the Hotel continues to operate seamlessly through the transition into chapter 11.

56.     Successful operation of the Hotel (including the bar and restaurant) depends on its access to and relationships with, *inter alia*, a network of vendors, suppliers, service providers and independent contractors.  Thus, it is essential to the Debtor's restructuring efforts to pay certain critical vendor claims to maintain the supply of the specialized products and services critical to the Debtor's business operation (the "Products and Services").  Without the Products and

16

Services, which include housekeeping, linen, laundry, room inspections, maintenance and repairs and services, the Debtor's ability to continue operating the Hotel during this Chapter 11 Case will be significantly impaired.

57.     Indeed, many of these services are critical to, and have a direct bearing on, the overall guest experience, and certain of them, such as housekeeping, fire safety inspection, and elevator and boiler inspection, maintenance and repair, directly impact the health and safety of the Debtor's guests.  Many of the vendors have had longstanding relationships with the Hotel and finding replacements would likely involve a commitment of significant resources on behalf of the Debtor's very small management team.  Further, the process of transitioning to new service providers would likely be disruptive to the Hotel's operations and, in some instances, may present a potential risk to health and safety as new providers become familiar with the Hotel, the building and the operations.  Many of these risks must be weighed against the amounts owed to the critical vendors, which are relatively small on an aggregate basis when compared to the Debtor's overall claims pool, and present truly nominal amounts for many of the critical vendors.

58.     Additionally, the Debtor has received certain inventory, goods, and materials from various 503(b)(9) claimants (the "503(b)(9) Claimants") within the 20-day period immediately preceding the Petition Date.  Certain of the 503(b)(9) Claimants do not have long-term contracts with the Debtor.  Rather, the Debtor obtains inventory, goods, or other materials from the 503(b)(9) Claimants on an order-by-order basis. As a result, the 503(b)(9) Claimants may refuse to supply new orders without payment of their prepetition claims. Such refusal could negatively impact the Debtor's estate as the Debtor's business is dependent on the steady flow of inventory to stock its Hotel.

17

59.     Additionally, the Debtor has no employees or benefits programs of its own.  To perform the work necessary to maintain the Hotel and continue its operations, the Debtor uses a skeleton team of six total individuals: (a) three independent contractors: (i) the general manager of the Hotel, (ii) an independent contractor that handles reservations, and (iii) a bookkeeper (collectively, the "Independent Contractors"), and (b) three individuals who are employed by a third party service provider, CMG Services LLC (the "Service Provider"), (i) a comptroller for the Debtor and (ii) two administrative workers.

60.     Absent the authority to pay the aforementioned, oversight and management of the daily workings of the Hotel would be disrupted, likely requiring the Hotel to limit operations or cease operations entirely, impairing the Debtor's ability to survive as a going concern and maximize the value of the estate for all parties in interest.

61.     Finally, certain parties that have provided services or delivered goods to the Debtor, including maintenance or repair work, may have the ability to assert mechanic's or similar liens giving them the right to lien claims that will further encumber the Hotel.

**D.  Motion for Authority to Pay Certain Prepetition and Postpetition Taxes**

62.     The Debtor intends to file the *Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and (II) Granting Related Relief* (the "Tax Motion") through which the Debtor seeks authority to pay certain prepetition and postpetition taxes.

63.     The Debtor collects, withholds, and incurs a variety of taxes, including property taxes, sales and use taxes, and occupancy taxes, in the ordinary course of business.  The Debtor remits the taxes to the State of New York and the City of New York (together, the "Authorities").  Taxes are remitted and paid by the Debtor through checks and electronic fund

transfers that are processed through its banks and other financial institutions.  The Debtor pays

taxes to the Authorities on a periodic basis, remitting them monthly, quarterly, semiannually or

annually of each year, depending on the nature and incurrence of a particular tax or fee.

64.     Any failure to pay the taxes may materially disrupt the Debtor's business

operations in several ways: (i) the Authorities may initiate audits of the Debtor, which would

unnecessarily divert the Debtor's attention from the chapter 11 process; (ii) the Authorities may

attempt to suspend the Debtor's operations, file liens, seek to lift the automatic stay, and pursue

other remedies that will harm the estate; and (iii) the Debtor's management could be subject to

claims of personal liability, which would likely distract key employees from their duties related

to the Debtor's restructuring.  Moreover, unpaid taxes may result in penalties, accrual of interest,

or both.  Accordingly, the Debtor seeks authority to pay the Taxes, many of which are priority or

trust fund amounts, to avoid the harm that may arise from non-payment.

**E.  Motion to Approve Proposed Adequate Assurance of Payment to Utility Companies**

65.     The Debtor intends to file the *Motion of the Debtor For Entry of Interim and*

*Final Orders (I) Authorizing the Debtor's Proposed Adequate Assurance of Payment for Future*

*Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing*

*Services, (III) Approving the Debtor's Proposed Procedures for Resolving Additional Assurance*

*Requests, and (IV) Granting Related Relief* (the "Utilities Motion").

66.     In connection with the operation of the Hotel, the Debtor receives services from

various utility companies and other providers (collectively, the "Utility Companies") for sewer,

water, gas, waste, electric, telephone, cellular, internet, technology infrastructure and other

similar utility services (collectively, "Utility Services").

67.     The Utility Companies provide the Utility Services for the Debtor's Hotel, including its restaurant and bar located on site.  The Utility Services are essential to the continued operation of the Debtor's business and, consequently, to the success of the Chapter 11 Case.  Should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtor's business operations could be severely disrupted, and such disruption would jeopardize the Debtor's restructuring efforts.  Accordingly, the Debtor seeks to establish an orderly process for providing adequate assurance to the Utility Companies without hindering the Debtor's ability to operate as a going concern.

68.     The Debtor proposes to deposit an amount equal to approximately fifty-percent (50%) of one (1) month of Utility Services calculated as a historical average of all billings for Utility Services incurred by the Debtor (each an "Adequate Assurance Deposit"), into a segregated bank account designated for the Adequate Assurance Deposits on behalf of all Utility Companies identified in Exhibit C to the Utilities Motion (the "Adequate Assurance Deposit Account"). The Adequate Assurance Deposit may be applied to any postpetition defaults in payment to the Utility Companies.

**F.  Motion for Authority to Maintain Insurance Policies and Premiums**

69.     The Debtor intends to file the *Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Continue to Maintain its Insurance Policies and Programs, (B) Pay All Prepetition Obligations in Respect Thereof, and (C) Continue its Insurance Premium Financing Program; (II) Authorizing Banks to Honor Related Checks and Transfers; and (III) Granting Related Relief* (the "Insurance Motion") through which the Debtor seeks authority to pay certain prepetition and postpetition insurance related obligations.

20

70.     In the ordinary course of business, the Debtor maintains certain insurance policies that are administered by third-party insurance carriers (the "Insurance Carriers"), which provide coverage for, among other things, general liability, excess liability, flood, workers' compensation, equipment damage, and commercial property (collectively, the "Insurance Policies").

71.     The Debtor believes the Insurance Policies provide coverage that is typical in scope and amount for businesses within the Debtor's industry. The Insurance Policies are essential to the preservation of the Debtor's business, property and assets.  Not only are some of the Insurance Policies required by the various laws and regulations that govern the Debtor's commercial activities, but section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a Chapter 11 Case.

72.     As of the Petition Date, the Debtor estimates that there are no accrued and unpaid amounts owed to the Insurance Carriers.  However, in the event that a request for payment of amounts attributable to the period prior to the Petition Date is outstanding or is received by the Debtor in connection with the Insurance Policies, the Debtor requests authority to pay such prepetition amounts.

73.     The Debtor obtains its Insurance Policies through Arthur J. Gallagher Risk Management Services, Inc. (the "Broker"). Among other things, the Broker assists the Debtor in obtaining comprehensive insurance coverage and providing related services. The Broker also assists with procuring and negotiating the respective Insurance Policies, enabling the Debtor to obtain the Insurance Policies on advantageous terms and at competitive rates. Should the Debtor fail to compensate the Broker in keeping with past practice, the Broker may refuse to assist the

21

Debtor, leaving it to seek out its own insurance policies or find a new broker, potentially at greater expense, to assist in obtaining comprehensive insurance coverage and providing related services. Accordingly, maintaining its relationships with the Broker allows the Debtor to obtain the insurance coverage necessary to operate its business in a reasonable and prudent manner and to realize savings in the procurement of the policies. The Debtor, therefore, believes that it is in the best interests of its creditors and the estate to continue its business relationship with the Broker.

74.     It is not economically advantageous for the Debtor to pay the premiums on all of the Insurance Policies on an annualized basis. Accordingly, from time to time, in the ordinary course of business, the Debtor finances the premiums of certain of the Insurance Policies.

75.     In the ordinary course of business, the Debtor maintains bonds in favor of certain third parties (the "Bonding Program") for the purposes of discharging any mechanics liens against the hotel which secure the Debtor's obligations to pay for work performed on the hotel (the "Covered Obligations"). The Debtor believes that the Bonding Program provides coverage that is both required and typical in scope and amount for businesses within the Debtor's industry.

76.     The Debtor intends to narrowly tailor the relief requested in the First Day Motions to meet the goals of: (a) continuing its current operations in chapter 11 with as little disruption as possible; (b) maintaining the confidence and support of its vendors, guests, and other key constituencies; and (c) establishing procedures for the efficient administration of this Chapter 11 Case.

77.     I have reviewed current versions of each of the First Day Motions (including attachments thereto) and I will review the final versions of the First Day Motions before they are

22

filed with the Court.  I believe the facts stated therein will be true and correct to the best of my knowledge with appropriate reliance on the Debtor's management and advisors.

78.     I believe that the relief that will be sought in each of the First Day Motions will be necessary to the Debtor's efforts to maximize the value of its estate.  It is my further belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims or continue selected prepetition programs, the relief requested will be essential to the maintenance of the Debtor's operations and necessary to avoid immediate and irreparable harm to the Debtor's estate and creditors.

79.     The success of this Chapter 11 Case depends on the Debtor's ability to preserve Hotel operations while it restructures its financial obligations.  The relief requested in the First Day Motions will be a critical component of maintaining the confidence of key constituencies necessary to implement this strategy.

80.     Accordingly, I respectfully request that all of the relief requested in the First Day Motions, and such other and further relief as may be just and proper, be granted.

LEGAL02/42518638v15

## **CONCLUSION**

I certify under the penalty of perjury that the foregoing *Declaration of Nat Wasserstein,*

*Chief Restructuring Officer of the Debtor, in Support of Debtor's First Day Motions and Related*

*Relief* is true and correct.


Executed: January 26, 2023                    */s/ Nat Wasserstein* _____
          New York, New York                    Nat Wasserstein
                                         Chief Restructuring Officer of 225 Bowery LLC

LEGAL02/42518638v15