**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| 225 BOWERY LLC,[1] | Case No. 23-10094 (TMH) |
| Debtor. | **Ref Doc. Nos: 371, 407, 450, & 503** |

**NOTICE OF FILING OF (A) REVISED DISCLOSURE STATEMENT TO THE THIRD
AMENDED CHAPTER 11 PLAN OF 225 BOWERY LLC PURSUANT TO CHAPTER 11
OF THE BANKRUPTCY CODE AND (B) BLACKLINE THEREOF**

**PLEASE TAKE NOTICE** that, on December 15, 2023, the above-captioned debtor and debtor in possession (the "Debtor"), filed the *Disclosure Statement to the Chapter 11 Plan of 225 Bowery LLC Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 371] (the "Disclosure Statement") with the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that, on January 19, 2024, the Debtor filed a revised disclosure statement [Docket No. 407] (the "Revised Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that, on March 8, 2024, the Debtor filed a revised disclosure statement [Docket No. 450] (the "Second Revised Disclosure Statement").

**LEASE TAKE FURTHER NOTICE** that, on April 18, 2024, the Debtor filed a revised disclosure statement [Docket No. 503] (the "Third Revised Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that, the Debtor has further revised the Third Revised Disclosure Statement, a copy of which is attached hereto as Exhibit 1 (the "Further Revised Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that, for the convenience of the Court and parties in interest, attached hereto as Exhibit 2 is a changed pages only blackline comparing the (x) Further Revised Disclosure Statement, and (y) Third Revised Disclosure Statement. The Debtor reserves all rights to further amend, supplement, or modify the Further Revised Disclosure Statement.

*[Signature page follows]*

---

[1]    The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is 225 Bowery LLC (1333). The location of the Debtor's service address is: 187 Chrystie Street, New York, NY, 10002.

Dated:    April 24, 2024
          Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Andrew A. Mark*
Michael R. Nestor (No. 3526)
Ryan M. Bartley (No. 4985)
Andrew A. Mark (No. 6861)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Emails:  mnestor@ycst.com
         rbartley@ycst.com
         amark@ycst.com

*– and –*

ALSTON & BIRD LLP

Gerard S. Catalanello
James J. Vincequerra
Dylan S. Cassidy
Kimberly J. Schiffman
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
Emails:  gerard.catalanello@alston.com
         james.vincequerra@alston.com
         dylan.cassidy@alston.com
         kimberly.schiffman@alston.com

*Counsel to the Debtor and Debtor in Possession*

## <u>EXHIBIT 1</u>

**Further Revised Disclosure Statement**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| 225 BOWERY LLC,[1] | Case No. 23-10094 (TMH) |
| Debtor. | |

### DISCLOSURE STATEMENT FOR THE THIRD AMENDED CHAPTER 11 PLAN OF 225 BOWERY LLC PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**ALSTON & BIRD LLP**
Gerard S. Catalanello (admitted *pro hac vice*)
James J. Vincequerra (admitted *pro hac vice*)
Dylan S. Cassidy (admitted *pro hac vice*)
Kimberly J. Schiffman (admitted *pro hac vice*)
90 Park Avenue
New York, New York 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
Emails: Gerard.Catalanello@alston.com
          James.Vincequerra@alston.com
          Dylan.Cassidy@alston.com
          Kimberly.Schiffman@alston.com

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Michael R. Nestor (No. 3526)
Matthew B. Lunn (No. 4119)
Ryan M. Bartley (No. 4985)
Andrew A. Mark (No. 6861)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Emails: mnestor@ycst.com
          mlunn@ycst.com
          rbartley@ycst.com
          amark@ycst.com

*Counsel to the Debtor and Debtor in Possession*

Dated: April 24, 2024

---

[1]   The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is 225 Bowery LLC (1333).  The location of the Debtor's service address is: 187 Chrystie Street, New York, New York, 10002

## DISCLAIMER

THE DISCLOSURE STATEMENT PROVIDES INFORMATION REGARDING THE THIRD AMENDED CHAPTER 11 PLAN OF 225 BOWERY LLC PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE (THE "PLAN") THAT THE DEBTOR IS SEEKING TO HAVE CONFIRMED BY THE BANKRUPTCY COURT. THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE PLAN, AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.

THE DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN DOCUMENTS RELATING TO THE PLAN. ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF, OR ARE INCONSISTENT WITH, THE PLAN, SUCH STATUTES, OR SUCH DOCUMENTS. TO THE EXTENT THERE IS ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD READ THE DISCLOSURE STATEMENT AND THE PLAN, AND THE RESPECTIVE EXHIBITS ATTACHED THERETO, IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN AND MAKING ANY ELECTIONS IN CONNECTION WITH THE PLAN WITH RESPECT TO RELEASES UNDER ARTICLE IX OF THE PLAN, AS APPLICABLE.

THE STATEMENTS CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THE DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN. ALTHOUGH THE DEBTOR HAS MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO MATERIALLY AFFECT ANY RECOVERIES UNDER THE PLAN, THE DEBTOR DOES NOT PURPORT TO PREDICT WITH ACCURACY CHANGES IN PRESENT CIRCUMSTANCES AND UNDERTAKES NO OBLIGATION TO AMEND THE DISCLOSURE STATEMENT TO REFLECT SUCH CIRCUMSTANCES.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THE DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER SUCH AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT.

THE DEBTOR MAKES STATEMENTS IN THE DISCLOSURE STATEMENT THAT MAY BE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES, REPRESENT THE DEBTOR'S ESTIMATES AND ASSUMPTIONS ONLY AS OF THE DATE SUCH STATEMENTS WERE MADE, AND INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER KNOWN AND UNKNOWN FACTORS THAT COULD IMPACT THE PLAN OR DISTRIBUTIONS THEREUNDER. IN ADDITION TO STATEMENTS THAT EXPLICITLY DESCRIBE SUCH RISKS AND UNCERTAINTIES, READERS ARE URGED TO CONSIDER STATEMENTS LABELED WITH THE TERMS "BELIEVE," "BELIEF," "EXPECT," "INTEND," "ESTIMATE," "ANTICIPATE," "PLAN" OR SIMILAR TERMS TO BE UNCERTAIN AND FORWARD-LOOKING. CREDITORS AND OTHER INTERESTED PARTIES SHOULD ALSO REVIEW THE SECTION OF THE DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS THAT MAY AFFECT THE PLAN AND DISTRIBUTIONS THEREUNDER.

## VOTING DEADLINE

**CLASSES 3 (SECURED LENDER CLAIM), 4 (ACE SECURED CLAIM), 7 (UNION CLAIMS), AND 8 (GENERAL UNSECURED CLAIMS) ARE IMPAIRED UNDER THE PLAN AND ARE ENTITLED TO HAVE THEIR VOTES TO ACCEPT OR REJECT THE PLAN COUNTED.**

THE DEADLINE TO VOTE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. (EASTERN TIME) ON MAY 29, 2024. TO BE COUNTED, THE VOTING AGENT MUST ACTUALLY RECEIVE YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE IN THE FORM AND MANNER PROVIDED FOR IN THE DISCLOSURE STATEMENT ORDER (DEFINED BELOW) AND THE VOTING INSTRUCTIONS AND DESCRIBED HEREIN.

## CONFIRMATION HEARING AND DEADLINE TO OBJECT TO THE PLAN

THE HEARING TO CONSIDER CONFIRMATION OF THE PLAN HAS BEEN SCHEDULED FOR JUNE 11, 2024 AT 10:00 A.M. (EASTERN TIME). OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED ON OR BEFORE MAY 29, 2024 AT 4:00 P.M. (EASTERN TIME) IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER (DEFINED BELOW) AND THE CONFIRMATION HEARING NOTICE.

***THE DEBTOR BELIEVES THAT THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE RECOVERIES TO CREDITORS, AND IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS ESTATE AND INTERESTED PARTIES.***

**\*NOTICE TO HOLDERS OF
CLASS 8 GENERAL UNSECURED CLAIMS\***

**THE DEBTOR URGES HOLDERS OF GENERAL UNSECURED CLAIMS IN CLASS 8 TO VOTE TO ACCEPT THE PLAN SO AS TO PROVIDE THE DEBTOR WITH THE MAXIMUM CHANCES OF CONFIRMING THE PLAN.**

**HOLDERS OF GENERAL UNSECURED CLAIMS IN CLASS 8 ARE (I) ESTIMATED TO RECEIVE CASH PAYMENTS TOTALING APPROXIMATELY 27.5% OF THEIR ALLOWED CLAIMS, AND (II) ENTITLED TO HAVE THEIR VOTE TO ACCEPT OR REJECT THE PLAN COUNTED.  IF HOLDERS OF GENERAL UNSECURED CLAIMS IN CLASS 8 VOTE TO REJECT THE PLAN, THEN (A) THE PLAN MAY NOT BE ABLE TO BE CONFIRMED, AND (B) THE DEBTOR MAY BE COMPELLED TO LIQUIDATE IT ASSETS WHICH WILL LIKELY RESULT IN $0 RECOVERY FOR HOLDERS OF CLASS 8 GENERAL UNSECURED CLAIMS.**

31582062.1

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................1

II.    THE DEBTOR'S BUSINESS OPERATIONS, AND CORPORATE AND
CAPITAL STRUCTURES .................................................................................2

    (a)    Corporate Structure ...............................................................................3

    (b)    The Debtor's Prepetition Business and Operations ...............................3

         1.    Management of the Hotel...........................................................3

             i.    Ace Management ..........................................................3

             ii.    COVID-19 and its Impact on the Hotel ........................4

             iii.    Airbnb Conversion—Another Effort to Save The Hotel ................4

    (c)    The Debtor's Prepetition Capital Structure and Indebtedness ...............5

         1.    The Prepetition Secured Credit Facility.....................................5

         2.    Ace Arbitration Award ...............................................................5

         3.    Unsecured Creditor Body ...........................................................6

         4.    Union...........................................................................................6

         5.    Mechanics' Liens and Bonds .....................................................7

         6.    Insider General Unsecured Claims .............................................8

III.    EVENTS PRECIPITATING THE CHAPTER 11 CASE .................................8

    (a)    Continued Troubled Outlook for Hospitality in New York City............8

    (b)    BHI Foreclosure....................................................................................9

    (c)    Northwind Litigation ............................................................................9

    (d)    Receivership Motions ..........................................................................10

    (e)    Ace Litigation .....................................................................................11

IV.    EVENTS DURING THE BANKRUPTCY CASE ........................................11

    (a)    Chapter 11 Goals and Engagement of the CRO ..................................12

    (b)    First Day Relief and Subsequent Cash Collateral Orders ....................12

    (c)    Debtor's Preference Action Against Ace..............................................13

    (d)    Additional Orders................................................................................14

    (e)    Claims Process and Bar Dates .............................................................15

         1.    Schedules and Statement of Financial Affairs ..........................15

         2.    Claims Bar Dates ......................................................................15

         3.    Claims Reconciliation ..............................................................16

(f)    Investigation of Insider Claims and Causes of Action............................................17

    1.    Omnia and Paz ...........................................................................................17

    2.    Northwind and Eliasaf ...............................................................................18

(g)    Post-Petition Negotiations with the Secured Lender ...............................................19

(h)    Post-Petition Negotiations with the Union ..............................................................21

(i)    Potential Sale of Substantially All of the Debtor's Assets ......................................21

(j)    Post-petition Negotiations with Ace .......................................................................23

V.    GENERAL DESCRIPTION OF THE PLAN AND TREATMENT OF SECURED LENDER AND ACE SECURED CLAIMS THEREUNDER......................24

(a)    Summary of Plan Implementation Transactions.......................................................25

(b)    Material Terms of the Plan ......................................................................................25

(c)    Summary of Treatment of Claims and Interests Under the Plan ...........................26

VI.    PLAN VOTING INSTRUCTIONS AND PROCEDURES, AND SOLICTIATION..................................................................................................................27

(a)    Voting Rights ...........................................................................................................27

    1.    Classes 1 (Other Priority Claims), 2 (Other Secured Claims), 5 (Mechanic's Lien Bonds Claims), 6 (Mechanic's Lien Claims) and 9 (Existing Equity Holder Interests in Debtor)............................................28

    2.    Classes 3 (Secured Lender Claim), 4 (Ace Secured Claim), 7 (Union Claims) and 8 (General Unsecured Claims)..................................28

(b)    Solicitation Materials ..............................................................................................28

(c)    Plan Voting Instructions and Procedures ................................................................29

VII.    SUMMARY OF THE CHAPTER 11 PLAN .......................................................................31

(a)    Administrative Claims and Priority Tax Claims......................................................31

    1.    Administrative Claims ...............................................................................31

        i.    Administrative Claims ...................................................................31

        ii.    Administrative Claims Bar Date ....................................................31

    2.    Professional Fee Claims.............................................................................32

        i.    Final Fee Applications and Payment of Professional Fee Claims .............................................................................................32

        ii.    Professional Fee Escrow Account .................................................32

        iii.    Professional Fee Reserve Amount .................................................33

        iv.    Post-Confirmation Date Fees and Expenses ..................................33

    3.    Priority Tax Claims....................................................................................33

4.    Statutory Fees........................................................................34

(b)    Classification and Treatment of Claims and Interests ...........................34

1.    Classification of Claims and Interests.........................................34

2.    Summary of Classification.........................................................34

3.    Treatment of Claims and Interests ..............................................35

    i.    Class 1 — Other Priority Claims ......................................35

    ii.    Class 2 — Other Secured Claims.....................................36

    iii.    Class 3 — Secured Lender Claim.....................................36

    iv.    Class 4 —Ace Secured Claim..........................................37

    v.    Class 5 — Mechanic's Lien Bond Claims .....................37

    vi.    Class 6 —Mechanic's Lien Claims..................................38

    vii.    Class 7 — Union Claims...................................................38

    viii.    Class 8 — General Unsecured Claims.............................39

    ix.    Class 9 — Existing Equity Holder Interests in Debtor .................39

4.    Special Provision Governing Unimpaired Claims .....................39

5.    Voting Classes; Presumed Acceptance by Non-Voting Classes.............39

6.    Acceptance by Impaired Classes ................................................40

7.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.........40

8.    Subordinated Claims .................................................................40

9.    Elimination of Vacant Classes ..................................................40

10.    Controversy Concerning Impairment ......................................41

(c)    Means for Implementation of the Plan....................................................41

1.    General Settlement of Claims and Interests...............................41

2.    Exemption from Certain Transfer Taxes and Recording Fees.................41

3.    Retained Causes of Action and Dismissal of Litigation ...........................42

4.    Plan Implementation Transactions.............................................43

5.    Secured Lender Consent Rights.................................................43

6.    The Reorganization ....................................................................44

    i.    Sources of Consideration for Plan of Reorganization Distributions..................................................................44

    ii.    Reinstatement of Existing Equity Holder Interests and Cancellation of Other Agreements and Interests ..........................44

    iii.    Reorganized Debtor Governance Documents.............................45

|  |  | iv. | Approved Loan Documents | 45 |
|  |  | v. | Ace Subordinated Note | 46 |
|  |  | vi. | Corporate Existence | 46 |
|  |  | vii. | Vesting of Assets | 46 |
|  |  | viii. | Plan Administrator | 47 |
|  |  | ix. | Corporate Action | 47 |
|  |  | x. | Sole Manager of the Reorganized Debtor | 48 |
|  |  | xi. | Effectuating Documents; Further Transactions | 48 |
|  |  | xii. | Indemnification Provisions | 48 |
|  | 7. | Closing the Chapter 11 Case | | 49 |
| (d) | Treatment of Executory Contracts and Unexpired Leases | | | 49 |
|  | 1. | Assumption and Rejection of Executory Contracts and Unexpired Leases | | 49 |
|  | 2. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | | 51 |
|  | 3. | Claims Based on Rejection of Executory Contracts and Unexpired Leases | | 52 |
|  | 4. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | | 52 |
|  | 5. | Reservation of Rights | | 53 |
| (e) | Provisions Governing Distributions | | | 53 |
|  | 1. | Timing and Calculation of Amounts to Be Distributed | | 53 |
|  | 2. | Disbursing Agent | | 53 |
|  | 3. | Rights and Powers of Disbursing Agent | | 53 |
|  |  | i. | Powers of the Disbursing Agent | 53 |
|  |  | ii. | Expenses Incurred On or After the Effective Date | 53 |
|  | 4. | Delivery of Distributions | | 54 |
|  |  | i. | Delivery of Distributions in General | 54 |
|  |  | ii. | Undeliverable Distributions and Unclaimed Property | 54 |
|  |  | iii. | Minimum Distributions | 55 |
|  | 5. | Compliance with Tax Requirements/Allocations | | 55 |
|  | 6. | No Postpetition or Default Interest on Claims | | 55 |
|  | 7. | Allocation Between Principal and Interest | | 55 |
|  | 8. | Setoffs and Recoupment | | 55 |

9. Surrender of Canceled Instruments or Securities.........................56

10. Claims Paid or Payable by Third Parties ..................................56

    i. Claims Paid by Third Parties ........................................56

    ii. Applicability of Insurance Policies ................................56

(f) The Plan Administrator.................................................................57

1. The Plan Administrator.......................................................57

    i. Plan Administrator Rights and Powers .........................57

    ii. Retention of Professionals ...........................................58

    iii. Compensation of the Plan Administrator.......................58

    iv. Plan Administrator Expenses .......................................58

2. Indemnification, Insurance and Liability Limitation ...............59

3. Tax Returns .......................................................................59

(g) Procedures for Resolving Disputed, Contingent, and Unliquidated Claims and Interests ..............................................................................59

1. Allowance of Claims and Interests ......................................59

2. Claims and Interests Administration Responsibilities .............59

3. Estimation of Claims.........................................................60

4. Adjustment to Claims and Interests Without Objection ..........60

5. Time to File Objections to Claims .......................................60

6. Disallowance of Claims .....................................................60

7. Amendments to Proofs of Claim.........................................61

8. No Distributions Pending Allowance ..................................61

9. Distributions After Allowance ...........................................61

(h) Settlement, Release, Injunction, and Related Provisions...................61

1. Discharge of Claims and Termination of Interests and Controversies .....................................................................61

2. Release of Liens ...............................................................62

3. Releases by the Debtor.......................................................62

4. Releases by Holders of Claims and Interests ........................64

5. Exculpation .....................................................................65

6. Injunction ........................................................................65

7. Protection Against Discriminatory Treatment .......................66

8. Term of Injunctions of Stays...............................................66

          9.       Document Retention ...................................................................67

     (i)   Conditions Precedent to Consummation of the Plan ............................67

          1.       Conditions Precedent to the Effective Date ...............................67

          2.       Waiver of Conditions.................................................................68

          3.       Effect of Non-Occurrence of Conditions to the Effective Date...............68

          4.       Substantial Consummation ........................................................68

VIII.   RISK FACTORS ...............................................................................................68

     (a)   The Bankruptcy Court Declines to Approve the Secured Lender
           Settlement Agreement; a Termination Event Occurs with Respect to the
           Secured Lender Settlement Agreement ................................................68

     (b)   If Holders of General Unsecured Claims Vote to Reject the Plan, then the
           Debtor Will Not be Able to Implement the Reorganization ...................69

     (c)   The Debtor Does Not Reach an Agreement with the Union ..................69

     (d)   The Union's Position Regarding the Plan.............................................69

     (e)   The Debtor Will Consider All Available Restructuring Alternatives if the
           Reorganization is not Implemented, and Such Alternatives May Result in
           Lower Recoveries for Holders of Claims Against and Interests in the
           Debtor ....................................................................................................70

     (f)   Certain Bankruptcy Law Considerations ..............................................71

     (g)   Parties May Object to the Plan's Classification of Claims and Interests...............71

     (h)   The Conditions Precedent to the Effective Date of the Plan May Not
           Occur.......................................................................................................71

     (i)   Failure to Satisfy Vote Requirements ...................................................71

     (j)   The Debtor May Not Be Able to Secure Confirmation of the Plan.......71

     (k)   Nonconsensual Confirmation.................................................................72

     (l)   The Debtor May Object to the Amount or Classification of a Claim...................72

     (m)   Risk of Non-Occurrence of the Effective Date......................................73

     (n)   Contingencies Could Affect Votes of Impaired Classes to Accept or Reject
           the Plan....................................................................................................73

     (o)   Releases, Injunctions, and Exculpations Provisions May Not be Approved.........73

     (p)   General Unsecured Creditors May Recover Less Than Projected.........73

     (q)   Risks Related to Income Taxation .........................................................73

     (r)   Litigation................................................................................................74

     (s)   Even if the Plan Implementation Transactions are Successful, the Debtors
           Will Continue to Face Risks. ................................................................74

31582062.1

IX.    CONFIRMATION OF THE PLAN ................................................................. 74

    (a)    The Confirmation Hearing ................................................................. 74

    (b)    Requirements for Confirmation of the Plan ...................................... 75

    (c)    Best Interests of Creditors ................................................................ 76

    (d)    Feasibility ......................................................................................... 76

    (e)    Acceptance by Impaired Classes ...................................................... 77

    (f)    Confirmation Without Acceptance by All Impaired Classes .............. 77

        1.    No Unfair Discrimination ........................................................ 77

        2.    Fair and Equitable Test .......................................................... 77

    (g)    Alternatives to Confirmation and Consummation of the Plan ............. 78

X.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES ............ 78

    (a)    Certain Tax Consequences to Holders of Claims ................................ 80

    (b)    Certain Tax Consequences to the Debtor ............................................. 81

        1.    Federal Taxation Issues Related to Corporations and Pass-Through Entities in General ...................................................................... 81

        2.    Cancellation of Indebtedness Income ...................................... 82

    (c)    Importance of Obtaining Professional Tax Assistance ........................ 83

XI.    RECOMMENDATION ............................................................................ 83

31582062.1

## **EXHIBITS**

EXHIBIT A    Third Amended Chapter 11 Plan of 225 Bowery LLC Pursuant to Chapter 11 of
the Bankruptcy Code
EXHIBIT B    Liquidation Analysis
EXHIBIT C    Financial Projections
EXHIBIT D    Ace Settlement and Amendment to Ace Settlement
EXHIBIT E    Secured Lender Settlement Agreement

| |
|---|
| **\*\*\*THE DEBTOR ADOPTS AND INCORPORATES THE EXHIBITS ATTACHED HERETO BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN\*\*\*** |

31582062.1

## I.    **INTRODUCTION**

225 Bowery LLC (the "Debtor" or "Company") in the above-captioned chapter 11 case (the "Chapter 11 Case") hereby submits this further revised disclosure statement (as amended, supplemented and modified from time to time, the "Disclosure Statement"), pursuant to sections 1125 and 1126(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), in connection with the solicitation of votes on the *Third Amended Chapter 11 Plan of 225 Bowery LLC Pursuant to Chapter 11 of the Bankruptcy Code*, dated April 18, 2024, (as amended, supplemented and modified from time to time, the "Plan").  A copy of the Plan is attached hereto as **Exhibit "A"**.[2]

The purpose of the Disclosure Statement is to enable creditors whose Claims are Impaired under the Plan and who are entitled to vote on the Plan to make an informed decision in exercising their right to accept or reject the Plan and grant certain releases provided therein.  The Disclosure Statement sets forth certain information regarding, among other things, the Debtor's prepetition operating and financial history, its reasons for seeking protection under chapter 11 of the Bankruptcy Code, the course of the Chapter 11 Case, and the disposition of the Debtor's assets.  The Disclosure Statement also describes, among other things, certain terms and provisions of the Plan (including the compromises and settlements provided for in the Plan), certain effects of Confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan.  In addition, the Disclosure Statement discusses, among other things, the Confirmation process and the voting and election procedures that Holders of Claims entitled to vote under the Plan must follow for their votes on the Plan to be counted and their elections with respect to releases under Article IX of the Plan, as applicable, to be effective.

As explained more fully in Article V below and in Article III of the Plan, the table below summarizes the treatment of each Class of Claims and Interests and projected recoveries with respect thereto.  The classification, treatment, and projected recoveries of classified Claims are described in summary form below for illustrative purposes only, are estimates, and are subject to material change.

| Class | Claim | Status | Voting Rights | Projected Recovery Under Plan |
|-------|-------|--------|---------------|-------------------------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote | 100% |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote | 100% |
| 3 | Secured Lender Claim | Impaired | Entitled to Vote | 100% |

---

[2]    Unless otherwise noted, all capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between the summary herein and the Plan, the Plan shall govern.

| Class | Claim | Status | Voting Rights | Projected Recovery Under Plan |
|-------|-------|--------|---------------|-------------------------------|
| 4 | Ace Secured Claim | Impaired | Entitled to Vote | 28.6% – 37% |
| 5 | Mechanic's Lien Bond Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 6 | Mechanic's Lien Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 7 | Union Claims | Impaired | Entitled to Vote | To be agreed upon by the Debtor and Union.[3] |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote | 27.5%[4] |
| 9 | Existing Equity Holder Interests in Debtor | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |

## II. THE DEBTOR'S BUSINESS OPERATIONS, AND CORPORATE AND CAPITAL STRUCTURES

Additional information regarding the Debtor's business, its capital structure and the circumstances leading to the filing of this Chapter 11 Case is set forth in the *Declaration of Nat Wasserstein, Chief Restructuring Officer of 225 Bowery LLC, in Support of Debtor's Petition and First Day Motions* [D.I. 19] (the "First Day Declaration").

---

[3] Projected recovery to the Union is dependent upon, among other things, the Debtor and Union reaching an agreement with regard to the CBA and all claims related thereto. As of the date hereof, the Debtor and the Union are engaging in discussions regarding a potential resolution of their disputes, but no such agreement has been achieved.

[4] Projected recovery to the holders of General Unsecured Claims assumes that (i) all Insider General Unsecured Claims that are currently included in Class 8 have been expunged, disallowed and/or subordinated to all other Claims in their entirety and (ii) the total amount of Allowed General Unsecured Claims will be less than or equal to $4,111,654.55, which is the Debtor's current estimate of the size of Allowed General Unsecured Claims. The Plan provides that Class 8 (General Unsecured Claims) will receive Cash payments equal to the lesser of (a) $1,130,705, or (b) an amount sufficient to provide a twenty seven and one half percent (27.5%) recovery on account of each Allowed General Unsecured Claim, as described in Article III.C.8. of the Plan.

(a)   *Corporate Structure*

The Debtor was incorporated in 2019 in Delaware.  The Debtor itself is wholly owned by 225 Bowery Group, LLC ("Bowery Group").  The Debtor is the owner a hotel property (the "Hotel") located at 223-225 Bowery, New York, New York.

(b)   *The Debtor's Prepetition Business and Operations*

Prior to January 24, 2023 (the "Petition Date"), the Debtor owned and operated the Hotel. The Debtor continues to own and operate the Hotel during the Chapter 11 Case.  Located on the Lower East Side of Manhattan, the Hotel is properly described as a micro hotel boutique.  The Hotel, now known as "Untitled at 3 Freeman Alley," has approximately two hundred fully functional, high-finished guest rooms whose square footage is less than a typical hotel room, along with communal spaces and restaurants which play an important role in guest engagement. The Hotel is positioned to cater to budget conscious millennials who are willing to exchange guest room size for the experience of a lifestyle hotel at an affordable price.  The facility includes the Hotel, a restaurant, lobby bar, and rooftop space, each of which provide services to the Hotel and can generate revenue for the Debtor separate and apart from Hotel occupancy revenue. Reservations at the Hotel are currently made through Airbnb, Inc. ("Airbnb"), the Debtor's exclusive booking channel from on or about August 2021 through on or about February 2023. Reservations can additionally be made through the Hotel's direct booking website, expedia.com, booking.com, and mrandmrssmith.com.  The Hotel is fully compliant with New York City (the "City") zoning rules and regulations.

1.   Management of the Hotel

i.   **Ace Management**

Construction of the Hotel was largely completed in 2019, and its doors opened shortly thereafter.  Ace Group Bowery LLC ("Ace Management"), an operating company that is part of a larger corporate family headed by Ace International LLC ("Ace International" and together with Ace Management, "Ace"), began operating and managing the Hotel under the "Sister City" brand from its opening, pursuant to a hotel management agreement (the "Hotel Management Agreement"), dated on or about July 22, 2014, between Ace Management, on the one hand, and non-Debtor entities KAL Realty Partners LLC ("KAL"), TLLULE LLC ("TLLULE"), and VNAA LLC ("VNAA"), on the other hand.  In connection with the 2019 financing of the Hotel, as more fully discussed below, the Hotel Management Agreement was thereafter assigned to the Debtor.

From the beginning, Ace Management and the Debtor were at odds over the management strategy employed by Ace Management.  The Hotel's performance in its first year under Ace Management was dramatically below pre-opening projections, having generated only $2,500,000.00 in revenue against a projected $7,900,000.00, which necessitated significant capital infusions.  Unfortunately, the Hotel's difficult start was worsened when, on or about March 11, 2020, the World Health Organization declared the novel coronavirus outbreak a global pandemic.

### ii.    COVID-19 and its Impact on the Hotel

The COVID-19 global pandemic dramatically worsened what was already a difficult start for the Hotel.  Federal and State mandates required a range of precautions to battle the pandemic, from "stay at home" orders, to prohibitions on public gatherings, to quarantines, to the full closure of bars, restaurants, and travel bans, among other precautions.  The full effect of the shutdown was felt as a complete shutdown for the hospitality industry, including the Hotel.  The Hotel, along with others around New York City, was effectively required to completely suspend all services and temporarily close its doors, forcing the Debtor to reduce operations to subsistence levels in order to maintain crucial operations within the building.

Faced with limited options and constrained greatly by the pandemic that was affecting the world on a scale not seen in recent memory, the Debtor secured a deal with the City to pair with Bowery Residents' Committee, Inc. (www.brc.org), a City funded not-for-profit to provide its clients with pandemic suitable, less crowded housing to stop the spread of COVID-19.  The Debtor leased housing to unsheltered individuals, leasing all two hundred of the Hotel's rooms at a rate of $110.00/day, generating approximately $660,000.00 in gross revenue per month for the Debtor when, otherwise, revenue would have been essentially zero.  The lease initially contemplated a four-month term, with both sides having the right to terminate.  The lease was renewable and signed on or around June 4, 2020 (the "City Use Agreement").

Ace Management was opposed to the Debtor's entry into the City Use Agreement and asserted that the deal with the City breached the Hotel Management Agreement.  This dispute was ultimately referred to and resolved through arbitration, which is discussed below.  In light of the change in relationship with Ace Management, on or about June 4, 2020, the Debtor retained BHT Management LLC ("BHT Management") to operate the Hotel.  BHT Management operated the Hotel through the life of the City Use Agreement, ultimately bringing in approximately $6,000,000.00 in revenue over eleven months.  Nonetheless, the Hotel's significant shortfall persisted.

As the City Use Agreement was expiring in June 2021, the Debtor and BHT Management continued to seek other opportunities for the Hotel to function in a manner that could generate revenue and limit operational costs.  Even though the severity of the COVID-19 global pandemic had lessened since early 2020, the hospitality industry as a whole was still struggling, and the future of hotels in the City was uncertain. The Debtor recognized that it must keep costs low and be creative in order to generate revenue

### iii.    Airbnb Conversion—Another Effort to Save The Hotel

In another effort to generate revenue, the Debtor decided to operate the Hotel as an Airbnb site.  So as to comply with City regulations to operate as an Airbnb site, the Hotel had to undergo certain renovations prior to operations.  The Airbnb related renovations were concluded in or around August 2021, which remodeled the rooms to facilitate longer-term stays and Airbnb reservations.

The Hotel has been successfully operating as an Airbnb site since around August 2021. From August 2021 and through December 2022, the Hotel generated revenue of approximately

31582062.1

$13,315,890.00 through the Airbnb platform. For calendar year 2023, the Hotel generated revenue of $14,553,377.86 (accrual basis) primarily through Airbnb and other online platforms, and for calendar year 2024 the Hotel is projected to generate revenue of approximately $16,888,256.49, also primarily through Airbnb and other online platforms.

**(c)    *The Debtor's Prepetition Capital Structure and Indebtedness***

### 1.    The Prepetition Secured Credit Facility

As of the Petition Date, the Debtor had a single layer of funded prepetition debt, consisting of the Loan Agreement (as defined and discussed more fully below). As of the Petition Date, the Debtor's outstanding obligations in respect thereof was estimated at $79,498,046.36.

Specifically, on March 4, 2019, the Debtor entered into that certain "Loan Agreement" with Bank Hapoalim B.M. ("BHI"), which is further evidenced by a Consolidated, Amended and Restated Promissory Note for up to $80,000,000.00 (the "Note"). The obligations under the Loan Agreement are referred to herein as the "Prepetition Secured Credit Facility." The Prepetition Secured Credit Facility is secured by a Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents and Security Agreement (the "Mortgage" and collectively with the Loan Agreement, Note and other Financing Documents (as that term is defined in the Loan Agreement), the "BHI Loan Documents"). The BHI Loan Documents and, in particular, the Mortgage, granted BHI a lien on and first priority security interest in "Personalty," which is defined in the Mortgage to include, the Hotel, Equipment and Accounts (the "BHI Security Interest"). On April 14, 2023, BHI filed a proof of claim (the "Prior Lender Proof of Claim") in the amount of $79,716,270.84.

On April 30, 2023, BHI transferred, assigned and conveyed to 225 Bowery Lender LLC (the "Secured Lender") all of its rights, powers, claims, liens, title, and security interests under the BHI Loan Documents and Final Cash Collateral Order (as defined below) (the "Transfer"). Consistent with the terms and conditions of the Transfer, on May 12, 2023, the Secured Lender filed a *Transfer of Claim Other than for Security*, pursuant to Rule 3001(e)(2) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), in the Chapter 11 Case, thereby providing notice of the Transfer [D.I. 170]. That same day, the Clerk of the Court entered the *Notice of Transfer of Claim* [D.I. 172], providing BHI with notice that the Secured Lender would be substituted as the original claimant pursuant to the Prior Lender Proof of Claim without further order of the Bankruptcy Court if no objections were received with respect thereto within twenty-one (21) days. No such objections were filed or received.

Upon information and belief, the Secured Lender was formed shortly before the Petition Date. The Secured Lender is owned by a group that includes an affiliate of Northwind RE LLP ("Northwind RE"). Northwind RE is an indirect owner of Bowery Group, the Debtor's sole member.

### 2.    Ace Arbitration Award

As previewed above, Ace Management opposed the Debtor's decisions to generate income through the City Use Agreement with the City and to partner with Airbnb. As a result, Ace

Management sought legal recourse alleging several claims for breach of the Hotel Management Agreement.

Pursuant to the Hotel Management Agreement, the Debtor and Ace Management were required to arbitrate as a means of dispute resolution. Prior to the Petition Date, an arbitration was conducted before a fast-track International Chamber of Commerce panel in New York City with a "merits hearing" taking place on June 17, 20, 21 and 22, 2022. The arbitration panel ultimately found that the Debtor breached certain contractual obligations under the Hotel Management Agreement and, pursuant to a Final Award dated September 22, 20222, awarded Ace Management damages in the amount of $10,474,628.18 (the "Arbitration Award"). The Arbitration Award reflected the discounted present value of all of the management fees that Ace Management would have collected through the term thereof had the Hotel Management not been repudiated by the Debtor.

### 3.    Unsecured Creditor Body

In the ordinary course of business, the Debtor incurs general unsecured debt on account of operational costs, related to, for example, equipment leases, certain goods and services procured on credit, and other trade claims, such as a small business administration loan. The largest potential unsecured claims are disputed claims arising from pending litigations or arbitrations. The Debtor does not have funded unsecured debt. As of the Petition Date, the Debtor had scheduled $4,079,717.00 in unsecured, non-insider debt and the Debtor's current estimate is that the size of the total amount of Allowed General Unsecured Claims will be $4,111,654.55.

### 4.    Union

Prior to the Petition Date, the Debtor agreed to be bound by the Industry-Wide Agreement ("IWA"), the collective bargaining agreement (the "CBA") between the Hotel and Gaming Trades Council, AFL−CIO (the "Union") and the Hotel Association of New York City, Inc. In March 2020, the Debtor laid off all of its employees due to the COVID-19 global pandemic. Thereafter, the Debtor then began operating the Hotel without the employees. The Union subsequently demanded an arbitration against the Debtor. On June 7, 2022, prior to the Petition Date, the arbitrator issued an arbitration award against the Debtor and in favor of the Union. The award directed that the Hotel cease and desist from allowing outside contractors to perform duties which were performed by bargaining unit employees, to recall such employees, and to make them whole for lost earnings. The Hotel was also directed to provide the Union with relevant records to determine backpay.

As discussed more fully herein, on April 14, 2023, the Union filed proof of claim 17 ("Proof of Claim No. 17") in the amount of $1,609.084.88, plus an unliquidated contingent claim for such other amounts. Through Proof of Claim No. 17, the Union asserts that the basis for the filing of its claim is for violations of the CBA and non-compliance with the arbitration award. The Union also asserts that a portion of Proof of Claim No. 17 is entitled to priority under 11 U.S.C. § 507(a)(4). The Union also filed proof of claim 18 ("Proof of Claim No. 18" and together with Proof of Claim No. 17, the "Union Claims") in the amount of $510,441.47, plus an unliquidated contingent claim for such other amounts. Through Proof of Claim No. 18, the Union asserts that the basis for the filing of its claim is for monthly benefit contributions on behalf of employees

employed by the Hotel before or prior to the Petition Date. The Union also asserts that a portion of Proof of Claim No. 18 is entitled to priority under 11 U.S.C. § 507(a)(5). The Debtor disputes that any amounts reflected in the Union Claims are entitled to priority and further disputes the amount of the Union Claims.

The Debtor reviewed and analyzed the Union Claims and believes that the Union Claims are General Unsecured Claims and should be Allowed in an amount substantially below the liquidated amount of such claims.

A further discussion on the Union's position and the Debtor's counter-position regarding the Plan, including the foregoing, is contained in Art. VIII below.

        5.    <u>Mechanics' Liens and Bonds</u>

Prior to the Petition Date, on or about May 21, 2018, New York Steel Erectors Inc. ("<u>New York Erectors</u>"), in connection with an action pending in the Supreme Court of the State of New York, New York County ("<u>N.Y. Supreme Court</u>"), captioned *New York Steel Erectors, Inc. v. AEH-VSLV, LLC et al.*, Index No. 653491/2018, against, among others, the Hotel's predecessor owners AEH-VSL, LLC, VNAA Bowery LLC, and TLLULE Bowery, LLC (collectively, the "<u>Predecessor Owners</u>"), filed a mechanic's lien (the "<u>NY Mechanic's Lien</u>") against the Hotel. On or about May 21, 2018, Westchester Fire Insurance Company issued a bond discharging the Mechanic's Lien (the "<u>Bond</u>").

Subsequent to the discharge of the NY Mechanic's Lien, the Hotel property was transferred in connection with an internal reorganization from the Predecessor Owners to Bowery Group. It is the Debtor's belief that the claim of New York Erectors, to the extent that New York Erectors has a claim, is subject to dispute, including, among other things, based upon the Debtor's position that the NY Mechanic's Lien has been discharged.

The Debtor has certain other mechanics lien release bonds that discharge additional mechanic's liens related to work performed on the Debtor's property. As with the Bond, the bond associated with the action pending in the N.Y. Supreme Court and filed by Open Architectural Products LLC *d/b/a* Open AWD ("<u>Open AWD</u>"), captioned *Open Architectural Products LLC d/b/a Open AWD v. AEH-VSLV LLC, et al.*, Index No. 154728/2019, arose prior to the transfer of the Hotel property in connection with the internal reorganization from the Predecessor Owners to Bowery Group. Relatedly, it is the Debtor's belief that the claim of Open AWD, to the extent that Open AWD has a claim, is subject to dispute, including, among other things, based upon the Debtor's position that Open AWD's mechanic's lien has been discharged. A bond also exists that secured a mechanics lien claims asserted by Culinary Depot, Inc. ("<u>Culinary Depot</u>"), which arose after the transfer of the Hotel property in connection with the internal reorganization from the Predecessor Owners to Bowery Group. The Debtor scheduled Depot's alleged claim with respect thereto as contingent, unliquidated and disputed. Notwithstanding such fact, Culinary Depot did not file a proof of claim prior to the General Bar Date (as defined below).

6.     Insider General Unsecured Claims

Omnia Properties LLC ("Omnia"), an entity that has an interest in Bowery Group, filed a proof of claim in the Debtor's Chapter 11 Case in the amount of $30,501,127.61 (the "Omnia Claim"). Bowery Group, David Paz ("Paz"), an individual who has an indirect interest in Bowery Group, and VNAA, an entity that also has an interest in Bowery Group, each filed proofs of claim against the Debtor, each in an undetermined amount (such proofs of claim, together with the Omnia Claim, the "Insider General Unsecured Claims"). The Debtor reviewed the Insider General Unsecured Claims and determined that it had several bases to seek disallowance and/or subordination of some or all of said claims. As is also more fully discussed below, projected recoveries to the holders of General Unsecured Claims in a Reorganization assumes that all Insider General Unsecured Claims that are currently included in Class 8 have been expunged, disallowed and/or subordinated to all other Claims in their entirety. As is also more fully discussed below, the Debtor, Paz, Omnia and related parties (collectively, the "Paz Parties") are currently in discussions regarding, among other things, the Insider General Unsecured Claims and the treatment of such claims under and pursuant to a global resolution of disputes between the Debtor and the Paz Parties. If these discussions result in an agreement prior to the Confirmation Hearing (as defined below), the Debtor expects that such agreement will provide for the expungement and/or subordination of the Insider General Unsecured Claims. If, however, these discussions do not result in an agreement between the Debtor and the Paz Parties, the Debtor intends to object to the Insider General Unsecured Claims by or prior to the Confirmation Hearing.

## III.   **EVENTS PRECIPITATING THE CHAPTER 11 CASE**

Despite the success and promise of certain initiatives aimed at positioning the Hotel for continued growth, a combination of legal setbacks and unfavorable macroeconomic conditions, including, at least initially, those most notably related to the COVID-19 global pandemic, an arbitration award in favor of Ace Management, and litigation centered on the Debtor's default under the BHI Loan Documents (as defined below), led to operational challenges that decreased revenue and increased costs for the Hotel.  The Debtor was able to withstand these liquidity impacts for some time due, in part, to various cost-saving and revenue generating measures, but long-term could not continue without significant operational changes and capital.  As a result, the Debtor began to consider strategic alternatives, including the potential filing of a chapter 11 case. Multiple factors contributed to the Debtor's need to commence the Chapter 11 Case.

### (a)     *Continued Troubled Outlook for Hospitality in New York City*

Prior to the Petition Date and for some period of time thereafter, the Debtor found itself in an industry still recovering from the COVID-19 global pandemic.  The hospitality industry in the City (and across the world) had not completely rebounded from the effects therefrom.  Indeed, some of these affects are still presently felt. As the virus continued to spread, uncertain economic conditions persisted, and unrest in parts of the world played out, there was a dramatic shift in the hospitality industry's outlook that saw a decrease in consumer hotel bookings.  Albeit slightly offset by increased average room rates as compared to 2019, hotels in the City and across the globe are faced a slowdown in consumer demand.

31582062.1

(b)   *BHI Foreclosure*

On or about October 27, 2021, BHI sent a Notice of Default to the Debtor with respect to the BHI loan, which provided that the Debtor had failed to make payment of principal and/or interest for the months of August, September, and October 2021, totaling more than $2 million in the aggregate.

When payment of the past due amounts was not received, BHI called an event of default under the BHI Loan Documents.  On or about November 3, 2021, BHI sent a Notice of Acceleration and Demand for Payment, which immediately called all amounts due and owing under the BHI Loan Documents, including the entire principal balance outstanding under the BHI loan along with any and all accrued interest at the default rate.

On or about April 28, 2022, BHI commenced a foreclosure action against the Debtor, Omnia, and Paz in the Supreme Court of the State of New York, County of New York (Index No. 850096/2022) (the "Foreclosure Action") along with a motion to appoint a receiver shortly thereafter (the "Foreclosure Receivership Motion").  The Debtor, Omnia and Paz subsequently moved to dismiss BHI's complaint. The motion to dismiss the complaint was granted in part, insofar as the second cause of action (appointment of a receiver) was dismissed, without prejudice, as against the Debtor, Omnia and Paz, and the third cause of action (against Guarantors) was dismissed, without prejudice, as against Omnia and Paz. As discussed more fully below, with respect to the Foreclosure Action, Ace removed its counterclaims against BHI and crossclaims against the Debtor to the Bankruptcy Court. The Foreclosure Action was stayed as a result of the commencement of the Chapter 11 Case.

(c)   *Northwind Litigation*

On or about May 17, 2022, Northwind RE, 225 Bowery NW PE LLC, 225 Bowery Holdings LLC, 225 Bowery Holdings II LLC, 225 Bowery Pref Equity LLC (collectively, with Northwind RE GP, LLC, Northwind RE Holdings, LLC, and 225 Bowery Mezz Lender LLC "Northwind") commenced a lawsuit against the Debtor, as a nominal defendant, and several non-Debtors—DSP Development LLC ("DSP") and Paz, as defendants, and KAL, TLLULE, VNAA, Bowery Group, as nominal defendants, by filing a complaint in the Supreme Court of the State of New York, County of New York (Index No. 656331/2022) (the "Northwind Action"). Contemporaneously with the filing of the complaint, Northwind submitted an order to show cause seeking to appoint a temporary receiver over the Debtor and certain non-Debtor affiliates (the "NW Receivership Motion" and together with the Foreclosure Receivership Motion, the "Receivership Motions").

The Debtor believes that all of the causes of action asserted by Northwind in the Northwind Action against DSP, Paz, KAL, TLLULE, and VNAA are property of, and otherwise belong to, the Estate. On August 18, 2023, the Debtor removed the Northwind Action to the United States District Court for the Southern District of New York (the "New York District Court"), Case No. 23-07342 (AT), pursuant to 28 U.S.C. §§ 1334(b) and 1452(a) and Bankruptcy Rule 9027, who automatically referred the removed Northwind Action to the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court") on or about October 30, 2023, Case No. 23-01194 (MEW).

On December 1, 2023, the Debtor filed a motion to transfer venue (the "Motion to Transfer Venue") of the Northwind Action from the New York Bankruptcy Court to the Bankruptcy Court on the basis, among others, that centralizing the adjudication of issues surrounding property of the Debtor's estate into a single court—*i.e.*, the Bankruptcy Court—is necessary and appropriate. On January 17, 2024, the New York Bankruptcy Court held a hearing on the Motion to Transfer Venue, following which the New York Bankruptcy Court granted the Debtor's Motion to Transfer Venue. On January 18, 2024, the New York Bankruptcy Court entered an order granting the Debtor's Motion to Transfer Venue, which transferred the Northwind Action to the Bankruptcy Court where it is currently pending as an adversary proceeding, Adv. No. 24-50006 (TMH).

> **(d)** *Receivership Motions*

Prior to the Petition Date, a consensual resolution of the Receivership Motions was reached by, among other things, entering into a stipulation (the "Stipulation") that provided, in relevant part:

- The Debtor was required to deposit into its checking account, maintained at BHI's New York branch (the "BHI Cash Account"), all funds in the Debtor's possession, custody or control at the time of the Stipulation or as of a date certain.

- From and after the date of the Stipulation, the Debtor was required take all steps necessary to have monies that are generated through the Debtor's operation of the Hotel deposited directly into the BHI Cash Account.

- The Debtor was prohibited from spending, distributing or otherwise disbursing any funds held in the BHI Cash Account, unless such expenditure was for the exclusive purpose of funding certain enumerated expenses set forth in Stipulation, *provided, however*, that such expense did not exceed the Approved Operating Expenses (as defined in the Stipulation).

- Any expense that was not an Approved Operating Expense required prior written approval by BHI and Northwind, *provided, however*, that prior approval was not required insofar as the Debtor sought to spend or distribute amounts from the BHI Account to unrelated third-party vendors/service providers up to a limit of $10,000.00.

- After accounting for Approved Operating Expenses or other distributions authorized pursuant to the Stipulation, any balance remaining in the BHI Account above $650,000.00 was required to be transferred to a separate account maintained at BHI's New York branch (the "BHI Suspense Account").

- The funds in the BHI Suspense Account were subject to application or release only by written consent of the parties to the Stipulation or further order of the court, *provided, however*, that if, after such a distribution, the remaining amount of funds in the BHI Cash Account were insufficient to pay for any Approved Operating Expenses, then the necessary funds to pay such Approved Operating Expenses were to be deposited into the BHI Cash Account.

The Debtor operated under the terms of the Stipulation from May 2022 through the Petition Date.

(e)      *Ace Litigation*

As noted above, prior to the Petition Date, Ace Management moved swiftly after the arbitration panel issued the Arbitration Award to seek confirmation thereof in the Supreme Court of the State of New York, County of New York.  Judgment on account of the Arbitration Award was entered against the Debtor on October 28, 2022 (the "Ace Judgment").

After entry of the Ace Judgment, Ace Management also initiated aggressive maneuvers, including issuing a number of statutory restraints on the accounts of the Debtor designed to "cut off" the Debtor's cash flow and life-line, to disrupt the Debtor's business.  Critically, Ace Management's strategy included placing a restraint on funds received on the Debtor's behalf by Airbnb.

Prior to the Petition Date, Ace Management also initiated litigation against the Debtor and various parties in business with the Debtor.  For example, Ace filed counterclaims in the Foreclosure Action against BHI seeking, among other things, damages and a declaratory judgment that the Ace Judgment has priority over the BHI Security Interest (the "Ace Counterclaims"). Additionally, Ace Management filed crossclaims (the "Ace Crossclaims") and third-party claims against, among others, the Debtor for purported fraudulent conveyance of millions of dollars that had been generated by the Hotel.  Ace also asserted crossclaims against, among others, the Debtor for declaratory relief, including, among other things, that (i) Ace has priority over BHI in the payment of its unpaid management fees and expenses from the Debtor's cashflow generated by the Hotel and in the BHI Suspense Account pursuant to the SNDA (as defined below), and (ii) Ace has the right under the SNDA to continue to look to the Hotel, the property of any future Purchaser in the Hotel, and the funds generated from the Hotel for the satisfaction of Ace's remedies under the Hotel Management Agreement, including, but not limited to, satisfaction of Ace's Judgment and Arbitration Award.

On January 20, 2023, BHI filed a motion to dismiss the Ace Counterclaims (the "BHI Motion to Dismiss"), which the Debtor filed a statement in support of shortly thereafter.  On May 22, 2023, the Debtor also filed an answer and counterclaims to the Ace Crossclaims (the "Debtor Counterclaims").  Ace filed its answer to the Debtor Counterclaims against them on June 12, 2023 (the "Ace Counterclaim Answer").  Both the Debtor Counterclaims and Ace Counterclaim Answer were filed in the SNDA Adversary Proceeding (as defined below).

On February 21, 2023, after the commencement of the Chapter 11 Case, Ace removed the Ace Counterclaims against BHI and Ace Cross claims against the Debtor to the New York District Court, pursuant to 28 U.S.C. § 1452(a) and Bankruptcy Rule 9027, which automatically referred such claims to the New York Bankruptcy Court.  On March 29, 2023, the New York Bankruptcy Court transferred venue to the Bankruptcy Court, which initiated the adversary proceeding captioned, *Bank Hapoalim, B.M. v. 225 Bowery LLC, et al.*, Adv. No. 23-50323 (TMH) (the "SNDA Adversary Proceeding").  A hearing on the BHI Motion to Dismiss in the SNDA Adversary Proceeding has been adjourned from time to time.

## IV.      EVENTS DURING THE BANKRUPTCY CASE

### (a)   *Chapter 11 Goals and Engagement of the CRO*

Prior to the Petition Date, the Debtor, in consultation with its professional advisors, diligently evaluated a range of strategic alternatives to address the near-term liquidity challenges created by the COVID-19 global pandemic and the effects of prepetition litigations and failed professional relationships with BHI and Ace.  To address these challenges, the Debtor and its professional advisors, after considering all available strategic options, determined that the best course of action was to commence the Chapter 11 Case in order to, among other things, explore a robust and independent marketing and sale process to preserve and maximize the value of the Debtor's Estate.  To that end, the Debtor, among other things, engaged Lindenwood Associates, LLC ("Lindenwood") to provide Nat Wasserstein as chief restructuring officer (the "CRO") while at the same time pursuing terms consistent with a consensual restructuring of the Debtor's obligations.

Following the appointment of the Debtor's CRO, the Debtor embarked on the intensive process of achieving a successful turnaround in the Chapter 11 Case.  This process required the Debtor's newly appointed CRO to take on the substantial task of learning about all elements of the Debtor's business and operations and consumed substantially all of the early months of the Chapter 11 Case.  As a result thereof, the Debtor: (i) stabilized its business operations in order to maximize the value of the Estate for the benefit of all stakeholders; (ii) responded to numerous creditor inquiries and demands; (iii) obtained consensual use of cash collateral to address its liquidity needs during the Chapter 11 Case; (iv) obtained relief that enabled the Debtor to continue operating its business in the ordinary course, including obtaining approval to pay certain critical vendors and prepetition claims thereof; (v) obtained court approval for the establishment of a claims bar date and began the review of filed proofs of claim; (vi) actively participated in litigations pending before the Bankruptcy Court; (vii) engaged in discussions and negotiations with key stakeholders regarding a successful restructuring and exit from bankruptcy; and (viii) generally navigated and handled the myriad other tasks related to the administration of the Estate and Chapter 11 Case.

### (b)   *First Day Relief and Subsequent Cash Collateral Orders*

On the Petition Date, the Debtor filed certain "first day" motions and applications with the Bankruptcy Court seeking certain immediate relief to aid in the efficient administration of the Chapter 11 Case, including the Cash Collateral Motion (as defined below).  The Bankruptcy Court held hearings on these first day motions and entered a series of customary orders in connection therewith.

The Debtor filed a motion seeking interim and final approval of the Debtor's use of cash collateral on a consensual basis with BHI [D.I. 20] (the "Cash Collateral Motion").  On January 31, 2023, the Bankruptcy Court entered an order approving the Cash Collateral Motion on an interim basis [D.I. 46].  On March 14, 2023, the Bankruptcy Court entered a final order approving the Cash Collateral Motion [D.I. 113] (the "Final Cash Collateral Order").

On October 18, 2023, the Debtor filed a motion for entry of an order seeking to supplement the Final Cash Collateral Order and granting additional adequate protection to the Secured Lender [D.I. 316] (the "Supplemental Cash Collateral Motion").  Prior to the Petition Date, the Debtor negotiated the consensual use of cash collateral with the Secured Lender's predecessor, BHI, in

exchange for an adequate protection package. Following the Secured Lender's acquisition of the BHI Loan Documents, as discussed more fully above, a number of disputes arose between the Debtor and the Secured Lender with respect to, among other things, the amount of the Secured Lender's secured claim as of the Petition Date, the Secured Lender's entitlement to default interest, and whether the adequate protection package approved by BHI was sufficient under the circumstances. Following productive discussions regarding the ongoing use of cash collateral as part of a global resolution of all of their disputes and the potential structure for the Debtor's exit from the Chapter 11 Case, the parties reached an agreement to make an adequate protection payment in the amount of $1,000,000.00 to the Secured Lender (the "Adequate Protection Payment"). On November 2, 2023, the Bankruptcy Court entered an order approving the Supplemental Cash Collateral Motion [D.I. 332] (the "Supplemental Cash Collateral Order"), which authorized and directed the Debtor to make the Adequate Protection Payment.[5] Consistent with the Supplemental Cash Collateral Order, the Debtor made the Adequate Protection Payment to the Secured Lender on or about November 3, 2023.

On January 9, 2024, the Debtor filed a motion for entry of an order supplementing the existing cash collateral orders and granting the Secured Lender additional adequate protection [D.I. 397] (the "Second Supplemental Cash Collateral Motion"). Through the Second Supplemental Cash Collateral Motion, the Debtor requested that the Bankruptcy Court grant the Debtor the authority to make an additional adequate protection payment up to $4,000,000.00 (the "Second Adequate Protection Payment") *provided* that: (i) the Secured Lender submits a ballot accepting the Plan; (ii) the Secured Lender supports confirmation of the Plan; and (iii) the Debtor and the Secured Lender reach agreement on the Approved Loan Documents (or any such other loan documents necessary to implement the treatment of the Secured Lender Claim under the Plan) and such documents are filed with the Bankruptcy Court. On January 18, 2024, the Bankruptcy Court entered an order granting the Second Supplemental Cash Collateral Motion [D.I. 405] (the "Second Supplemental Cash Collateral Order"). Pursuant to the terms of the Secured Lender Settlement Agreement, on April 19, 2024, the Debtor waived certain of the conditions contained in the Second Supplemental Cash Collateral Order (as the Debtor was authorized to do) and made the Tranche 1 Payment (as defined in the Secured Lender Settlement Agreement) in the amount of $1,250,000.00 to the Secured Lender pursuant to the authority provided to it under the Second Supplemental Cash Collateral Order.

**(c)**    *Debtor's Preference Action Against Ace*

On the Petition Date, the Debtor also initiated an adversary proceeding by filing a complaint (the "Complaint") against Ace (the "Ace Preference Adversary Proceeding"). Through the Complaint, the Debtor sought to avoid the Ace Judgment as a preferential transfer of the Debtor's interest in property that occurred during the ninety-day period prior to the Petition Date, pursuant to 11. U.S.C. § 547(b). On March 28, 2023, Ace filed its answer and affirmative Defenses.

On or about June 5, 2023, Ace and the Debtor conferred on a proposed scheduling order governing discovery and other matters in the Ace Preference Adversary Proceeding [Adv. D.I. 19],

---

[5]    The Final Cash Collateral Order continues to remain in full force and effect except as specifically modified by the Supplemental Cash Collateral Order and the Second Supplemental Cash Collateral Order (as defined below).

which has since been amended from time to time [Adv. D.I. 37, 40, 42 and 44] (collectively, the "Ace Scheduling Order").  Pursuant to the Ace Settlement (as defined and discussed more fully below), including an amendment thereto, the Ace Scheduling Order was amended to, among other things, hold the Ace Preference Adversary Proceeding in abeyance during the Standstill Period (as defined therein) [Adv. D.I. 42 and 44].

The Ace Scheduling Order governs discovery and other matters in the Ace Preference Adversary Proceeding. Consistent with the Ace Scheduling Order, the parties have, among other things, exchanged initial disclosures and written fact discovery, and document discovery has commenced.  Pursuant to the Plan, and in accordance with the Ace Settlement, on the Effective Date, the Plan will provide for a release to Ace for, among other things, any claims, debts, or other liabilities related to, the Ace Preference Adversary Proceeding.

      **(d)**    *Additional Orders*

Shortly after the Petition Date, the Debtor also filed a number of customary motions and applications to retain professionals and to streamline the administration of the Chapter 11 Case. The Bankruptcy Court entered the following orders granting such motions and applications:

- *Order (I) Establishing Deadlines for Filing Proofs of Claim and (II) Approving the Form, Timing, and Manner of Notice Thereof* [D.I. 95];

- *Order Authorizing the Retention and Employment of Alston & Bird LLP as Counsel for the Debtor, Effective as of the Petition Date* [D.I. 102];

- *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [D.I. 103];

- *Order (I) Authorizing the Employment and Retention of Lindenwood Associates, LLC, to Provide a Chief Restructuring Officer for the Debtor, Effective as of the Petition Date; and (II) Granting Related Relief* [D.I. 104];

- *Order Authorizing the Retention and Employment of Young Conaway Stargatt & Taylor, LLP as Bankruptcy Co-Counsel for the Debtor, Effective as of the Petition Date* [D.I. 105]; and

- *Order (I) Authorizing the Debtor to Retain and Compensate Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [D.I. 136].

- *Orders Extending the Time Period Within Which the Debtor May Remove Actions* [D.I. 161, 288, 365 and 442].

- *Orders Pursuant to Section 1121(d) of the Bankruptcy Code Extending the Exclusive Periods Within Which the Debtor May File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 185, 281 and 392].[6]

### (e)   *Claims Process and Bar Dates*

#### 1.   Schedules and Statement of Financial Affairs

The Debtor filed its Schedules and Statements of Financial Affairs (collectively, the "Schedules") on March 13, 2023 [D.I. 107 and 108]. On March 15, 2023, the Debtor filed an amended Statement of Financial Affairs [D.I. 116]. On April 24, 2023, the Debtor filed amendments to certain of the Schedules [D.I. 156].

#### 2.   Claims Bar Dates

On February 21, 2023, the Bankruptcy Court entered the Bar Date Order providing that, except as otherwise provided therein, the deadline for (a) all persons or entities (including, without limitation, individuals, partnerships, corporations, joint ventures and trusts) that assert a claim, as defined in section 101(5) of the Bankruptcy Code, against the Debtor, including without limitation, any claims under section 503(b)(9) of the Bankruptcy Code, secured claims and priority claims, which arose prior to the Petition Date, to file a proof of any such claim was 5:00 p.m. (prevailing Eastern Time) on April 14, 2023 (the "General Bar Date"); and (b) all governmental units, as defined in section 101(27) of the Bankruptcy Code, to file a proof of any such claim was 5:00 p.m. (prevailing Eastern Time) on July 24, 2023 (the "Government Bar Date").

The Bar Date Order also provides that if the Debtor amends or supplements the Schedules subsequent to the date of service of the Bar Date Notice (as defined in the Bar Date motion [D.I. 66], then the Debtor shall give notice of any such amendment or supplement to the holders of claims affected thereby, and such holders shall be afforded the later of (a) the applicable Bar Date or (b) 5:00 p.m. (prevailing Eastern Time) on the date that is twenty-one (21) days from the date on which such notice is given, to file proofs of claim in respect of their claims (the "Supplemental Bar Date").

Additionally, pursuant to the Bar Date Order, except as otherwise provided by another order of the Bankruptcy Court, any person or entity that holds a claim arising from the rejection of an executory contract or unexpired lease (a "Rejection Damages Claim") must file a proof of claim on account of such Rejection Damages Claim on or before the later of (a) the General Bar Date or (b) 5:00 p.m. (prevailing Eastern Time) on the first business date that is thirty (30) days after any such counterparty or other party in interest is served with notice of the order approving the rejection of the executory contract or unexpired lease (the "Rejection Damages Bar Date" and collectively with the General Bar Date, the Government Bar Date and the Supplemental Bar Date, the "Bar Dates").

---

[6]   On February 16, 2024, the Debtor filed the *Fourth Motion of the Debtor for Entry of an Order Further Extending the Time Period Within Which the Debtor May Remove Actions* [D.I. 429] (the "Fourth Exclusivity Motion"), which remains pending before the Bankruptcy Court.

Notice of the Bar Dates was provided by mail and publication in accordance with the procedures outlined in the Bar Date Order.

3.      Claims Reconciliation

Twenty-one (21) proofs of claim have been filed against the Estate.  As of the date of the Disclosure Statement, inclusive of amounts set forth in the Schedules and not superseded by filed proofs of claims, there are approximately $130,697,581.77 in Claims asserted against the Debtor and its Estate, including approximately $34,753,546.47[7] in General Unsecured Claims. The chart immediately below summarizes the foregoing. *However, this amount does not reflect the actual liabilities owed by the Debtor, because, among other things, certain of these Claims are invalid claims for various reasons, including being filed after the applicable Bar Date, and are not likely to be Allowed Claims.* The Claims that remain pending and unsatisfied against the Debtor as of the date hereof are, except as otherwise noted herein or in the Plan, accounted for in the Liquidation Analysis (as defined below) attached hereto.  As explained in the Plan and more fully below, the analysis reflects certain assumptions regarding, among other things, proofs of claim that are contingent and/or disputed, certain proofs of claim that have been filed in partially or wholly unliquidated amounts, and certain proofs of claim that assert invalid claims that are not likely to be Allowed Claims.  Because of these and other reasons, the amount of Claims against the Estates that will ultimately become Allowed Claims remains uncertain, but the Liquidation Analysis represents the best estimate of the Debtor at this time.

| Claimant | Proof of Claim/Schedule[8] | Estimated Amount[9] |
|---|---|---|
| Secured Lender | Claim No. 16 | $79,498,046.36 |
| Ace | Claim No. 10 | $10,474,628.18 |
| Other Secured Creditors | Claim No. 20 | $15,895.35 |
| Mechanic's Lien Bond | Claim No. 19 | $2,014,128.08 |
| Mechanic's Lien | Claim No. 1 and 5; Schedule E/F | $1,821,820.98 |

---

[7]     The amount listed above is inclusive of the Insider General Unsecured Claims described more fully herein. Projected recovery to the holders of General Unsecured Claims assumes that all Insider General Unsecured Claims that are currently included in Class 8 have been expunged, disallowed and/or subordinated to all other Claims in their entirety.

[8]     The Debtor is continuing to review all filed Proofs of Claim and its books and records.  The information contained in this summary chart is the Debtor's current estimate of claim amounts associated with the various Plan classes, which is subject to change.

[9]     The below amounts include claimed amounts that the Debtor believes will be disallowed.

| Claimant | Proof of Claim/Schedule[8] | Estimated Amount[9] |
|---|---|---|
| General Unsecured Creditors | Claim Nos. 2, 3, 4, 6, 7, 8, 9, 11, 12, 13, 14 15, and 21; Schedule E/F | $34,753,536.47[10] |
| Union | Claims No. 17 and 18 | $2,119,526.35 |
| | **Total** | **$130,697,581.77** |

The claims reconciliation process is ongoing. As discussed more fully above, the Debtor intends to object to the proof of claim of New York Erectors based upon, among other things, the fact that the NY Mechanic's Lien was discharged and that any claim would be a claim against the Predecessor Owners, who are non-Debtor entities. The Debtor also intends to object to the claim filed by Open AWD based upon the fact, among others, that Open AWD's mechanic's lien was discharged. As discussed more fully above, the Debtor intends to object to the Insider General Unsecured Claims by or prior to the Confirmation Hearing if discussions between the Debtor and the Paz Parties do not result in an agreement.

**(f)      *Investigation of Insider Claims and Causes of Action***

The Debtor, through the CRO, determined early on in the Chapter 11 Case to investigate pre-Petition Date transactions involving the Debtor and insiders and/or affiliated entities or individuals (the "Investigation"), including, but not limited to (i) Omnia, (ii) Northwind, (iii) Paz, and (vi) Ran Eliasaf ("Eliasaf"). The Investigation has included a review of (a) the transfers identified on the Debtor's schedules of assets and liabilities and statement of financial affairs [D.I. 107, 115, and 156], (b) purported equity contributions and distributions, and (c) various loan transactions. The Debtor's counsel and CRO assisted the Debtor in conducting the Investigation and made a number of requests for information to Omnia, Paz, Northwind, and Eliasaf.

1.      Omnia and Paz

In terms of the Investigation as it relates to transactions involving the Paz Parties, the CRO reviewed documents and other information provided by such parties and analyzed various potential claims and causes of action that may exist arising therefrom. Thereafter, the CRO and the Paz Parties engaged in good faith, arm's length negotiations regarding a potential resolution of the disputes amongst them. The Debtor and the Paz Parties did, in fact, reach an agreement resolving their disputes, including an agreement to expunge and/or subordinate the Insider General Unsecured Claims, and that agreement was then memorialized in a term sheet, dated March 8, 2024 (the "Paz Parties Settlement Term Sheet"), and annexed as Exhibit "E" to the Debtor's prior disclosure statement related to the Second Amended Plan (as defined below). In light of the terms and conditions of the Secured Lender Settlement Agreement, however, the Debtor is no longer able to proceed with an agreement with the Paz Parties consistent with the Paz Parties Settlement

---

[10]    The amount listed above is inclusive of the Insider General Unsecured Claims described more fully herein. *See* Art. II, § (c)(6). As applicable, the amount listed above also does not include amounts associated with withdrawn, previously satisfied claims, and/or unliquidated amounts.

31582062.1

Term Sheet. Instead, the Debtor and the Paz Parties have re-engaged in discussions and negotiations focused on a global resolution of their disputes and the Debtor is hopeful that an agreement to that effect will be reached prior to the Confirmation Hearing.  Pursuant to the Secured Lender Settlement Agreement, (a) any settlement reached with the Paz Parties shall not (i) be inconsistent with the Secured Lender Settlement, or (ii) have a materially adverse impact on the economic and other terms of the Secured Lender Settlement Agreement; (b) the rights of the Secured Lender and all parties in interest to object to any settlement entered into between the Debtor and any Paz Parties are fully reserved, and nothing set forth in the Secured Lender Settlement Agreement shall be deemed to be, or construed as, consent by the Secured Lender to any settlement entered into between the Debtor and any Paz Party.

The Plan contemplates that all potential claims and causes of action against the Paz Parties shall be retained under the Plan and pursued by the Debtor or Reorganized Debtor.

2.    Northwind and Eliasaf

In terms of the Investigation as it relates to transactions involving the Northwind Parties, the CRO was hampered in his efforts because the Northwind Parties were extremely slow in producing documents and other information requested.  In this regard, given the limited amount of documents and other information voluntarily provided by the Northwind Parties after months of requests by the CRO, on October 17, 2023 the Debtor filed its *Motion Pursuant to Bankruptcy Rule 2004 for Entry of an Order Directing Examination of Northwind Parties and the Production of Documents* [D.I. 315] (the "Northwind 2004 Motion").  The Northwind 2004 Motion was resolved by the parties shortly after filing and, on November 3, 2023, the Bankruptcy Court entered the *Order Directing Examination of Northwind Parties and the Production of Documents* [D.I. 336] (the "2004 Order"), which led to the Northwind Parties producing certain documents related to (a) a transfer of over $15 million from the proceeds of the BHI Loan for the benefit of Northwind entity 225 Bowery Mezz Lender LLC to satisfy a mezzanine loan to non-Debtor entities that never owned the Hotel (the "Mezz Loan Payoff").

The Debtor believes that it may have claims and causes of action, including under 11 U.S.C. §§ 547 and 548 and in excess of approximately $15,000,000, against the Northwind Parties related to, among other things, the Mezz Loan Payoff. The Debtor believes that payment of the Mezz Loan Payoff placed the Debtor in a dire financial situation that contributed to its liquidity crises and need to file for chapter 11 bankruptcy protection. As more fully discussed below, the Debtor and Northwind have had preliminary discussions regarding a potential resolution of their disputes. The Debtor remains hopeful that a resolution can be reached with respect thereto.

The Plan contemplates that all potential claims and causes of action against the Northwind Parties shall be retained under the Plan and pursued by the Debtor or Reorganized Debtor. Pursuant to the Secured Lender Settlement Agreement, the Secured Lender shall receive 100% of the Net Proceeds related to any Retained Causes of Action on account of any Northwind Claims. The Secured Lender shall apply 100% of such Net Proceeds to principal, interest, and other charges, in its sole and absolute discretion, *provided* that such applications are consistent with the Secured Lender Settlement Agreement and the terms of the Approved Loan Documents, all as more fully set forth in Section 6 of the Secured Lender Settlement Agreement.

(g)    *Post-Petition Negotiations with the Secured Lender*

Following the Secured Lender's acquisition of the Secured Lender Claim, the Debtor and the Secured Lender engaged in extensive discussions and negotiations regarding the consensual treatment of the Secured Lender Claim under a chapter 11 plan, resulting in the Debtor and the Secured Lender reaching an agreement in principle in September 2023 (the "Agreement in Principle"). To that end, given that the Debtor believed that the parties had made substantial progress in their negotiations, on December 15, 2023 and January 19, 2024, the Debtor filed its *Chapter 11 Plan of 225 Bowery Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 370] (the "Initial Plan") and its *First Amended Chapter 11 Plan of 225 Bowery LLC Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 406] (the "First Amended Plan"), respectively, each of which were substantially consistent with the Agreement in Principle. Unfortunately, the parties were not able to finalize an agreement for the treatment of the Secured Lender Claim under the First Amended Plan and, in fact, had substantial disagreements regarding key terms and provisions of the restructuring. Consequently, negotiations between the parties effectively came to a standstill, thereby preventing the Debtor and the Secured Lender from finalizing the terms of a consensual plan and implementing the Agreement in Principle. At the same time, the Debtor and the Paz Parties entered into the Paz Parties Settlement Term Sheet. On March 8, 2024, the Debtor filed its *Second Amended Chapter 11 Plan of 225 Bowery Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 447] (the "Second Amended Plan"), which, among other things, implemented the terms of the Paz Settlement Term Sheet and which was inconsistent with the Agreement in Principle, because, among other things, the Debtor contemplated treatment of the Secured Lender Claim in the context of a "cram up" under section 1129(b)(2)(A) of the Bankruptcy Code through the Second Amended Plan. As noted earlier, in light of the terms and conditions of the Secured Lender Settlement Agreement, the Debtor is no longer able to proceed with an agreement with the Paz Parties consistent with the Paz Parties Settlement Term Sheet. Instead, the Debtor and the Paz Parties have re-engaged in discussions and negotiations focused on a global resolution of their disputes and the Debtor is hopeful that an agreement to that effect will be reached prior to the Confirmation Hearing.

In that regard, the Debtor determined at that time to move ahead with its efforts to confirm the Second Amended Plan notwithstanding the fact that the Secured Lender opposed the treatment of the Secured Lender Claim thereunder and advised the Debtor that it intended to object to confirmation of the Second Amended Plan, as well as take other actions, including requesting relief from the automatic stay, terminating exclusivity and seeking additional adequate protection of the Secured Lender Claim. The Secured Lender also made it clear that it intended to object to the Fourth Exclusivity Motion and approval of the Second Amended Disclosure Statement.

In connection therewith, on March 26, 2024, the Secured Lender filed the *Emergency Motion of 225 Bowery Lender LLC for Entry of an Order Terminating the Debtor's Exclusive Periods to File a Plan and Solicit Acceptances Thereof Pursuant to Section 1121(d) of the Bankruptcy Code* [D.I. 469] (the "Exclusivity Termination Motion"), *Emergency Motion of 225 Bowery Lender LLC for Additional Adequate Protection and Relief from the Automatic Stay With Respect to Second Tranche Adequate Protection Payment* [D.I. 470] (the "Stay Relief Motion"), and sought to have the Exclusivity Termination Motion and Lift Stay Motion heard by the Bankruptcy Court on an expedited basis [D.I. 472] (the "Motion to Shorten"). On March 27, 2024, the Debtor filed its objection to the Secured Lender's Motion to Shorten [D.I. 474] and noted its

intention file substantive objections with respect to the Exclusivity Termination Motion and Stay Relief Motion at a later date. That same day, the Bankruptcy Court scheduled a hearing to consider the Motion to Shorten for March 28, 2024 (the "Motion to Shorten Hearing").

In light of the looming and threatened litigation and discovery related to, among other things, the Second Amended Plan, Exclusivity Termination Motion, the Lift Stay Motion, and the Fourth Exclusivity Motion, on March 27, 2024, the Debtor, Paz Parties, Secured Lender and Northwind, along with their respective representatives and counsel, met to discuss potential resolutions of certain of their disputes. As a result of this meeting, on April 18, 2024, the Debtor sought Bankruptcy Court authorization to enter into an agreement with the Secured Lender, which resolves their differences and provides for, among other things, the agreed upon treatment of the Secured Lender Claim under the Plan, which is memorialized in the Secured Lender Settlement Agreement, a copy of which is attached hereto as **Exhibit "E"**.

In summary, the Secured Lender Settlement Agreement reflects a settlement by and between the Debtor and the Secured Lender that provides, among other things, the following material terms and conditions of the treatment of the Secured Lender Claim under the Plan:

(i)    the Secured Lender will have an Allowed Claim in Class 3 (Secured Lender Claim) in the amount of $85,150,000.00 (the "Allowed Secured Lender Claim"), prior to application of the Principal Payments (as defined below);

(ii)    on or before the applicable Payment Deadline (as defined in the Secured Lender Settlement Agreement), the Debtor shall remit to the Secured Lender payments totaling $2,250,000.00 (the "Pre-Plan Effective Date Payments") from the Restricted Cash Account (as defined in the Second Supplemental Cash Collateral Order). On the Effective Date, the Secured Lender shall apply the Pre-Plan Effective Date Payments as follows: (i) $1,900,000.00 as pre-paid Monthly Interest Payments (as defined in the Secured Lender Settlement Agreement) treated as a credit against the payments of Monthly Interest by the Debtor or the Reorganized Debtor, as applicable, and (ii) $350,000.00 to reduce the principal amount owing under the Approved Loan Documents;

(iii)    On the Effective Date, the Secured Lender shall apply $650,000.00 of the First Tranche Adequate Protection Payment (as defined in the Secured Lender Settlement Agreement) to reduce the principal amount owing under the Approved Loan Documents (together with the $350,000.00 referenced in Section 8(d)(ii) of the Secured Lender Settlement Agreement, the "Principal Payments"); after application of the Principal Payments, the principal amount due and owing under the Approved Loan Documents shall be $84,150,000.00; and

(v) On the Effective Date, the Reorganized Debtor shall execute versions of the Approved Loan Documents to reflect, among other things, the following terms, conditions and provisions: (a) the Loan shall bear (i) interest at a rate of 7.00% per annum, payable on the 1st of each month, and (ii) PIK interest at a rate of 2.75% per annum on the outstanding amount of the Loans, payable upon the Maturity Date or the Extended Maturity Date (each as defined in the Secured Lender Settlement Agreement), as applicable; (b) the Maturity Date under the Approved Loan Documents shall be May 31, 2026, unless the Debtor exercises its option to extend the Maturity Date for one additional year, in exchange for a payment of an $850,000.00 Extension Fee (as defined in the

Secured Lender Settlement Agreement), pursuant to the terms and conditions of the Approved Loan Documents; (c) the Reorganized Debtor may satisfy its obligations under the Approved Loan Documents prior to the Maturity Date or the Extended Maturity Date, as applicable, without the assessment of any prepayment penalties, *provided* that the Loans are paid in full, including all principal, interest, fees, and other amounts owed under the Approved Loan Documents as of the date of such prepayment; and (d) no later than September 1, 2025, the Reorganized Debtor shall remit an additional payment of $250,000.00 to reduce the principal amount owning under the Approved Loan Documents from $84,150,000.00 to $83,900,000.00.

Pursuant to the Secured Lender Settlement Agreement, the Debtor is required to obtain entry of the Secured Lender Settlement Order prior to obtaining approval of this Disclosure Statement. On April 18, 2024, the Debtor filed a motion with the Bankruptcy Court seeking approval of the Secured Lender Settlement Agreement under Bankruptcy Rule 9019(a) [D.I. 500] and anticipates that the Secured Lender Settlement Agreement will be approved by the Bankruptcy Court in the near term.

The foregoing is only a summary of certain of the material terms and conditions of the Secured Lender Settlement Agreement and, therefore, creditors and other parties in interest are urged to review **Exhibit "E"** for a full recitation of the terms and conditions of the agreement reached by the Debtor and the Secured Lender.

(h)    *Post-Petition Negotiations with the Union*

The Debtor and the Union have had a number of meetings to discuss a potential consensual resolution of the Union Claim and the modification or termination of the CBA. The Debtor and the Union have exchanged proposals and the Debtor is continuing to engage with the Union to reach a resolution that avoids the need to attempt to reject the CBA under section 1113 of the Bankruptcy Code. The Debtor intends to continue the constructive dialogue it has had with the Union and is optimistic that an agreement with the Union can be reached in connection with the process seeking confirmation of the Plan. If the Debtor and Union have not reached an agreement prior to the Confirmation Hearing, the Debtor anticipates that it will file a motion seeking an order of the Bankruptcy Court authorizing the Debtor to reject the CBA pursuant to section 1113 of the Bankruptcy Code.

(i)    *Potential Sale of Substantially All of the Debtor's Assets*

The Debtor decided, in its business judgment, that it was necessary to engage in a marketing process for the Hotel to explore the potential for a value maximizing sale in order to bring the Chapter 11 Case to a successful conclusion. To that end, on July 6, 2023, the Debtor filed a motion for the entry of an order authorizing the Debtor to retain and employ Keen-Summit Capital Partners LLC ("Keen-Summit") [D.I. 212] as marketing agent and broker. The Debtor required the services of Keen-Summit to assist the Debtor in connection with the marketing and potential sale of all or substantially all of the Debtor's assets. On August 22, 2023, the Bankruptcy Court entered an order approving the employment and retention of Keen-Summit as marketing agent and broker for the Debtor [D.I. 265].

On July 21, 2023, the Debtor filed a motion for the entry of orders (I)(a) approving certain bidding procedures for the marketing and sale of the Debtor's assets (the "Bidding Procedures"), (b) scheduling an auction and a hearing on the approval of the sale of substantially all of the Debtor's assets free and clear of all liens, claims, interests, and encumbrances (the "Sale Hearing"), (c) establishing certain assumption and assignment procedures, (d) approving the form and manner of notice of the foregoing, and (e) granting related relief; and (II)(a) authorizing the sale of substantially all of the Debtor's assets free and clear of all liens, claims, interests, and encumbrances, (b) approving the assumption and assignment of the assigned contracts, and (c) granting related relief [D.I. 228] (the "Bid Procedures Motion"). Importantly, the Bidding Procedures preserve the Debtor's right to remove, in its business judgment, the assets from the competitive bidding process set forth in these Bidding Procedures.  On August 28, 2023, the Bankruptcy Court entered an order approving the Bid Procedures Motion and Bidding Procedures [D.I. 279] (the "Bidding Procedures Order").  In material part, the Bidding Procedures Order provided the following key sale process dates and deadlines:[11]

| Event | Proposed Dates/Deadlines |
|---|---|
| Bidding Procedures Hearing | August 22, 2023, at 2:00 p.m. (ET) |
| Deadline to File Assumption and Assignment Notice and Cure Schedule | October 2, 2023, at 4:00 p.m. (ET) |
| Stalking Horse Supplement Deadline | October 5, 2023 |
| Objection Deadline for Assumption/Assignment/Cure Objections | October 18, 2023, at 4:00 p.m. (ET) |
| General Sale Objection Deadline[12] | October 18, 2023, at 4:00 p.m. (ET) |
| Bid Deadline | November 7, 2023, at 10:00 a.m. (ET) |
| Deadline to Notify Potential Bidders of Qualified Bid Status | May 14, 2024, at 10:00 a.m. (ET) |
| Auction (if necessary) | May 22, 2024, at 10:00 a.m. (ET) |

---

[11]   On March 13, 2024, the Debtor modified the Bidding Procedures with respect to certain Proposed Dates and Deadlines [D.I. 455]. The following chart reflects such modifications.

[12]   The "General Sale Objection Deadline" applies to all objections not tied to the (a) conduct of the Auction, (b) identity of a Successful Bidder or a Next-Highest Bidder, or (c) adequate assurance of future performance by the Successful Bidder or Next-Highest Bidder.  For the avoidance of doubt, the "General Sale Objection Deadline" shall not apply to the Prepetition Secured Lender.

31582062.1

| Event | Proposed Dates/Deadlines |
|---|---|
| Deadline to File and Serve Notice of Successful Bidder | Prior to 12:00 p.m. (prevailing Eastern Time) on the day following the conclusion of the Auction (or, if an Auction is not held, by 12:00 p.m. (ET) on the day the Debtor selects the Successful Bidder) |
| Supplemental Sale Objection Deadline[13] | May 29, at 4:00 p. m. (ET) |
| Sale Hearing | To Be Determined |
| Closing Date | To Be Determined |

Thereafter, with the assistance of Keen-Summit, the Debtor commenced a marketing process to solicit bids from potential purchasers. In connection with this solicitation, the Debtor, its professional advisors, and Keen-Summit prepared, among other things, a confidential information memorandum ("CIM") to provide potential investors with adequate information upon which to make a proposal. The Debtor executed confidentiality agreements with multiple parties, approximately two hundred fifty (250), who were subsequently granted access to the CIM and a virtual data room containing additional diligence from the Debtor.

The Debtor received indications of interest from several parties. By the bid deadline of November 7, 2023, the Debtor received four (4) Bids (as defined in the Bidding Procedures). As of the date hereof, the Debtor is reviewing each Bid received from a Potential Bidder (as defined in the Bidding Procedures) to determine whether any or all have satisfied the Bid Requirements (as defined in the Bidding Procedures) (a "Qualified Bid" and each Potential Bidder that submitted such a Qualified Bid considered a "Qualified Bidder").

Based upon the Bids received, the overall information gleaned from the marketing process run by Keen-Summit, as well as the aforementioned developments and progress made with regard to a Restructuring of the Debtor as provided for in the Secured Lender Settlement Agreement, the Debtor exercised its discretion and terminated the sale process as it was authorized to do under and pursuant to the Bidding Procedures.

**(j)** *Post-petition Negotiations with Ace*

Following the Petition Date, and continuing thereafter, the Debtor engaged in a process designed to develop an exit from the Chapter 11 Case with the support of the Secured Lender and Ace, particularly given the ongoing cost, delay and risk associated with the SNDA Adversary

---

[13]   The "Supplemental Sale Objection Deadline" applies to objections related solely to the (a) conduct of the Auction, (b) identity of the Successful Bidder or the Next-Highest Bidder, or (c) adequate assurance of future performance by the Successful Bidder or the Next-Highest Bidder.

Proceeding and the Ace Preference Adversary Proceeding. After numerous discussions and negotiations, the Debtor and Ace ultimately reached an agreement for the consensual treatment of the Ace Secured Claim under the Plan, which provides for a global resolution of that Claim and all litigation related thereto, including the SNDA Adversary Proceeding and the Ace Preference Adversary Proceeding.

In relevant part, the Plan implements a  settlement by and between the Debtor and Ace (as amended, supplemented and modified from time to time, the "Ace Settlement") that provides that Ace will have an Allowed Secured Claim in the amount of $3,875,000 (the "Ace Secured Claim") for purposes of voting on the Plan and such Claim is satisfied in full in exchange for the following treatment: (a) $3,000,000.00 paid in cash on the Effective Date (the "Effective Date Payment"), (b) issuance of an unsecured subordinated promissory note (the "Ace Subordinated Note"), which (i) will be subordinated in all respects to satisfaction of all obligations of the Reorganized Debtor, (ii) will not accrue or be paid interest, and which will be paid from only from "Net Proceeds" (as defined in the Ace Settlement) upon the occurrence of a Trigger Event (as defined in the Ace Settlement). A copy of the Ace Settlement and amendment thereto is attached hereto as **Exhibit "D"**.

The Ace Settlement also provides, among other things, that the Plan shall: (i) contain mutual releases effective on the Effective Date by and between, among others, the Debtor, Reorganized Debtor, Ace, BHI and the Secured Lender; (ii) provide that to the extent not already terminated, termination of each of the Hotel Management Agreement and that certain Subordination, Non-Disturbance and Attornment Agreement, effective as of March 4, 2019, between BHI and Ace the on the Effective Date (the "SNDA"); and (iii) provide for the dismissal, with prejudice, of all pending actions in the New York State Supreme Court and the Bankruptcy Court involving, among others, the Debtor, Ace, BHI, the Secured Lender, and all other parties identified in such actions no later than ten (10) days following the Effective Date. Additionally, under the Ace Settlement, Ace agreed to (a) forbear, cease, and refrain from (i) moving to lift the automatic stay, (ii) exercising any remedies with respect to the Ace Secured Claim, and (iii) exercising any remedies against Debtor; and (b) the Debtor's continued use of cash collateral on the same terms and conditions in the Final Cash Collateral Order.  As discussed above, such cash collateral use has been further amended by the Supplemental Cash Collateral Order and Second Supplemental Cash Collateral Order.

## V.    GENERAL DESCRIPTION OF THE PLAN AND TREATMENT OF SECURED LENDER AND ACE SECURED CLAIMS THEREUNDER

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action (other than the Retained Causes of Action), and controversies, including those Claims resolved by the Ace Settlement.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises and settlements with respect to all such Claims, Interests, Causes of Action (other than the Retained Causes of Action), and controversies.  The Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, the Estate, Holders of Claims, and other parties in interest, and are fair, equitable, and reasonable.

(a)    *Summary of Plan Implementation Transactions*

During the past several months, the Debtor worked closely with its professional advisors and certain of their key stakeholders, including Ace and the Secured Lender, to evaluate various exit scenarios, ultimately determining that a chapter 11 plan allowing for the possibility of either a sale or restructuring was the best option for the Debtor and its creditors.

To that end, on (i) December 15, 2023, the Debtor filed the Initial Plan, (ii) January 19, 2024, the Debtor filed the First Amended Plan, and (iii) March 8, 2024, the Debtor filed the Second Amended Plan (all such chapter 11 plans being collectively referred to as the "Prior Plans"). Through the Prior Plans, the Debtor contemplated consummating one of two alternative transactions to maximize the value of its Estate—either a standalone reorganization (the "Reorganization") or a sale of all or substantially all of the Debtor's assets (the "Asset Sale Wind-Down" and together with the Reorganization, the "Plan Implementation Transactions").

The Debtor reserved the right to decide whether to seek implementation of the Plan through a Reorganization or an Asset Sale Wind-Down. The Debtor's decision whether to proceed with a Reorganization or an Asset Sale Wind-Down considered a number of factors, including (a) the outcome of the marketing and sale process run by Keen-Summit, and (b) whether or not the Debtor and the Union have reached an agreement with regard to (i) the mutual termination or modification of the CBA, and (ii) reconciliation and treatment of any and all claims arising or related thereto.

As noted above, based upon the Bids received, the overall information gleaned from the marketing process run by Keen-Summit, as well as the aforementioned developments and progress made with regard to a Restructuring of the Debtor as provided for in the Secured Lender Settlement Agreement, the Debtor exercised its discretion and terminated the sale process as it was authorized to do under and pursuant to the Bidding Procedures.  In connection therewith, on April 18, 2024, the Debtor filed the Plan.

Through the Plan, the Debtor will consummate the Reorganization.

(b)    *Material Terms of the Plan*

The following is an overview of certain material terms of the Plan:

•    Article IX of the Plan provides for certain releases by various parties of the Released Parties.

•    The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises and settlements provided for in the Plan, including the resolution of all such Claims, Interests, Causes of Action (other than the Retained Causes of Action), and controversies, including the Secured Lender Claim and those Claims resolved by the Ace Settlement.  The Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, its Estate, Holders of Claims and other parties in interest, and are fair, equitable and reasonable.

(c)     *Summary of Treatment of Claims and Interests Under the Plan*

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests for all purposes, including voting, Confirmation, and distribution pursuant hereto.  All Claims and Interests, except for Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in Article III of the Plan.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of other such Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The following chart summarize the classification of Claims and Interests pursuant to the Plan.[14]  The classification, treatment, and projected recoveries of classified Claims are described in summary form below for illustrative purposes only, are estimates, and are subject to material change.  *Additionally, recoveries available to Holders of Allowed Claims are estimates and actual recoveries may materially differ based on, among other things, whether the amount of Claims actually Allowed exceeds the estimates provided below. In such an instance, the recoveries available to holders of Allowed Claims could be materially lower when compared to the estimates provided below*.  For a complete description of the Debtor's classification and treatment of Claims and Interests, as well as estimated recoveries, reference should be made to the Plan and the other sections of the Disclosure Statement**.**  To the extent that any inconsistency exists between the summaries  contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

| Class | Claim | Status | Voting Rights | Projected Recovery Under Plan |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote | 100% |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote | 100% |
| 3 | Secured Lender Claim | Impaired | Entitled to Vote | 100% |
| 4 | Ace Secured Claim | Impaired | Entitled to Vote | 28.6% – 37% |
| 5 | Mechanic's Lien Bond Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |

---

[14]    The information in the table is provided in summary form and is qualified in its entirety by Article III.C of the Plan.

31582062.1

| Class | Claim | Status | Voting Rights | Projected Recovery Under Plan |
|-------|-------|--------|---------------|-------------------------------|
| 6 | Mechanic's Lien Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 7 | Union Claims | Impaired | Entitled to Vote | To be agreed upon by the Debtor and Union.[15] |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote | 27.5%[16] |
| 9 | Existing Equity Holder Interests in Debtor | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |

Except to the extent that the Debtor and a Holder of an Allowed Claim or Allowed Interest, as applicable, agree to less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter, or, if payment is not due, in the ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such Allowed Claim or Allowed Interest, as applicable.

***THE DEBTOR BELIEVES THAT THE REORGANIZATION PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF ALLOWED CLAIMS, AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN***

## VI.    PLAN VOTING INSTRUCTIONS AND PROCEDURES, AND SOLICTIATION

### (a)    *Voting Rights*

Under the Bankruptcy Code, only classes of claims or interests that are "impaired" and that are not deemed as a matter of law to have rejected a plan under section 1126 of the Bankruptcy Code are entitled to vote to accept or reject such plan.  Any class that is "unimpaired" is not entitled to vote to accept or reject a plan, and is conclusively presumed to have accepted such plan.  As set

---

[15]   Projected recovery to the Union is dependent upon, among other things, the Debtor and Union reaching an agreement with regard to the CBA and all claims related thereto. As of the date hereof, the Debtor and the Union are engaging in discussions regarding a potential resolution of their disputes, but no such agreement has been achieved.

[16]   Projected recovery to the holders of General Unsecured Claims assumes that all Insider General Unsecured Claims that are currently included in Class 8 have been expunged, disallowed and/or subordinated to all other Claims in their entirety.

forth in section 1124 of the Bankruptcy Code, a class is "impaired" if the legal, equitable or contractual rights attaching to the claims or equity interests of that class are modified or altered. Holders of claims or interests within an impaired class are entitled to vote to accept or reject a plan if such claims or interests are "allowed" under section 502 of the Bankruptcy Code.

Under the Bankruptcy Code, acceptance of a plan by a class of claims is determined by calculating the number and the amount of allowed claims voting to accept such plan. Acceptance by a class of claims requires more than one-half of the number of total allowed claims voting in the class to vote in favor of the plan, and at least two-thirds in dollar amount of the total allowed claims voting in the class to vote in favor of the plan; only those holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met.

1.   Classes 1 (Other Priority Claims), 2 (Other Secured Claims), 5 (Mechanic's Lien Bonds Claims), 6 (Mechanic's Lien Claims) and 9 (Existing Equity Holder Interests in Debtor)

*Claims in Classes 1, 2, 5 and 6 are Unimpaired by the Plan, and Holders of such Claims are deemed to have accepted the Plan, and, therefore, are not entitled to vote on the Plan. See Art.II.c.4; Art. VIII.c. Interests in Class 9 are Unimpaired by the Plan, and Holders of such Claims are deemed to have accepted the Plan, and, therefore, are not entitled to vote on the Plan.*

2.   Classes 3 (Secured Lender Claim), 4 (Ace Secured Claim), 7 (Union Claims) and 8 (General Unsecured Claims)

*Claims in Classes 3, 4, 7 and 8 are Impaired by, and entitled to receive a Distribution under, the Plan, and only the Holders of Claims in Classes 3, 4, 7 and 8 are entitled to have their vote counted to accept or reject the Plan. Only Holders of Claims in Classes 3, 4, 7 and 8 as of April 26, 2024 (the "Voting Record Date") may vote to accept or reject the Plan.*

As discussed more fully above, projected recovery to the holders of General Unsecured Claims assumes that all Insider General Unsecured Claims that are currently included in Class 8 have been expunged, disallowed and/or subordinated to all other Claims in their entirety. To the extent that Insider General Unsecured Claims are not expunged and disallowed in their entirety, projected recoveries to Holders of General Unsecured Claims will be significantly reduced to two percent (2%) or less. *See also* Art.II.c.4; Art. VIII.c.

**(b)   Solicitation Materials**

The Debtor, with the approval of the Bankruptcy Court, has engaged The Reliable Companies (the "Voting Agent") to serve as the voting agent to process and tabulate Ballots and to oversee the Plan voting and solicitation process generally. The following materials constitute the solicitation package (the "Solicitation Package"):

•   The Disclosure Statement, including the Plan and any other exhibits annexed thereto;

- The Bankruptcy Court order approving the Disclosure Statement (the "Disclosure Statement Order") (excluding exhibits);

- The Ballots and voting instructions (the "Voting Instructions") to be used in connection with voting to accept or to reject the Plan;

- A pre-addressed, postage pre-paid return envelope;

- The notice of, among other things, (a) the date, time and place of the hearing to consider Confirmation of the Plan and related matters, and (b) the deadline for filing objections to Confirmation of the Plan (the "Confirmation Hearing Notice");

- Such other materials as the Bankruptcy Court may direct.

The Debtor, through the Voting Agent, will distribute the Solicitation Package in accordance with the Disclosure Statement Order.

If you are the Holder of a Claim and believe that you are entitled to vote on the Plan, but you did not receive a Solicitation Package, or if you have any questions concerning voting procedures, you should contact the Voting Agent by submitting an inquiry via electronic mail to GMatthews@reliable-co.com, or in writing to 225 Bowery LLC Ballot Processing, c/o The Reliable Companies, Attn: Gene Matthews, 1007 North Orange Street, Suite 110, Wilmington, DE 19801.

**If your Claim is subject to a pending claim objection as of April 26, 2024, and you wish to vote on the Plan in the amount and priority as reflected on your timely filed proof of claim, you must File a motion on the date that is fourteen (14) days from the later of (a) the mailing of the Confirmation Hearing Notice, and (b) the filing of a claim objection, in accordance with the Disclosure Statement Order, pursuant to Bankruptcy Rule 3018(a) with the Bankruptcy Court for the temporary allowance of your Claim for Plan voting purposes, and your Claim or portion thereof, as applicable, must be temporarily allowed by the Bankruptcy Court for voting purposes by the Voting Deadline, or you will not be entitled to vote to accept or reject the Plan.**

**THE DEBTOR, ITS ESTATE, AND THE REORGANIZED DEBTOR, AS APPLICABLE, RESERVE THE RIGHT TO OBJECT TO OR SEEK TO DISALLOW ANY CLAIM FOR PLAN DISTRIBUTION PURPOSES OR OTHERWISE.**

      (c)    *Plan Voting Instructions and Procedures*

To ensure your vote on the Plan is counted and any release "opt-out" (a "Release Opt-Out") is effective you must: (a) complete the Ballot in accordance with the instructions set forth therein; (b) indicate your decision either to accept or reject the Plan in the boxes indicated in the Ballot; (c) affirmatively mark on the Ballot that you are making a Release Opt-Out election, if applicable and desired; and (d) sign and submit the Ballot to the Voting Agent prior to the Voting Deadline (defined below) either in paper form at the address provided for therein.

**BALLOTS SENT BY FACSIMILE OR ELECTRONIC TRANSMISSION ARE NOT ALLOWED AND WILL NOT BE COUNTED.**

The deadline to vote on the Plan is **May 29, 2024 at 5:00 p.m. (ET)** (the "**Voting Deadline**").  For your vote to be counted, your Ballot must be properly completed in accordance with the Voting Instructions, and **actually received** by the Voting Agent no later than the Voting Deadline.

**Holders of Claims in Classes 3, 4, 7 and 8 as of the Voting Record Date are entitled to have their vote counted to accept or reject the Plan.**  Each Holder of a Claim must vote its entire Claim either to accept or reject the Plan and may not split such vote.  It is important to follow the specific Voting Instructions contained in the ballot applicable to each Holder's Claim.

Except as otherwise provided in the Disclosure Statement Order, any party who has previously delivered a valid Ballot for the acceptance or rejection of the Plan may revoke such Ballot and change its vote by delivering to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan; and any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline.  In the case where multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot.  To be valid, a notice of withdrawal must (a) contain the description of the Claims to which it relates and the aggregate principal amount represented by such Claims; (b) be signed by the withdrawing party in the same manner as the Ballot being withdrawn; (c) contain a certification that the withdrawing party owns the Claims and possesses the right to withdraw the vote sought to be withdrawn; and (d) be actually received by the Voting Agent prior to the Voting Deadline.  The Debtor's right to contest the validity of any such withdrawals of Ballots is expressly reserved.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS.  IT IS IMPORTANT THAT THE HOLDER OF A CLAIM ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

If you have any questions about (a) the procedure for voting your Claim; (b) the Solicitation Package that you have received; or (c) the amount of your Claim, or if you wish to obtain, at your own expense (unless otherwise specifically required by Bankruptcy Rule 3017(d)), an additional copy of the Plan, the Disclosure Statement or any appendices or exhibits to such documents, please contact the Voting Agent at the address specified above.  Documents Filed in this Chapter 11 Case may also be examined between the hours of 8:00 a.m. and 4:00 p.m., Eastern Time, Monday through Friday, at the Office of the Clerk of the Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.

The Voting Agent will process and tabulate Ballots received by the Voting Agent for the Classes entitled to vote to accept or reject the Plan and will file a voting report in accordance with the Disclosure Statement Order.

## VII.   SUMMARY OF THE CHAPTER 11 PLAN

(a)   *Administrative Claims and Priority Tax Claims*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.   Administrative Claims

### i.   Administrative Claims

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtor or the Reorganized Debtor, as applicable, or to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Case, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the unpaid portion of such Allowed Administrative Claim in accordance with the following: (a) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than sixty (60) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtor or the Reorganized Debtor, as applicable; or (e) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

### ii.   Administrative Claims Bar Date

A notice setting forth the Administrative Claims Bar Date will be Filed on the Bankruptcy Court's docket and served with notice of entry of the Confirmation Order and occurrence of the Effective Date.  No other notice of the Administrative Claims Bar Date will be provided.  Except as otherwise provided in Article II.A.2 of the Plan, requests for payment of Administrative Claims that accrued on or before the Effective Date (other than Professional Fee Claims) must be Filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order and occurrence of the Effective Date no later than the Administrative Claims Bar Date.  **Holders of Administrative Claims that are required to, but do not File and serve a request for payment of such Administrative Claims by such date will be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor or the Reorganized Debtor or their respective property and such Administrative Claims shall be deemed discharged as of the Effective**

**Date.  If for any reason such Administrative Claim is incapable of being forever barred and discharged, then the Holder of such Claim will not have recourse to any property of the Reorganized Debtor to be distributed pursuant to the Plan or that vests in the Reorganized Debtor.**  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Objections to requests for payment of an Administrative Claim, if any, must be Filed and served on the Reorganized Debtor or the Plan Administrator, as applicable, and the requesting party no later than the Administrative Claims Objection Deadline.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims that are the subject of a timely objection will be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court

2.    Professional Fee Claims

i.    **Final Fee Applications and Payment of Professional Fee Claims**

All final requests for payment of Professional Fee Claims must be filed no later than the first Business Day that is twenty-one (21) days after the Effective Date.  The objection deadline relating to a final fee application will be 4:00 p.m. (prevailing Eastern time) on the date that is twenty-one (21) calendar days after the filing of such final fee application.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any applicable Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims will be determined by the Bankruptcy Court.  The Allowed amount of Professional Fee Claims owing to the Professionals, after taking into account any prior payments, will be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account promptly following the date when such Claims are Allowed by a Final Order.  After all Professional Fee Claims have been paid in full, the escrow agent will promptly return any amounts remaining in the Professional Fee Escrow Account to the Reorganized Debtor or Debtor, as applicable.

ii.    **Professional Fee Escrow Account**

As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtor will establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account will be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, Claims, or Interests will encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Account in any way.  Such funds will not be considered property of the Estate, the Debtor, or the Reorganized Debtor.

The amount of Professional Fee Claims owing to the Professionals will be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account as soon as reasonably

practicable after such Professional Fee Claims become payable in accordance with the Interim Compensation Order or are Allowed by an order of the Bankruptcy Court; *provided*, that obligations with respect to Allowed Professional Fee Claims will not be limited nor deemed limited to the balance of funds held in the Professional Fee Escrow Account. When all Allowed Professional Fee Claims have been irrevocably paid in full, any remaining funds held in the Professional Fee Escrow Account will promptly be paid to the Reorganized Debtor or Debtor, as applicable, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

### iii.    Professional Fee Reserve Amount

The Professionals will provide an estimate of their fees and expenses incurred in rendering services to the Debtor before and as of the Effective Date projected to be outstanding as of the Effective Date, and will deliver such estimate to the Debtor no later than five (5) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimate will not be considered an admission or limitation with respect to the fees and expenses of such Professional. If a Professional does not provide an estimate, the Debtor may estimate the unbilled fees and expenses of such Professional, taking into account prior payments; *provided*, *however*, that such estimate will not be considered an admission or limitation with respect to the fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date will be utilized by the Debtor to determine the amount to be funded to the Professional Fee Escrow Account; *provided*, that the Reorganized Debtor, or Debtor, as applicable, will use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

### iv.    Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtor or Plan Administrator will, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtor or the Reorganized Debtor, as applicable. If the Debtor or Plan Administrator disputes the reasonableness of any such invoice, the Debtor, the Reorganized Debtor, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice. The undisputed portion of such invoice will be paid in the ordinary course of business, and the disputed portion of such invoice will not be paid until the dispute is resolved. From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date will terminate, and the Debtor, Reorganized Debtor or Plan Administrator may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3.    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge

of, and in exchange for, each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

4.    Statutory Fees

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtor on the Effective Date. After the Effective Date, the Debtor or the Reorganized Debtor, as applicable shall be liable to pay Quarterly Fees when due and payable. The Debtor shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Debtor or the Reorganized Debtor, as applicable, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. The Debtor or the Reorganized Debtor, as applicable, shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of the Chapter 11 Case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the case, and shall not be treated as providing any release under the Plan.

**(b)**    ***Classification and Treatment of Claims and Interests***

1.    Classification of Claims and Interests

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests for all purposes, including voting, Confirmation, and distribution pursuant hereto. All Claims and Interests, except for Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in Article III of the Plan. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of other such Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

2.    Summary of Classification

The classification of Claims and Interests against the Debtor pursuant to the Plan is as set forth below. All of the potential Classes for the Debtor are set forth in Article III of the Plan.[17]

The following chart summarizes the classification of Claims and Interests pursuant to the Plan.[18]

---

[17]    The Debtor reserves the right to separately classify Claims to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

[18]    The information in the table is provided in summary form and is qualified in its entirety by Article III.C of the Plan.

31582062.1

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Secured Lender Claim | Impaired | Entitled to Vote |
| 4 | Ace Secured Claim | Impaired | Entitled to Vote |
| 5 | Mechanic's Lien Bond Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 6 | Mechanic's Lien Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 7 | Union Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Existing Equity Holder Interests in Debtor | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

3.     Treatment of Claims and Interests

To the extent a Class contains Allowed Claims or Allowed Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

**i.     Class 1 — Other Priority Claims**

(a)   *Classification*: Class 1 consists of Other Priority Claims.

(b)   *Treatment:* Except to the extent that the Holder of the Allowed Other Priority Claims agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for the Allowed Other Priority Claims, each Holder of the Allowed Other Priority Claims will receive payment in full of the unpaid portion of the Other Priority Claim on, or as soon as reasonably practicable thereafter, the latter of the Effective Date or such date that the Priority Claim becomes an Allowed Claim.

(c)   *Voting*: Class 1 is Unimpaired.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of

Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

*See also* Art.II.c.4; Art. VIII.c.

### ii.    Class 2 — Other Secured Claims

(a)  *Classification*: Class 2 consists of Other Secured Claims.

(b)  *Treatment:* Except to the extent that the Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim will receive at the option of the Debtor or Reorganized Debtor, as applicable: (i) payment in full in Cash of such Allowed Other Secured Claim on, or as soon as reasonably practicable thereafter, the latter of the Effective Date or such date that the Other Secured Claim becomes an Allowed Claim, (ii) the collateral securing such Allowed Other Secured Claim, (iii) reinstatement of such Allowed Other Secured Claim, or (iv) such other treatment that will render claim unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)  *Voting*: Class 2 is Unimpaired.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Plan.

### iii.    Class 3 — Secured Lender Claim

(a)  *Classification*: Class 3 consists of the Secured Lender Claim, which shall be Allowed in the aggregate principal amount of $85,150,000.00, prior to the application of the Principal Payments.

(b)  *Treatment*: Except to the extent that the Holder of the Allowed Secured Lender Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, the Allowed Secured Lender Claim, the Holder of the Allowed Secured Lender Claim shall receive (i) the Pre-Plan Effective Date Payments, which are to be paid on or before the applicable Payment Deadline; (ii) the Reorganized Debtor's entry into the Approved Loan Documents, which shall be consistent with the Secured Lender Settlement Agreement in a respects, and which shall provide for, among other things, delivery of the Deed Instrument, the Cash Collateral Stipulation, and the Reorganized Debtors' execution of DACAs in favor of the Secured Lender on the Effective Date; (iii) the Additional Principal Payment; and (iv) 100% of the Net Proceeds

related to any Retained Causes of Action against the Northwind Parties to be applied to principal, interest, and other charges, in its sole and absolute discretion, *provided* that such applications is consistent with the Settlement Terms (as defined in the Secured Lender Settlement Agreement) and the terms of the Approved Loan Documents, all as more fully set forth in Section 6 of the Secured Lender Settlement Agreement.

(c) *Voting*: Class 3 is Impaired.  Holder of Allowed Secured Lender Claim is entitled to vote to accept or reject the Plan.

### iv.   Class 4 —Ace Secured Claim

(a) *Classification*: Class 4 consists of the Ace Secured Claim, which will be Allowed in the aggregate amount of $10,474,628.18.

(b) *Treatment*: Except to the extent that the Holder of the Allowed Ace Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, the Allowed Ace Secured Claim, the Holder of the Allowed Ace Secured Claim shall receive:

   (i)   On the Effective Date, payment from the Debtor or Reorganized Debtor, as applicable, of $3,000,000 in Cash; and

   (ii)   On the Effective Date, the Ace Subordinated Note issued by the Reorganized Debtor.

On the Effective Date, the Ace Judgment Lien shall be deemed terminated and discharged in all respects. Ace shall execute any and all documents reasonably necessary to effectuate such termination and discharge.

(c) *Voting*: Class 4 is Impaired.  The Holder of the Allowed Ace Secured Claim is entitled to vote to accept or reject the Plan.

### v.   Class 5 — Mechanic's Lien Bond Claims

(a) *Classification*: Class 5 consists of Mechanic's Lien Bond Claims.

(b) *Treatment*: Except to the extent that a Holder of the Allowed *Mechanic's Lien Bond Claims agrees to less favorable treatment, in full* and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, the Allowed Mechanic's Lien Bond Claims, the Holders of the Allowed Mechanic's Lien Bond Claims will receive treatment sufficient to render their Mechanic's Lien Bond Claims Unimpaired in accordance with Section 1124 of the Bankruptcy Code.

(c) *Voting*: Class 5 is Unimpaired.  Holders of Allowed Mechanic's Lien Bond Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Allowed Mechanic's Lien Bond Claims are not entitled to vote to accept or reject the Plan.

### vi.      Class 6 —Mechanic's Lien Claims

(a) *Classification*: Class 6 consists of Mechanic's Lien Claims.

(b) *Treatment*: The Mechanic's Lien Claims are contingent, unliquidated, and disputed Claims with respect to the Debtor and the Holders thereof are the beneficiaries of the applicable Mechanic's Lien Bond.  The Holders of the Allowed Mechanic's Lien Claims will receive treatment sufficient to render their Mechanic's Lien Claims Unimpaired in accordance with Section 1124 of the Bankruptcy Code.

(c) *Voting*: Class 6 is Unimpaired.  Holders of Allowed Mechanic's Lien Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Allowed Mechanic's Lien Claims are not entitled to vote or accept or reject the Plan.

### vii.     Class 7 — Union Claims

(a) *Classification*: Class 7 consists of Union Claims.

(b) *Treatment*: Except to the extent that any Holder of the Allowed Union Claims agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, the Allowed Union Claims, the Holders thereof shall receive either (1) if an agreement between the Debtor and the Union can be reached (A) mutual termination or modification of the CBA or (B) rejection of the CBA under section 1113 of the Bankruptcy Code and Cash payments to the Union in an amount and upon terms to be agreed upon by the Debtor and the Union on account of the Union Claims or (2) if an agreement between the Debtor and the Union cannot be reached, (A) rejection of the CBA under section 1113 of the Bankruptcy Code pursuant to the Confirmation Order or other order of the Bankruptcy Court and (B) cash payments in an amount and payment schedule to provide the Union Claims with an equal percentage recovery to Class 8 (General Unsecured Claims).

(c) *Voting*: Class 7 is Impaired.  The Holders of the Allowed Union Claims are entitled to vote to accept or reject the Plan.

*See also* Art.II.c.4; Art. VIII.c.

### viii.    Class 8 — General Unsecured Claims

(a)    *Classification*: Class 8 consists of all General Unsecured Claims.

(b)    *Treatment*: Except to the extent that the Holders of the Allowed General Unsecured Claims agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, the Allowed General Unsecured Claims, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the GUC Reorganization Payments, which shall be paid in four (4) equal installments on each of (i) a date chosen by the Plan Administrator that is not later than six (6) months following the Effective Date, (ii) a date chosen by the Plan Administrator that is not later than twelve (12) months following the Effective Date, (iii) a date chosen by the Plan Administrator that is not later than fifteen (15) months following the Effective Date and (iv) a date chosen by the Plan Administrator that is not later than eighteen (18) months following the Effective Date; provided however that if a General Unsecured Claim is not Allowed as of the date of any such payment, the Holder shall receive such payment within thirty (30) days following the Allowance of such General Unsecured Claim.

(c)    *Voting*: Class 8 is Impaired.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

### ix.    Class 9 — Existing Equity Holder Interests in Debtor

(a)    *Classification*: Class 9 consists of all Interests in Debtor.

(b)    *Treatment*: The Existing Equity Holder's Interest in the Debtor shall be Reinstated, vest in, or otherwise assumed by, the Reorganized Debtor and the Existing Equity Holder shall retain all Interests in the Reorganized Debtor in accordance with the Plan.

(c)    *Voting*: Class 9 is not entitled to vote because it is Unimpaired and is deemed to accept the Plan.

4.    Special Provision Governing Unimpaired Claims

Except as specifically provided in the Plan, nothing in the Plan will affect the Debtor's or the Reorganized Debtor's rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

5.    Voting Classes; Presumed Acceptance by Non-Voting Classes

If a Class contains Holders of Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtor will request

the Bankruptcy Court to deem the Plan accepted by the Holders of such Claims or Interests in such Class.

6.    Acceptance by Impaired Classes

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims will have accepted the Plan if Holders of at least two-thirds in dollar amount and more than one-half in number of the Claims in such Class entitled to vote that actually vote on the Plan have voted to accept the Plan.

7.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.C of the Plan.  The Debtor will seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtor reserve the right to alter, amend, or modify the Plan, or any document in the Plan Supplement, and in accordance with Article XI.A of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to the Debtor.

8.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests, and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided in the Plan, the Debtor or the Reorganized Debtor, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto. For the avoidance of doubt, the Secured Lender Claim shall not be subject to subordination under section 510 of the Bankruptcy Code or otherwise, or reclassification under the Bankruptcy Code or otherwise.

9.    Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing will be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of

determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

10.    Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class thereof, is Impaired, the Bankruptcy Court will, after notice and a hearing, determine such controversy on or before the Confirmation Date.

(c)    *Means for Implementation of the Plan*

1.    General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action (other than the Retained Causes of Action), and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan, including the Ace Settlement.   The Plan will be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action (other than the Retained Causes of Action), and controversies, including the Secured Lender Claim and those Claims resolved by the Ace Settlement, pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order will constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action (other than the Retained Causes of Action), and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtor and their Estate.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and will be final.

In connection with the resolution and settlement of the Ace Secured Claim as provided for in the Plan, within ten (10) days of the Effective Date, the following actions will be dismissed with prejudice, without costs to any party, (i) the SNDA Adversary Proceeding; (ii) the Ace Preference Adversary Proceeding; and (iii) any and all other pending actions in the New York State Supreme Court involving the Debtor, Ace, the Prior Lender, Secured Lender, and all other parties identified in such actions. On the Effective Date, Ace and the Debtor will, and are hereby authorized to, take all such actions necessary or appropriate to effect such dismissals. For the avoidance of doubt, nothing set forth in the Plan shall be deemed to, or construed as, modifying, eliminating, or otherwise abrogating the rights of the Secured Lender with respect to the Paz Guarantees, all of which rights are fully preserved.

2.    Exemption from Certain Transfer Taxes and Recording Fees

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to the Secured Lender or any other Entity) of property pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtor

or the Reorganized Debtor; (2) the Plan Implementation Transactions; (3) the implementation of the terms of the Secured Lender Settlement Agreement, including delivery of the Deed Instrument; (4) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (5) the making, assignment, or recording of any lease or sublease; (6) the implementation of the terms and conditions of the Approved Loan Documents; or (7) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan or the Secured Lender Settlement Agreement, including the Deed Instrument and any other deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, will not be subject to any document recording tax, stamp tax, conveyance fees, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and, upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents will forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Entity with authority over any of the foregoing), wherever located and by whomever appointed, will comply with the requirements of section 1146(c) of the Bankruptcy Code, will forego the collection of any such tax or governmental assessment, and will accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or government assessment.

### 3.   Retained Causes of Action and Dismissal of Litigation

Unless any Retained Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtor or Reorganized Debtor, as applicable, will retain all rights to commence, prosecute, or settle, as appropriate, any and all Retained Causes of Action, whether arising before or after the Petition Date, which will vest in the Debtor or Reorganized Debtor, as applicable, pursuant to the terms of the Plan.  The Plan Administrator will have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to, or action, order, or approval of, the Bankruptcy Court, and the Plan Administrator's rights to commence, prosecute, or settle such Retained Causes of Action will be preserved notwithstanding the occurrence of the Effective Date.  The Plan Administrator may pursue such Retained Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Retained Causes of Action to the extent the Plan Administrator deems appropriate, including on a contingency fee basis.  No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Plan Administrator will not pursue any and all available Retained Causes of Action against them.  Unless any Retained Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Debtor or Reorganized Debtor, as applicable, expressly reserves all Retained Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise),

or laches, will apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. The Debtor and Reorganized Debtor, as applicable, reserve and will retain the foregoing Retained Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Plan. Net Proceeds of Retained Causes of Action against the Northwind Parties will be applied to the Secured Lender Claim in accordance with the Approved Loan Documents.

        4.     <u>Plan Implementation Transactions</u>

Before, on, and after the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will, among other things, enter into any transaction, and will take any action as may be necessary or advisable to effectuate the Plan Implementation Transactions or any other transaction or action contemplated in the Plan, including, to the extent applicable  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and Plan Supplement; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) execution of the Approved Loan Documents; (4) execution of DACAs in favor  of the Secured Lender; (5) filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other organizational documents pursuant to applicable law; (6) the execution and delivery of the Approved Loan Documents and the Ace Subordinated Note, and any filings related thereto; (7) the execution and delivery of the Reorganized Debtor Governance Documents, and any certificates or articles of incorporations, by-laws, or such other applicable analogous formation or shareholder documents (if any) of the Reorganized Debtor (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtor and/or the Reorganized Debtor, as applicable); (8) the execution and consummation of the Ace Settlement; (9) implementation of the Secured Lender Settlement; and (10) all other actions that the Debtor or Reorganized Debtor, as applicable, determines to be necessary or advisable, including making filings or recordings that may be required by applicable law in connection with the Plan.

The Confirmation Order will and will be deemed to, pursuant to sections 1123, 1141 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Plan Implementation Transactions.

        5.     <u>Secured Lender Consent Rights</u>

Notwithstanding anything to the contrary in the Plan, the Secured Lender will have consent rights with respect to the Definitive Documents, including the Plan, the Disclosure Statement, and the Confirmation Order, the Approved Loan Documents, the Reorganized Debtor Governance Documents, the Plan Administrator Agreement, and any other applicable Plan Supplement documents to the extent such provisions implicate the terms of the Secured Lender Settlement or

the Secured Lender's rights under the Approved Loan Documents and the Secured Lender Settlement Agreement.

6. <u>The Reorganization</u>

***The Debtor shall implement the Reorganization as follows:***

i. **Sources of Consideration for Plan of Reorganization Distributions**

The Debtor or the Reorganized Debtor, as applicable, will fund distributions under the Plan with Cash on hand and income or other proceeds generated by the operation of the Reorganized Debtor. Cash payments to be made pursuant to the Plan will be made by the Disbursing Agent. Each distribution and issuance referred to in Article VI of the Plan will be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions will bind each Entity receiving such distribution or issuance; *provided*, that to the extent that a term of the Plan conflicts with the term of any such instruments or other documents, the terms of the Plan will govern; provided further, however, that all such instruments and other documents shall be consistent with the Secured Lender Settlement in all respects.

ii. **Reinstatement of Existing Equity Holder Interests and Cancellation of Other Agreements and Interests**

On the Effective Date, (i) the Existing Equity Holder Interests shall be Reinstated and the Existing Equity Holder Interests shall become all of the Interests in Reorganized Debtor and (ii)(1) except as otherwise provided in the Plan, including the prior clause (i), all notes, bonds (other than the Mechanic's Lien Bonds), agreements, instruments, certificates, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, indentures, and any other instruments or documents directly or indirectly evidencing, creating, or, relating to any indebtedness or obligations of, or ownership interest, equity, or portfolio interest in, the Debtor, or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity ownership, or profits interests in the Debtor giving rise to any Claims or Interests shall be canceled, discharged, surrendered, and of no force or effect and deemed surrendered to the Debtor and the Debtor shall not have any continuing obligations thereunder; and (2) the Interests in the Debtor and Claims against the Debtor created by, in each case, the foregoing (ii)(1) shall be fully released, settled, compromised, and discharged. The Holders of, or parties to, such agreements, Interests and Claims in the foregoing (ii)(1) and (ii)(2) will have no rights arising from or related to such agreements, Interests and Claims; *provided*, that, notwithstanding Confirmation or the occurrence of the Effective Date, any such canceled agreements or Interests and Claims that govern the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of enabling Holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided therein. Notwithstanding the foregoing, for the avoidance of doubt, nothing in Art. IV.F.2 or elsewhere in the Plan shall be deemed to cancel, modify, alter, negate, supersede or otherwise change in any manner the Northwind Side Letter.

### iii.    Reorganized Debtor Governance Documents

The Reorganized Debtor Governance Documents will, among other things: (a) substantially conform to the forms contained in the Plan Supplement; (b) provide that the Existing Equity Holder will retain and/or receive all Interests in the Reorganized Debtor; and (c) prohibit the issuance of non-voting equity securities in accordance with section 1123(a)(6) of the Bankruptcy Code. For the avoidance of doubt, the Reorganized Governance Documents will be consistent with the Secured Lender Settlement Agreement and the Approved Loan Documents.

On or immediately before the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will file the respective Reorganized Debtor Governance Documents with the applicable Secretary of State and/or other applicable authorities in the state of incorporation or formation in accordance with the applicable laws of its respective state of incorporation or formation, to the extent required for such Reorganized Debtor Governance Documents to become effective. After the Effective Date, the Reorganized Debtor may amend, amend and restate, supplement or modify the Reorganized Debtor Governance Documents in accordance with their terms, and the Reorganized Debtor may file their respective formation, organizational, and constituent documents as permitted by the laws of the applicable jurisdiction of incorporation or formation and the terms of such documents.

### iv.    Approved Loan Documents

On the Effective Date, the Reorganized Debtor will enter into the Approved Loan Documents, execute DACAs in favor of the Secured Lender, and otherwise take all actions to implement the applicable terms of the Secured Lender Settlement Agreement, including, without limitation, delivery of the Deed Instrument to the Secured Lender. Confirmation of the Plan will be deemed approval of the Approved Loan Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtor in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtor to enter into and execute the Approved Loan Documents.

On the Effective Date, any Liens and security interests to be granted in accordance with the Approved Loan Documents (a) will be deemed to be granted, (b) will be legal, binding, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Approved Loan Documents, (c) will be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Approved Loan Documents, and (d) will not be subject to recharacterization or equitable subordination for any purposes whatsoever and will not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law. The Reorganized Debtor and the Entities granted such Liens and security interests will be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection will occur automatically by virtue of the entry of the Confirmation Order (subject solely to the occurrence of the Effective Date) and any such filings, recordings, approvals, and consents will not be required), and will thereafter cooperate to make all

other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

The Approved Loan Documents shall include the Cash Collateral Stipulation, the treatment of the Secured Lender Claim specified in Article III.C.3. of the Plan, and shall otherwise be consistent with the Secured Lender Settlement Agreement.

### v. Ace Subordinated Note

On the Effective Date, the Reorganized Debtor shall issue the Ace Subordinated Note.

### vi. Corporate Existence

Except as otherwise provided in the Plan, the Reorganized Debtor Governance Documents, or any agreement, instrument, or other documented incorporated in the Plan or the Plan Supplement, on the Effective Date, the Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a legal entity, with all the powers of a corporation, limited liability company, partnership, or other form of Entity, as the case may be, pursuant to the applicable law in the jurisdiction in which the Debtor is incorporated or formed and pursuant to the Reorganized Debtor Governance Documents, and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable law.

After the Effective Date, the Reorganized Debtor Governance Documents may be amended or modified in accordance with its respective terms without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules; *provided, however*, that until such time as the obligations under the Approved Loan Documents are satisfied in full, any amendments or modifications to the Reorganized Debtor Governance Documents shall be subject to the consent of the Secured Lender, which consent shall not be unreasonably held.

### vii. Vesting of Assets

Except as otherwise provided in the Plan, the Confirmation Order, the Secured Lender Settlement Agreement, or in any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property (including all interests, rights, and privileges related thereto) in the Debtor's Estate and any property acquired by the Debtor pursuant to the Plan will vest in the Reorganized Debtor free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations on account of the Approved Loan Documents or Other Secured Claims that are Reinstated pursuant to the Plan).  On and after the Effective Date, except as otherwise provided in the Plan, the Secured Lender Settlement Agreement, or the Approved Loan Documents, the Reorganized Debtor may operate its business and may use, acquire, or dispose of its respective property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, in each case subject to the Plan and the Reorganized Debtor Governance Documents.

In connection with the vesting of the assets in Reorganized Debtor, any attorney-client, work-product or other privilege or immunity attaching to any documents or communications (whether written or oral) will vest in Reorganized Debtor, subject to the terms of the Amended Organizational Documents and the Plan. The Debtor, the Reorganized Debtor, and the Plan Administrator, as applicable, are authorized to take all necessary actions to effectuate the transfer of such privileges, protections, and immunities.

### viii.    Plan Administrator

The Plan Administrator will act in the same fiduciary capacity as applicable to a board of managers, directors, members and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, members or officers of the Debtor will be deemed to have resigned, solely in their capacities as such, and the Plan Administrator will be appointed as the Sole Manager and sole officer of Reorganized Debtor. Except as otherwise provided in the Reorganized Debtor Governance Documents or the Approved Loan Documents, from and after the Effective Date, the Plan Administrator will be the sole representative of, and will act for, the Reorganized Debtor to implement the Plan. The foregoing will not limit the authority of the Plan Administrator to continue the employment of any former manager, director, or officer, to implement the Plan. The Reorganized Debtor will be deemed to be substituted as the party-in-lieu of the Debtor in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (b) all matters pending in any courts, tribunals, forums, or administrative proceedings outside the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

### ix.    Corporate Action

Upon the Effective Date, all actions contemplated by the Plan or the Plan Supplement will be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of the Debtor, the Reorganized Debtor, or any other Entity, including: (a) implementation of the Reorganization; (b) entry into the Approved Loan Documents and the incurrence of credit and the grant of security interests thereunder; (c) implementation of the Secured Lender Settlement; (d) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (e) adoption of the Reorganized Debtor Governance Documents; (f) execution, consummation, and implementation of the Ace Settlement; and (g) all other acts or actions contemplated, or reasonably necessary or appropriate to promptly consummate the transactions contemplated by, the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, as applicable, and any corporate action required by the Debtor or the Reorganized Debtor, as applicable, in connection therewith, will be deemed to have occurred and will be in effect, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtor or the Reorganized Debtor, as applicable.

Before, on, or after the Effective Date, the appropriate officers, directors, managers, or authorized persons of the Debtor or the Reorganized Debtor, as applicable, will be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor, including the Approved Loan Documents, the Reorganized Debtor Governance Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing or contemplated by the Plan, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by Article IV.F.9 of the Plan will be effective notwithstanding any requirements under non-bankruptcy law.

### x.    Sole Manager of the Reorganized Debtor

As of the Effective Date, (a) the terms of any current managers, directors, and officers of the Debtor shall expire and (b) the Sole Manager, consistent with the Reorganized Debtor Governance Documents, shall be appointed and the Sole Manager shall, until such date as the Secured Lender Claim has been paid in full in accordance with the terms of the Approved Loan Documents and other than certain matters which shall require the consent of one or more Independent Manager as set forth in the Reorganized Debtor Governance Documents and the Approved Loan Documents, have sole authority (i) over the Reorganized Debtor; (ii) to amend the Reorganized Debtor Governance Documents consistent with the terms thereof (including the composition of any board of directors, managers or other governing body of the Reorganized Debtor, subject in all respects to the applicable provisions of the Approved Loan Documents until such time as the obligations under the Approved Loan Documents are satisfied in full); and (iii) to implement the terms of the Plan as the Plan Administrator in connection with a Reorganization.

### xi.    Effectuating Documents; Further Transactions

Prior to, on, and after the Effective Date, the Debtor, the Reorganized Debtor, the Plan Administrator, and the Sole Manager, each as applicable, are authorized to, and may, issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of the Plan, the Approved Loan Documents, the Reorganized Debtor Governance Documents, and any securities issued pursuant to the Plan in the name of and on behalf of the Debtor or Reorganized Debtor, as applicable, in each case, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to the Plan.

The Confirmation Order will and will be deemed to, pursuant to both section 1123, section 1141 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

### xii.    Indemnification Provisions

On and as of the Effective Date, the Indemnification Provisions will be deemed assumed and irrevocable and will remain in full force and effect and survive the effectiveness of the Plan

Unimpaired and unaffected, and the Reorganized Debtor Governance Documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtor's and the Reorganized Debtor's current and former directors, members, officers, employees, agents, managers, attorneys, and other professionals, and such current and former directors, members, officers, and managers' respective Affiliates at least to the same extent as such documents of each of the respective Debtor on the Petition Date but in no event greater than as permitted by law, against any Claims or Causes of Action; *provided, however,* that the Reorganized Debtor will not indemnify any such Person for any Claims or Causes of Action arising out of or related to any act or omission that is a criminal act or constitutes actual fraud, gross negligence or willful misconduct or for which indemnification is not permissible under law and, *provided further*, *however,* that the Indemnification Provisions will not be assumed as to, and the Reorganized Debtor will not indemnify any of, the Paz Parties or the Northwind Parties. The Reorganized Debtor will not amend and/or restate its respective organizational documents before, on or after the Effective Date to terminate, reduce, discharge, impair or adversely affect in any way (i) any of the Reorganized Debtor's obligations referred to in the immediately preceding sentence, or (ii) the rights of such current and former directors, members, officers, employees, agents, managers, attorneys, and other professionals, and such current and former directors, members, officers, and managers' respective Affiliates referred to in the immediately preceding sentence; *provided*, that in either case of the foregoing (i) and (ii) the Debtor may make any changes or amendments to the Reorganized Debtor Governance Documents to ensure that Indemnification Provisions do not include any obligations of the Reorganized Debtor to indemnify any of, the Paz Parties or the Northwind Parties.  Notwithstanding anything to the contrary in Article IX of the Plan, the Debtor's current and former officers' and directors' rights to indemnification (other than any Paz Party or Northwind Party) are preserved to the extent set forth in the Plan.

7.      Closing the Chapter 11 Case

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator will seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**(d)      *Treatment of Executory Contracts and Unexpired Leases***

1.      Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, will be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (2) is subject to a pending motion to assume such Executory Contract or Unexpired Lease as of the Effective Date; (3) is to be assumed by the Debtor; (4) is the Secured Lender Settlement Agreement, which the Debtor or the Reorganized Debtor, as applicable, shall assume on the Effective Date; or (5) is a contract,

instrument, release, indenture, or other agreement or document entered into in connection with the Plan.  Entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Entry of the Confirmation Order by the Bankruptcy Court will constitute an order approving the assumptions, assumptions and assignments, or rejections, as applicable, of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Schedule of Assumed Executory Contracts and Unexpired Leases, or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order.  Unless otherwise indicated or agreed by the Debtor and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date; *provided*, *however*, if, as a result of the filing of Supplemental Cure Notice, the time to object, or the resolution of a timely-filed objection, has not occurred by the Effective Date, than the assumption, assumption and assignment, or rejection of the subject Executory Contract or Unexpired Lease will occur upon the earlier of (x) the expiration of the objection period without an objection being timely interposed and (y) resolution of a timely objection by agreement or entry of the Final Order, subject to the re-designation rights set forth in Article V of the Plan.  Subject to section 365(c) of the Bankruptcy Code, each Executory Contract and Unexpired Lease assumed pursuant to the Plan or a Bankruptcy Court order and not assigned to a third party on or prior to the Effective Date, will re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been validly modified by order of the Bankruptcy Court and notwithstanding any provision in any such assumed Executory Contract or Unexpired Lease that restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), and, therefore, consummation of the transactions contemplated by the Plan will not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Notwithstanding anything to the contrary in the Plan or the Secured Lender Settlement Agreement, the Debtor reserves the right to alter, amend, modify, or supplement the listing of Executory Contracts and Unexpired Leases identified on the Schedule of Rejected Executory Contracts and Unexpired Leases and the Schedule of Assumed Executory Contracts and Unexpired Leases, as applicable, at any time prior to the Effective Date.  Parties that may object to either the assumption, assumption and assignment or rejection of their Executory Contract or Unexpired Lease must timely raise such objections regardless of whether the Debtor has indicated an intent to assume and not reject or reject and not assume such Executory Contract or Unexpired Lease.

For avoidance of doubt and to the extent such agreements have not previously been terminated, the Management Agreement and SNDA will be rejected and terminated on the Effective Date, *provided*, *however*, that Ace will not be entitled to any Claims, including any rejection damages, beyond the treatment of the Ace Secured Claim provided in Article III.C.4 of the Plan.

2.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claims, in Cash on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.

***Unless a different amount is (i) set forth in a Supplemental Cure Notice, or (ii) set by a Final Order of the Court following a timely-filed objection from a counterparty as specified in the paragraph immediately below, all Cure Claims will be set at $0.00.*** In the event of a dispute regarding: (1) the amount of any Cure Claim; (2) the ability of the Reorganized Debtor or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned; and/or (3) any other matter pertaining to assumption or the assumption and assignment, the underlying Executory Contract or Unexpired Lease will not be assumed and payment of the Cure Claims will not occur until after the entry of a Final Order resolving the dispute and approving the assumption or the assumption and assignment or as may be agreed upon by the Debtor or the Reorganized Debtor, as applicable, and the counterparty to such Executory Contract or Unexpired Lease; provided that, if a Final Order adjudicates a Cure Claim in an amount higher than the Debtor proposed, the Debtor or the Reorganized Debtor will have seven (7) days from the date such order becomes a Final Order to designate the underlying Executory Contract or Unexpired Lease for rejection. Notwithstanding the foregoing, nothing in the Plan will prevent the Debtor or the Reorganized Debtor, as applicable from settling any Cure Claim without further notice to or action, order, or approval of the Bankruptcy Court.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a Cure Claim must be Filed, served, and actually received by the Debtor fourteen (14) calendar days after the date on which the applicable Supplemental Cure Notice is filed and served. Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption or assumption and assignment, must be Filed, served, and actually received by the Debtor before the later of (i) the Confirmation Objection Deadline or (ii) fourteen (14) calendar days after the date on which the Debtor adds such Executory Contract and Unexpired Lease to the Schedule of Assumed Executory Contracts and Unexpired Leases. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Notice will be deemed to have assented to such assumption or assumption and assignment, and Cure Claim. To the extent that the Debtor seeks to assume and assign an Executory Contract or Unexpired Lease pursuant to the Plan, the Debtor will identify the assignee in the Plan Supplement and provide "adequate assurance of future performance" for such assignee (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease to be assumed and assigned at or prior to the Confirmation Hearing.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment of the Cure Claim, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at

any time prior to the effective date that the Debtor assume or assume and assign such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned, and the Cure Claim paid, shall be deemed Disallowed and expunged, without further notice to, or action, order, or approval of, the Bankruptcy Court.

3.  <u>Claims Based on Rejection of Executory Contracts and Unexpired Leases</u>

Proofs of Claims with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the Effective Date.  **Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Case on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtor, the Debtor's Estate, the Reorganized Debtor, the Plan Administrator, or the property for any of the foregoing without the need for any objection by the Debtor, the Reorganized Debtor, or the Plan Administrator, as applicable, or further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease will be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases will be classified as General Unsecured Claims and will be treated in accordance with Article III.C.8 of the Plan.

Counterparties to Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases will be served with a notice of rejection of Executory Contracts and Unexpired Leases substantially in the form approved by the Bankruptcy Court, pursuant to the Bankruptcy Court order approving the Disclosure Statement no later than seven (7) days prior to the Voting Deadline.

4.  <u>Modifications, Amendments, Supplements, Restatements, or Other Agreements</u>

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed will include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case will not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

31582062.1

5. <u>Reservation of Rights</u>

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, will constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtor or Reorganized Debtor has any liability thereunder.

**(e)** **_Provisions Governing Distributions_**

1. <u>Timing and Calculation of Amounts to Be Distributed</u>

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests (which will only be made if and when they become Allowed Claims or Allowed Interests) will be made pursuant to the provisions set forth in Article VIII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims and Interests will not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. The Debtor will have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

2. <u>Disbursing Agent</u>

Except as otherwise provided in the Plan, all distributions under the Plan will be made by the Disbursing Agent as set forth in the Plan.  At the option of the Disbursing Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.  The Disbursing Agent will not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

3. <u>Rights and Powers of Disbursing Agent</u>

i. **Powers of the Disbursing Agent**

The Disbursing Agent will be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

ii. **Expenses Incurred On or After the Effective Date**

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the applicable Disbursing Agent on or after the Effective Date

(including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable, actual, and documented attorney and/or other professional fees and expenses) made by the Disbursing Agent will be paid in Cash by the Debtor or Reorganized Debtor, as applicable.

4.    Delivery of Distributions

### i.    Delivery of Distributions in General

Except as otherwise provided in the Plan, as applicable, distributions to Holders of Allowed Claims will be made to Holders of record as of the Distribution Record Date by the Disbursing Agent, as appropriate: (a) to the signatory set forth on any Proof of Claim filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is filed or if the Debtor has not been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Debtor, the Reorganized Debtor, the Plan Administrator, or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; or (c) on any counsel that has appeared in the Chapter 11 Case on the Holder's behalf. Subject to Article VI of the Plan, distributions under the Plan on account of Allowed Claims will not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim will have and receive the benefit of the distributions in the manner set forth in the Plan, and the Plan Administrator will have no liability for making the distributions without regard to any asserted levy, garnishment, attachment, or like legal process. The Debtor, the Reorganized Debtor, the Plan Administrator, and the Disbursing Agent, as applicable, will not incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

### ii.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder will be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution will be made to such Holder without interest; *provided*, *however*, that such distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180-calendar days from the date of the distribution. After such date, all unclaimed property or interests in property will revert to the Debtor or Reorganized Debtor, as applicable, automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property will be discharged and forever barred.

Checks issued on Account of Allowed Claims will be null and void if not negotiated within 180 calendar days from and after the date of issuance thereof. Requests for reissuance of any check must be made directly and in writing to the Disbursing Agent by the Holder of the relevant Allowed Claim within the 180-calendar day period. After such date, the relevant Allowed Claim (and any Claim for reissuance of the original check) will be automatically discharged and forever barred, and such funds will revert to the Debtor or Reorganized Debtor, as applicable (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary).

### iii.    Minimum Distributions

Holders of Allowed Claims entitled to distributions of $50 or less will not receive distributions, and each Claim to which this limitation applies will be discharged pursuant to Article IX of the Plan (as applicable) and its Holder will be forever barred pursuant to Article IX of the Plan from asserting such Claim against the Reorganized Debtor or the Plan Administrator, as applicable, or their property.

### 5.    Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Debtor, the Reorganized Debtor, the Disbursing Agent (if other than the Reorganized Debtor), and the Plan Administrator will comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto will be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, Debtor, the Reorganized Debtor, the Disbursing Agent, and the Plan Administrator will be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

### 6.    No Postpetition or Default Interest on Claims

Unless otherwise specifically provided for in the Plan, the Secured Lender Settlement Agreement, or the Approved Loan Documents, and subject to sections 511 and 1129(a)(9) of the Bankruptcy Code, the Cash Collateral Order, the Confirmation Order, or other order of the Bankruptcy Court, and notwithstanding any documents that govern the Debtor's prepetition indebtedness to the contrary, (1) postpetition and/or default interest will not accrue or be paid on any Claims, and (2) no Holder of a Claim will be entitled to: (a) interest accruing on or after the Petition Date on any such Claim; or (b) interest at the contract default rate, as applicable.

### 7.    Allocation Between Principal and Interest

Except as otherwise provided in the Plan, the Secured Lender Settlement Agreement, or the Approved Loan Documents, the aggregate consideration paid to Holders with respect to their Allowed Claims will be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, on such Allowed Claim accrued through the Petition Date.

### 8.    Setoffs and Recoupment

Other than as expressly set forth in the Plan or the Confirmation Order, the Debtor, the Reorganized Debtor, or the Plan Administrator, as applicable, may, but will not be required to, setoff against or recoup from any Allowed Claim or the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature whatsoever that the Debtor, the Reorganized Debtor, or the Plan Administrator, as applicable, may have against the

Holder of such Allowed Claim pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the Holder of such Claim, to the extent that such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (pursuant to the Plan or otherwise); *provided*, *however*, that the failure of the Debtor, the Reorganized Debtor, or the Plan Administrator, as applicable, to do so will not constitute a waiver, abandonment or release by the Debtor, the Reorganized Debtor, or the Plan Administrator, as applicable, of any such Claim they may have against the Holder of such Claim.

9.      Surrender of Canceled Instruments or Securities

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or an Interest (other than the Existing Equity Holder's Interest) will be deemed to have surrendered such certificate or instrument to the Debtor or Reorganized Debtor, as applicable. Such surrendered certificate or instrument will be canceled solely with respect to the Debtor or Reorganized Debtor, as applicable, and such cancellation will not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that govern the rights of the Holder of a Claim or Interest, which will continue in effect for purposes of allowing Holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights (subject to Article IV.F.12. of the Plan), and obligations which expressly survive the Effective Date. Notwithstanding anything to the contrary in the Plan, this paragraph will not apply to certificates or instruments evidencing Claims that are Unimpaired or Reinstated under the Plan. For the avoidance of doubt, nothing set forth in the Plan will be deemed to, or construed as, (a) a release by the Debtor or the Reorganized Debtor, as applicable, of the obligations of the Paz Guarantors under the Paz Guarantees, or (b) any modification, elimination, or abrogation of the rights of the Secured Lender with respect to the Paz Guarantees.

10.      Claims Paid or Payable by Third Parties

**i.      Claims Paid by Third Parties**

A Claim will be reduced in full, and such Claim will be Disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtor or the Reorganized Debtor. To the extent that a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtor or the Reorganized Debtor on account of such Claim, such Holder will repay, return, or deliver any distribution held by or transferred to the Holder to the Reorganized Debtor or to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

**ii.      Applicability of Insurance Policies**

The availability, if any, of insurance policy proceeds for the satisfaction of an Allowed Claim will be determined by the terms of the insurance policies of the Debtor or the Reorganized

Debtor, as applicable.  Nothing contained in the Plan will constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor will anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

      **(f)**      ***The Plan Administrator***

            1.    <u>The Plan Administrator</u>

The powers of the Plan Administrator will include any and all powers and authority to implement the Plan, to administer and distribute any assets of the Debtor or Reorganized Debtor, as applicable, consistent with the Plan, to administer the Retained Causes of Action including (as, and if, applicable): (1) liquidating, selling, receiving, holding, investing, supervising, and protecting the assets of the Debtor; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (3) taking all steps to execute all instruments and documents necessary to effectuate and implement the Secured Lender Settlement; (4) making distributions as contemplated under the Plan; (5) establishing and maintaining bank accounts in the name of Debtor or the Reorganized Debtor, as applicable; (6) execute the DACAs in favor of the Secured Lender; (7) subject to the terms set forth in the Plan, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (8) paying all reasonable fees, expenses, debts, charges, and liabilities of Debtor; (9) administering and paying taxes of the Debtor, including filing tax returns; (10) representing the interests of the Estate or Debtor, as applicable, before any taxing authority in all matters, including any action, suit, proceeding, or audit; (11) managing and carrying out the purpose of the Debtor; (12) compromising or settling any Claims, Interests, or Retained Causes of Action of the Debtor without further approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules; and (13) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court, pursuant to the Plan, pursuant to the Reorganized Debtor Governance Documents, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan, consistent with the Secured Lender Settlement Agreement and the Approved Loan Documents in all respects.

In accordance with the Reorganized Debtor Governance Documents, the Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court; *provided*, that such resignation will only become effective upon the appointment of a permanent or interim successor Plan Administrator.  For the avoidance of doubt, that until such time as the obligations under the Approved Loan Documents are satisfied in full, no Paz Party may serve as the Plan Administrator.  Upon its appointment, the successor Plan Administrator, without any further act, will become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Debtor will be terminated.

            **i.**      **Plan Administrator Rights and Powers**

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan, and as otherwise provided in the Confirmation Order, the Plan Administrator Agreement, the Approved Loan Documents, or the Reorganized

Debtor Governance Documents.  The Plan Administrator shall be the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

### ii.      Retention of Professionals

The Plan Administrator will have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  The reasonable fees and expenses of such professionals will be paid by the Reorganized Debtor pursuant to the Operating Budget upon the monthly submission of statements to the Plan Administrator.  The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals will be made in the ordinary course of business from such assets and will not be subject to the approval of the Bankruptcy Court. For the avoidance of doubt, neither the Reorganized Debtor nor the Plan Administrator may retain a Paz Party as a professional hereunder; *provided, however*, that solely for purposes of Article VII.A of the Plan, neither Miya Nadri nor Hernan Galvis shall be considered a Paz Party.

### iii.     Compensation of the Plan Administrator

As of the Effective Date, the Plan Administrator will be entitled to receive the Plan Administrator Compensation.  The Plan Administrator Compensation will be (a) consistent with the Secured Lender Settlement Agreement; (b) set forth in the and Plan Administrator Agreement; and (c) paid by the Reorganized Debtor pursuant to the Reorganized Debtor Operating Budget. Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes imposed on Debtor) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties will be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in by the Reorganized Debtor; *provided, however*, that all such fees and expenses will be consistent with the Secured Lender Settlement Agreement, the Approved Loan Documents, and the Reorganized Debtor Operating Budget.

### iv.     Plan Administrator Expenses

All reasonable, necessary, and documented costs, expenses, and obligations incurred by the Plan Administrator in administering the Plan, or in any manner connected, incidental, or related thereto, in effecting distributions thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid by the Reorganized Debtor pursuant to the Operating Budget and shall otherwise be consistent with the Secured Lender Settlement Agreement and the Approved Loan Documents.

The Debtor and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  In the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid by the Reorganized Debtor.

2.      Indemnification, Insurance and Liability Limitation

The applicable Plan Supplement documents, including the Reorganized Debtor Governance Documents, shall provide that the Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by Debtor and/or Reorganized Debtor, as applicable, to the maximum extent permissible by law.  The Plan Administrator may obtain commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations.  The Plan Administrator may rely upon written information previously generated by the Debtor.

Notwithstanding anything to the contrary contained in the Plan, the Plan Administrator, in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtor

3.      Tax Returns

After the Effective Date, the Plan Administrator will complete and file all final or otherwise required federal, state, and local tax returns for the Debtor or Reorganized Debtor, as applicable, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of the Debtor, Reorganized Debtor or its Estate, as applicable, for any tax incurred during the administration of the Debtor's Chapter 11 Case as determined under applicable tax laws.

**(g)     *Procedures for Resolving Disputed, Contingent, and Unliquidated Claims and Interests***

1.      Allowance of Claims and Interests

After the Effective Date, the Reorganized Debtor will have and retain any and all rights and defenses the Debtor had with respect to a Claim or Interest immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case before the Effective Date (including the Confirmation Order), no Claim against or Interest in the Debtor will become an Allowed Claim or an Allowed Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Case Allowing such Claim or Interest.

2.      Claims and Interests Administration Responsibilities

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtor, or the Plan Administrator, as applicable, will have the sole authority to: (1) File and prosecute objections to Claims and Interests; (2) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims or Interests, regardless of whether such Claims or Interests are classified under Article III of the Plan or otherwise; (3) settle, compromise, or resolve any Disputed Claim against or Disputed Interest in the Debtor without any

further notice to or action, order, or approval by the Bankruptcy Court; and (4) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  On and after the Effective Date, the Plan Administrator will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise.

### 3.      Estimation of Claims

Before, on, or after the Effective Date, the Debtor, the Reorganized Debtor, or the Plan Administrator, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount will constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtor, Reorganized Debtor, or the Plan Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 4.      Adjustment to Claims and Interests Without Objection

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted on the Claims Register by the Reorganized Debtor or the Plan Administrator, as applicable, without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 5.      Time to File Objections to Claims

Any objections to Claims will be Filed on or before the Claims Objection Deadline, as such may be extended pursuant to the terms of the Plan.

### 6.      Disallowance of Claims

All Proofs of Claim Filed on account of an indemnification obligation, including the applicable Insider General Unsecured Claims, shall be deemed disallowed or satisfied, and shall be expunged from the Claims Register, as of the Effective Date solely to the extent such indemnification obligation owed the Holder of the Claim is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to, or action, order, or approval of, the Bankruptcy Court.

**Except as otherwise provided in the Plan, the Secured Lender Settlement Agreement, or as agreed to by the Reorganized Debtor or the Plan Administrator, as applicable, any and**

**all Proofs of Claim Filed after the Bar Date will be deemed Disallowed and expunged as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

7. <u>Amendments to Proofs of Claim</u>

On or after the Effective Date, a Proof of Claim or Proof of Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court, the Reorganized Debtor or the Plan Administrator, as applicable, and any such new or amended Proof of Claim or Proof of Interest filed will be deemed Disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court, to the maximum extent provided by applicable law.

8. <u>No Distributions Pending Allowance</u>

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan will be made on account of such Claim or any portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Debtor, the Reorganized Debtor, or the Plan Administrator, as applicable.

9. <u>Distributions After Allowance</u>

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions will be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Debtor, the Reorganized Debtor, or the Plan Administrator, as applicable, will provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided in the Plan.

**(h) *Settlement, Release, Injunction, and Related Provisions***

1. <u>Discharge of Claims and Termination of Interests and Controversies</u>

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, the Secured Lender Settlement Agreement, the Approved Loan Documents, or in any contract, instrument, or other agreement or document created pursuant to the Plan, including the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan will be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action (other than the Retained Causes of Action) against the Debtor of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtor or any of its assets or properties, regardless of whether any property will have been distributed or retained pursuant to the Plan on

account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Causes of Action accrued before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtor with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Case will be deemed cured (and no longer continuing) as of the Effective Date.  Unless expressly provided in the Plan, the Secured Lender Settlement Agreement, or the Approved Loan Documents, the Confirmation Order will be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

2.     Release of Liens

**Except as otherwise specifically provided in the Plan, the Confirmation Order, the Secured Lender Settlement Agreement, the Approved Loan Documents, or in any contract, instrument, release, or other agreement or document created, assumed or preserved pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate (including the Ace Judgment Lien and any other liens held by Ace) will be fully released, settled, discharged, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests will revert to the Debtor or the Reorganized Debtor, and their respective successors and assigns, as applicable, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtor or the Reorganized Debtor, as applicable.  The Reorganized Debtor will execute and deliver all documents to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests on such assets of the Debtor that are subject to the Reorganization and will authorize the Reorganized Debtor to file UCC-3 termination statements (to the extent applicable) with respect thereto.  For the avoidance of doubt, any Liens asserted or held by Ace (including the Ace Judgment Lien) will be fully released, settled and otherwise discharged against the Debtor and any of its property, the Prior Lender and any of its property and, to the extent applicable, the Secured Lender and any of its property, in all respects.**

3.     Releases by the Debtor

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Secured Lender Settlement Agreement, the Approved Loan Documents, the Plan, or the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party (other than the Debtor and the Reorganized Debtor) shall hereby be expressly, unconditionally, irrevocably, generally, individually and collectively, released and acquitted by the Debtor, the Reorganized Debtor, the Estate, and the Plan Administrator, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of**

Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf the Debtor, that the Debtor, the Reorganized Debtor, the Estate, or the Plan Administrator would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the Debtor's in- or out-of-court restructuring efforts, intercompany transactions, the Ace Secured Claim, Secured Lender Claim, Loan Documents, Arbitration Award, Ace Judgment Lien, Management Agreement, Ace Complaint, SNDA, SNDA Adversary Proceeding, SNDA Counterclaims, SNDA Crossclaims, the Ace Preference Adversary Proceeding, the Cash Collateral Order, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Bidding Procedures Documents, the Disclosure Statement, the Plan, the Reorganized Debtor Governance Documents, the Secured Lender Settlement Agreement, the Approved Loan Documents, Ace Settlement, Ace Subordinated Note, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Reorganized Debtor Governance Documents, the Secured Lender Settlement Agreement, the Approved Loan Documents, Ace Settlement, Ace Subordinated Note, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any post-Effective Date obligations of any Person or Entity under the Plan or any document, instrument, or agreement (including the Secured Lender Settlement Agreement, the Approved Loan Documents, and any other Plan Supplement document) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan, (2) any Retained Causes of Action, or (3) claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the releases set forth above, which includes by reference to each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that the releases set forth above are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the releases set forth above; (3) in the best interests of the Debtor and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after reasonable investigation by the Debtor and after notice and opportunity for hearing; and (6)

a bar to the Debtor asserting any claim released by the releases set forth above against any of the Released Parties.

4.      Releases by Holders of Claims and Interests

Effective as of the Effective Date, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released each Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of the Debtor, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the management, ownership or operation thereof), the purchase, sale, or rescission of any security of the Debtor, the Reorganized Debtor, their Estate, or the Plan Administrator, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the Debtor's in- or out-of-court restructuring efforts, intercompany transactions, Ace Secured Claim, Secured Lender Claim, Loan Documents, the Arbitration Award, Ace Judgment Lien, Management Agreement, Ace Complaint, SNDA, SNDA Adversary Proceeding, SNDA Counterclaims, SNDA Crossclaims, the Ace Preference Adversary Proceeding, the Cash Collateral Order, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Bidding Procedures Documents, Disclosure Statement, the Plan, the Reorganized Debtor Governance Documents, the Secured Lender Settlement Agreement, the Approved Loan Documents, Ace Settlement, Ace Subordinated Note, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Reorganized Debtor Governance Documents, the Secured Lender Settlement Agreement, the Approved Loan Documents, Ace Settlement, Ace Subordinated Note, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any post-Effective Date obligations of any Person or Entity under the Plan or any document, instrument, or agreement (including the Secured Lender Settlement Agreement, the Approved Loan Documents, and any other Plan Supplement document) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan or (2) claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence.

For the avoidance of doubt, (1) the Secured Lender reserves all rights, claims and defenses it may have against the Paz Guarantors and any other parties arising from or related to the  Paz Guarantees, and (2) the Paz Guarantors reserve all rights, claims and

**defenses they may have against the Secured Lender and any other parties arising from or related to the Paz Guarantees.**

**Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the third-party release set forth above, which includes by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that the third-party release set forth above is: (1) consensual and in exchange for the good and valuable consideration provided hereunder and by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtor and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the third-party release set forth above against any of the Released Parties.**

5.    Exculpation

**Except as otherwise specifically provided in the Plan, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission occurring on or after the Petition Date through and including the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Case, the Disclosure Statement, the Plan, Ace Secured Claim, Secured Lender Claim, Loan Documents, Arbitration Award, Ace Judgment Lien, Management Agreement, Ace Complaint, SNDA, SNDA Adversary Proceeding, SNDA Counterclaims, SNDA Crossclaims, Ace Preference Adversary Proceeding, Bidding Procedures Documents, the Secured Lender Settlement Agreement, the Approved Loan Documents, the Ace Settlement, Ace Subordinated Note, Reorganized Debtor Governance Documents, or any contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Person or Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or any other act taken or omitted to be taken in connection or in contemplation with the restructuring of the Debtor or administration of the Plan or property to be distributed under the Plan, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

6.    Injunction

**Except with respect to the obligations arising under the Secured Lender Settlement Agreement, the Approved Loan Documents, the Plan, or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold claims or interests that have been released, discharged, or exculpated**

pursuant to Article IX.A., IX.B., IX.C, IX.D. or IX.E. of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Released Parties or Exculpated Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (4) asserting any right of setoff (except to the extent exercised prior to the Petition Date), subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim, Interest, Cause of Action, or liability or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.  For the avoidance of doubt, the Secured Lender's pursuit of the Paz Guarantors in connection with the Paz Guarantees shall not be subject to the foregoing injunction.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their Related Parties will be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.

## 7.   Protection Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the supremacy clause of the U.S. Constitution, all Entities, including Governmental Units, will not discriminate against the Reorganized Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against the Reorganized Debtor, or another Entity with whom the Reorganized Debtor has been associated, solely because the Debtor has been a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case), or have not paid a debt that is dischargeable in the Chapter 11 Case.

## 8.   Term of Injunctions of Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) will remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order will remain in full force and effect in accordance with their terms.

31582062.1

9.      Document Retention

On and after the Effective Date, the Reorganized Debtor may maintain documents in accordance with its standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtor.

**(i)      *Conditions Precedent to Consummation of the Plan***

1.      Conditions Precedent to the Effective Date

It will be a condition to Consummation of the Plan that the following conditions will have been satisfied (or waived pursuant to the provisions of Article X.B of the Plan):

      i.    the Secured Lender Settlement Order will have been entered and will be in full force and effective and will not have been stayed, modified, or vacated on appeal;

      ii.    the Debtor will have remitted the Pre-Plan Effective Date Payments to the Secured Lender on or before the applicable Payment Deadline;

      iii.    the Debtor and the Secured Lender will have entered into the Approved Loan Documents;

      iv.    the Debtor will have executed the DACAs in favor of the Secured Lender, and delivered the Deed Instrument to the Secured Lender;

      v.    the Confirmation Order, which will be consistent with the Secured Lender Settlement, will have been duly entered and will be in full force and effect and will not have been stayed, modified, or vacated on appeal;

      vi.    all actions, documents, certificates, and agreements necessary to implement the Plan will have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable law;

      vii.    all governmental and third-party approvals and consents, including Bankruptcy Court approval, that are necessary to implement the Plan Implementation Transactions will have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods will have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

      viii.    the Debtor will have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Plan Implementation Transactions;

31582062.1

ix. all Professional Fee Claims authorized to be paid by the Bankruptcy Court will have been paid in full or amounts sufficient to pay all Professional Fee Claims that become payable or Allowed after the Effective Date will have been placed in the Professional Fee Escrow Account, which will have been established and funded; and

x. the Debtor will have implemented the Plan Implementation Transactions in a manner consistent in all material respects with the Plan.

### 2. Waiver of Conditions

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in Article X of the Plan may be waived only by consent of the Debtor, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummates the Plan; *provided, however*, that the waiver of the conditions precedent set forth in Article X.A.1. through Article X.A.5 of the Plan shall be subject to the consent of the Secured Lender, which consent shall not be unreasonably withheld. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of such rights, and each such right will be deemed an ongoing right, which may be asserted at any time.

### 3. Effect of Non-Occurrence of Conditions to the Effective Date

If the Effective Date does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (1) constitute a waiver or release of any Claims or Interests; (2) prejudice in any manner the rights of the Debtor, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtor, any Holders, or any other Entity in any respect.

### 4. Substantial Consummation

"Substantial Consummation" of the Plan, as such term is defined in section 1101(2) of the Bankruptcy Code, will be deemed to occur on the Effective Date.

## VIII. RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtor's businesses or the Plan and its implementation.

**(a)** ***If a Termination Event Occurs with Respect to the Secured Lender Settlement Agreement, Costly and Protracted Litigation May Ensue Which May Prevent Confirmation of the Plan***

As noted in Art. IV(g) herein, the Debtor and the Secured Lender have reached a settlement that provides, among other things, for the treatment of the Secured Lender Claim under the Plan**,** which is memorialized in the Secured Lender Settlement Agreement, a copy of which is attached hereto as **Exhibit "E"**. The Secured Lender Settlement Agreement provides the Secured Lender

and the Debtor with certain rights to terminate the Secured Lender Settlement Agreement in accordance with Section 22 and/or Section 23 of the Secured Lender Settlement Agreement (any such termination a "Termination Event").  If a Termination Event occurs, then, among other things, (a) costly and protracted litigation between the Debtor and the Secured Lender concerning, among other things, the Exclusivity Termination Motion, Fourth Exclusivity Motion, Stay Relief Motion, and the Debtor's overall restructuring, may ensue, and (b) the Secured Lender may oppose the Plan in which event the Debtor may be prevented from confirming the Plan. The Debtor is hopeful that no Termination Event under the Secured Lender Settlement will occur, thereby enabling the Debtor to consummate the Plan and the transactions contemplated thereunder.

**(b)**      ***If Holders of General Unsecured Claims Vote to Reject the Plan, then the Debtor May Not be Able to Implement the Reorganization***

If Class 8, Holders of General Unsecured Claims, reject the Plan, the Debtor may be compelled to liquidate, and it is currently anticipated that no payments will be made to General Unsecured Creditors in Class 8, as more fully set forth on the Liquidation Analysis attached hereto as **Exhibit "B"**.  Alternatively, if Class 8 votes to accept the Plan and the Debtor elects to proceed with the Reorganization, then each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of the GUC Reorganization Payments if the Plan is approved by the Bankruptcy Court. However, other factors beyond the acceptance of the Plan by Class 8 may impact whether the Reorganization is implemented.

**(c)**      ***The Debtor Does Not Reach an Agreement with the Union***

Absent an agreement between the Union and the Debtor regarding the mutual termination or modification of the CBA, and reconciliation and treatment of any and all claims arising or related thereto, the Debtor may have no choice but to proceed with a liquidation.

**(d)**      ***The Union's Position Regarding the Plan***

The Union asserts that, to date, the Debtor remains in violation of the arbitration award: the Debtor continues to employ outside contractors to perform bargaining unit work, has not returned laid off bargaining unit employees to work, and has not made the laid off bargaining unit employees whole for lost earnings.

As discussed above, the Union asserts that the claim (Proof of Claim No. 17) for back pay on behalf of laid off bargaining unit employees for the 180 days prior to the Petition Date is entitled to priority under section 507(a)(4) of the Bankruptcy Code, and absent a settlement providing otherwise, must, pursuant to section 1129 (a)(9)(B) of the Bankruptcy Code, be paid in full in Cash on the Effective Date of the Plan.

As further discussed above, the Union further asserts that the claim of the NYHTC and Hotel Association of NYC Employee Benefit Funds (Proof of Claim No. 18) for benefit fund contributions owed on the back pay for the 180 days prior to the Petition Date is also entitled to priority under section 507(a)(5) of the Bankruptcy Code and, absent a settlement providing otherwise, must, pursuant to section 1129 (a)(9)(B) of the Bankruptcy Code, be paid in full in Cash on the Effective Date of the Plan.

The Union also asserts that the claim for back pay on behalf of laid off bargaining unit employees for the post-petition period is entitled to priority under section 507(a)(2) of the Bankruptcy Code, and that the claim of the NYHTC and Hotel Association of NYC Employee Benefit Funds for benefit fund contributions owed on the back pay for the post-petition period is also entitled to priority under section 507(a)(2) of the Bankruptcy Code and, absent a settlement providing otherwise, must, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, be paid in full in Cash on the Effective Date of the Plan.

In the absence of a settlement, the Union asserts that the Plan does not disclose a source of funds to pay these priority claims on the Effective Date of the Plan, and additional funds will be needed in order for the Plan to be feasible.

The Union asserts that, under the Plan, the Existing Equity Holder cannot retain its equity interest in the Reorganized Debtor unless all creditors are paid in full, or at minimum, the classes, including the Class of Union Claims approve the Plan.

The Debtor is hopeful that a consensual resolution can be reached with the Union that maximizes value for all parties in interest. The Debtor has considered the assertions of the Union as set forth directly above and believes that, among other things:

1. Union Claims Are Not Administrative Expenses: Because the Union Claims are damages arising from a CBA entered into prior to the Petition Date, they are not entitled to administrative expense priority, and the Union is attempting to elevate the Union Claims above other unsecured creditors of equal priority to obtain a benefit it is not entitled to under section 507(a)(2), section 1129(a)(9) or any other section of the Bankruptcy Code.

2. Union Claims Are Not Entitled to Priority: Because the CBA was entered into more than 180 days prior to the Petition Date, the Union Claims are not entitled to priority under either section 507(a)(4) or section 507(a)(5) of the Bankruptcy Code.

3. Existing Equity Holder Can Retain its Interest: In a Reorganization, the Existing Equity Holder can retain its Interest in the Debtor if all impaired Classes of Claims senior to the Existing Equity Holder Class vote to accept the Plan. If any such Class votes to reject the Plan, then the Debtor will not implement the Reorganization.

**(e)      *The Debtor Will Consider All Available Restructuring Alternatives if the Reorganization is not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtor***

If the Reorganization is not implemented, the Debtor will consider all other restructuring alternatives available at that time, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, or any other transaction that would maximize the value of the Debtors' estates. Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against and Interests in the Debtor than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, or the Chapter 11 Case, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtor. For example, it would also adversely affect (i) the Debtor's liquidity; (ii) the Debtor's ability to raise additional capital; (iii) how the Debtor's business is viewed by parties; and (iv) the Debtor's enterprise value.

**(f)** *Certain Bankruptcy Law Considerations*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

**(g)** *Parties May Object to the Plan's Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Interests, with each such Class encompassing Claims or Interests, as applicable that are substantially similar to the other Claims or Interests, as applicable in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**(h)** *The Conditions Precedent to the Effective Date of the Plan May Not Occur*

As more fully set forth in Article X of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

**(i)** *Failure to Satisfy Vote Requirements*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtor may seek to confirm an alternative chapter 11 plan, among other possible alternatives. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

**(j)** *The Debtor May Not Be Able to Secure Confirmation of the Plan*

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting

classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received and, even if received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A nonaccepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or the Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.

Confirmation of the Plan is also subject to certain conditions as described in Article X of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.

The Debtor, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### (k) *Nonconsensual Confirmation*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtor believes that the Plan satisfies these requirements, and the Debtors intend to request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code, to the extent necessary. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Professional Fee Claims.

### (l) *The Debtor May Object to the Amount or Classification of a Claim*

Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an

31582062.1

objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**(m)**     *Risk of Non-Occurrence of the Effective Date*

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will in fact occur.

**(n)**     *Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan*

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies could affect solutions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtor cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

**(o)**     *Releases, Injunctions, and Exculpations Provisions May Not be Approved*

Article IX of the Plan provides for certain releases, injunctions, and exculpations. However, all of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved, or if approved, may not be binding on certain parties that oppose the release and injunction provisions.

**(p)**     *General Unsecured Creditors May Recover Less Than Projected*

The Cash available for Distributions to Holders of Allowed General Unsecured Claims will be reduced by, among other things, the prior payment of (a) costs and expenses of the Debtor; (b) Allowed Claims required to be paid by the Estate pursuant to the Plan with priority over Allowed General Unsecured Claims; and (c) Allowed Professional Fees.  These amounts may exceed the Debtor's estimates and, therefore, General Unsecured Creditors may recover less than projected.

**(q)**     *Risks Related to Income Taxation*

There are several income tax considerations, risks and uncertainties associated with the Plan. Interested parties should read carefully the discussions set forth in Article X of the Disclosure

Statement regarding certain United States federal income tax consequences of the transactions proposed by the Plan.

**(r)** *Litigation*

As is the case with most litigation, the outcomes of any litigation involving the Debtor, or any other Retained Cause of Action commenced, or preserved, prior to the Effective Date, are difficult to assess or quantify.

**(s)** ***Even if the Plan Implementation Transactions are Successful, the Debtors Will Continue to Face Risks.***

The Plan Implementation Transactions are generally designed to reduce the amount of debt on the Debtor's balance sheet and the Debtor's cash interest expense while improving the Debtor's liquidity and financial and operational flexibility. Even if the Plan Implementation Transactions are implemented, the Debtor will continue to face a number of risks, including certain risks that are beyond the Debtor's control, such as changes in economic conditions, changes in the Debtor's industry, and the ongoing effects related to the COVID-19 global pandemic. As a result of these risks and others, there is no guarantee that the Plan Implementation Transactions will achieve the Debtor's stated goals.

## IX.   <u>CONFIRMATION OF THE PLAN</u>

**(a)** *The Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

**The Bankruptcy Court has scheduled the Confirmation Hearing to commence on <u>June 11, 2024 at 10:00 a.m. (Eastern Time)</u>,** before the Honorable Thomas M. Horan, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.  The Confirmation Hearing Notice, which sets forth the time, date and place of the Confirmation Hearing, has been included along with the Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or in a notice of rescheduled hearing in the agenda for the Confirmation Hearing Filed with the Bankruptcy Court.

Objections to Confirmation of the Plan must be Filed and served on the Debtor and certain other entities, all in accordance with the Confirmation Hearing Notice, so that they are actually received by no later than **<u>May 29, 2024 at 4:00 p.m. (Eastern Time)</u>**.  Unless objections to Confirmation of the Plan are timely Filed and served in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court.  For further information, refer to Article IX of the Disclosure Statement, "Confirmation of the Plan."

31582062.1

(b)    *Requirements for Confirmation of the Plan*

Among the requirements for the Confirmation of the Plan is that the Plan: (a) is accepted by all Impaired Classes of Claims, or, if rejected by an Impaired Class of Claims, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Impaired Class of Claims; (b) is feasible; and (c) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtor believe that: (a) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (b) the Debtor has complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (c) the Plan has been proposed in good faith. Specifically, the Debtor believes that the Plan satisfies or will satisfy the following applicable Confirmation requirements of section 1129 of the Bankruptcy Code, along with any other such requirements:

• The Plan complies with the applicable provisions of the Bankruptcy Code.

• The Debtor has complied with the applicable provisions of the Bankruptcy Code.

• The Plan has been proposed in good faith and not by any means forbidden by law.

• Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

• Each Holder of a Claim in an Impaired Class of Claims has either (1) accepted the Plan; or (2) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. (This is the "best interests of creditors" test referred to below.)

• Except to the extent a different treatment is agreed to, the Plan provides that all Claims will be paid or otherwise satisfied in accordance with the Plan.

• At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

• All accrued and unpaid fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

31582062.1

(c)     *Best Interests of Creditors*

Often called the "best interests of creditors" test, section 1129(a)(7) of the Bankruptcy Code requires that a Bankruptcy Court find, as a condition to confirmation of a chapter 11 plan, that the plan provides, with respect to each impaired class, that each holder of a claim or an interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the Debtor liquidated under chapter 7 on the Effective Date.

Here, the costs of liquidation under chapter 7 of the Bankruptcy Code would include, among other things, the statutory fees payable to a chapter 7 trustee, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage, which amounts would have to be paid before anything is paid to Holders of Allowed General Unsecured Claims.

Conversion to chapter 7 of the Bankruptcy Code would also mean the establishment of a new claims bar date, which could result in, among other things, new Claims being asserted against the Estate, thereby diluting the recoveries of Allowed General Unsecured Claims.

After considering the effects that a chapter 7 liquidation would have on the funds available for distribution to Holders of Allowed Claims, including, among other things, fees payable to a chapter 7 trustee, the Debtor believes that Holders of Allowed Claims will receive not less than such Holders would receive if these Chapter 11 Case was converted to cases administered under chapter 7 of the Bankruptcy Code.

In light of the foregoing, the Debtor believes that confirmation of the Plan will provide each Holder of an Allowed Claim with a greater recovery than such Holder would receive pursuant to the liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

(d)     *Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor, or any successor to the Debtor (unless such liquidation or reorganization is proposed in the plan). This requirement is satisfied as the Plan (including, but not limited to, the Approved Loan Documents) provides for the deleveraging of the Debtor and the distribution of its assets. Moreover, the Debtor believes that sufficient funds will exist to make all payments required by the Plan. Accordingly, the Debtor believes that all Plan obligations will be satisfied without the need for further reorganization of the Debtor.

(e)     *Acceptance by Impaired Classes*

The Bankruptcy Code requires that, as a condition to confirmation, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

A class is "impaired" unless a plan:  (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of allowed claims in that class, counting only those claims that actually voted to accept or reject the plan.  Thus, a Class of Impaired Claims will have voted to accept the Plan only if two-thirds in dollar amount and a majority in number actually voting on the Plan cast their Ballots in favor of acceptance.

(f)     *Confirmation Without Acceptance by All Impaired Classes*

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan even if all impaired classes have not accepted it, if the plan has been accepted by at least one impaired class of claims, determined without including the acceptance of the plan by any insider. Notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

    1.     <u>No Unfair Discrimination</u>

The "unfair discrimination" test applies to classes of claims or interests that reject or are deemed to have rejected a plan and that are of equal priority with another class of claims or interests that is receiving different treatment under such plan.  The test does not require that the treatment of such classes of claims or interests be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.  The Debtor submits that the Plan does not "discriminate unfairly" against any rejecting Class.

    2.     <u>Fair and Equitable Test</u>

The "fair and equitable" test applies to classes that reject or are deemed to have rejected a plan and are of different priority and status vis-à-vis another class (*e.g.*, secured versus unsecured claims, or unsecured claims versus interests), and includes the general requirement that no class of

claims receive more than 100% of the amount of the allowed claims in such class, including interest. As to the rejecting class, the test sets different standards depending upon the type of claims or interests in such rejecting class. The Debtor submits that the Plan meets the "fair and equitable" test.

### (g) *Alternatives to Confirmation and Consummation of the Plan*

The Debtor believes that the Plan affords Holders of Allowed General Unsecured Claims the potential for a greater recovery on the Debtor's assets than a chapter 7 liquidation, and, therefore, is in the best interests of such Holders. If, however, the requisite acceptances of the Voting Classes of Claims are not received, or no Plan is confirmed and consummated, the theoretical alternatives to the Plan include (i) formulation of a plan of liquidation, or (ii) liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

The Debtor believes that the Plan enables Holders Allowed General Unsecured Claims to realize the greatest possible recovery under the circumstances, and, as compared to a plan of liquidation, has the greatest chance of being confirmed and consummated.

The Chapter 11 Case may also be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to complete the liquidation of the Debtor's assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. As described above, the Debtor believes that the Plan will provide each Holder of an Allowed General Unsecured Claim with a greater recovery than such Holder would receive with respect to a liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code.

## X.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

This discussion is provided for information purposes only, and is based on provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect on the date hereof. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly, and adversely, affect the United States federal income tax consequences of the Plan.

The following summary is limited to Holders that are United States persons within the meaning of the IRC. For purposes of the following discussion, a "United States person" is any of the following:

31582062.1

(i)      An individual who is a citizen or resident of the United States;

(ii)     A corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States or any state or political subdivision thereof;

(iii)    An estate, the income of which is subject to federal income taxation regardless of its source; or

(iv)     A trust that (a) is subject to the primary supervision of a United States court and which has one or more United States persons who have the authority to control all substantial decisions of the trust or (b) has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

This discussion does not address all aspects of United States federal income taxation that may be relevant to a particular Holder in light of such Holder's particular facts and circumstances, or to certain types of Holders subject to special treatment under the IRC. Examples of Holders subject to special treatment under the IRC include, without limitation, governmental entities and entities exercising governmental authority, foreign companies, persons who are not citizens or residents of the United States, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, small business investment companies, regulated investment companies, persons that have a functional currency other than the United States dollar, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction. All Holders, including Holders subject to special treatment under the IRC, are urged to consult their own tax advisors regarding the U.S. federal, state, local, or other tax consequences of the Plan. This discussion does not address state, local, or foreign tax consequences of the Plan with respect to any Holders.

The tax treatment of Holders of Claims and the character, amount, and timing of income, gain, or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan may vary depending upon several factors, including without limitation: (i) whether the Claim or portion thereof constitutes a Claim for principal or interest; (ii) the type of consideration, if any, received by the Holder in exchange for the Claim, and whether the Holder receives Distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to United States federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction or a worthless securities deduction with respect to the Claim or any portion thereof in the current or prior taxable years; (viii) whether the Holder has previously included in gross income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for United States federal income tax purposes; and (xi) whether the "market discount" rules apply to the Holder. Therefore, each Holder should consult such Holder's own tax advisor for tax advice with respect to that Holder's particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

A significant amount of time may elapse between the date of the Disclosure Statement and the receipt of a final Distribution under the Plan. Events occurring after the date of the Disclosure Statement, such as new or additional tax legislation, court decisions, or administrative changes, could affect the United States federal income tax consequences of the Plan and the transactions contemplated thereunder. No ruling has been or will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtor with respect thereto. No representations are being made regarding the particular tax consequences of confirmation or implementation of the Plan as to any Holder of a Claim. This discussion is not binding upon the IRS or other taxing authorities. The IRS or another taxing authority could assert, and a court sustain, a different position from any discussed herein and no assurance is given as to whether such a different position will or will not be asserted.

(a)      *Certain Tax Consequences to Holders of Claims*

A Holder of an Allowed Claim will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in its Allowed Claim and the amount realized by the Holder in respect of its Allowed Claim. Over time and on a cumulative basis, the amount realized generally will equal the aggregate amount of the Cash (and the fair market value of property, if any) distributed to the Holder, less the amount, if any, attributable to accrued but unpaid interest. A Holder of an Allowed Claim will generally recognize ordinary income to the extent that the amount of Cash or property received (or deemed received) under the Plan is attributable to interest that accrued on a Allowed Claim but was not previously paid by the Debtor or previously included in income by the Holder of the Allowed Claim.

The character of any gain or loss recognized by a Holder will depend upon a number of factors, including the status of the Holder, the nature of the Allowed Claim in the Holder's hands, whether the Allowed Claim was purchased at a discount, whether and to what extent the Holder has previously claimed a bad debt deduction with respect to the Allowed Claim, and the Holder's holding period of the Allowed Claim. If the Allowed Claim in the Holder's hands is a "capital asset" within the meaning of IRC Section 1221, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the Holder held such Allowed Claim for longer than one year or short-term capital gain or loss if the Holder held such Allowed Claim for one year or less. Any capital loss realized generally may be used by a corporate Holder only to offset capital gains and by an individual Holder only to the extent of capital gains plus a certain limited statutorily proscribed amount of ordinary income in any single taxable year, currently $3,000.

A Holder of an Allowed Claim who receives, in respect of the Holder's Allowed Claim, an amount that is less than that Holder's tax basis in such Allowed Claim may be entitled to a bad debt deduction under IRC Section 166(a). The rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the Holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to the ability to take a bad debt deduction. A Holder that has previously recognized a loss or deduction in respect of that Holder's Allowed Claim may be required to include in gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Allowed Claim.

31582062.1

Holders of Allowed Claims who were not previously required to include any accrued but unpaid interest with respect to an Allowed Claim may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. A Holder previously required to include in gross income any accrued but unpaid interest with respect to an Allowed Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

A Holder of an Allowed Claim constituting an installment obligation for tax purposes may be required to currently recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than face value or distributed, transmitted, sold, or otherwise disposed of within the meaning of IRC Section 453B.

Under backup withholding rules, a Holder of an Allowed Claim may be subject to backup withholding with respect to payments made pursuant to the Plan unless such Holder: (i) is a corporation or is otherwise exempt from backup withholding and, when required, demonstrates this fact; or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that (a) the taxpayer identification number is correct and (b) the Holder is not subject to backup withholding because of failure to report all dividend and interest income. Any amount withheld under the backup withholding rules is not an additional tax and may be credited against the Holder's federal income tax liability if the Holder timely provides required information to the IRS.

Holders of Subordinated Claims and Claims that are not Allowed ("Disallowed Claims") will not receive any Distribution under the Plan. Accordingly, because such a Holder may receive an amount that is less than that Holder's tax basis in such Claim, such Holder may be entitled to a bad debt deduction under IRC Section 166(a). The rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the Holder, the obligor, and the instrument with respect to which a bad debt deduction is claimed. Holders of Subordinated Claims and Disallowed Claims, therefore, are urged to consult their tax advisors with respect to the ability to take a bad debt deduction.

**(b)**    ***Certain Tax Consequences to the Debtor***

1.    Federal Taxation Issues Related to Corporations and Pass-Through Entities in General

In general, for United States federal income tax purposes, an entity can be classified as a corporation or association, a partnership, or disregarded entity. The primary difference between an entity classified as a corporation and an entity classified as a partnership for tax purposes is how the entity's items of income, gain, deduction, and loss are taxed. Generally, a corporation is a tax-paying entity, unaffected by the personal characteristics of its shareholders or changes in the composition of such shareholders as a result of transfers of stock from one or more shareholders to other existing or new shareholders. As separate taxpayers, corporations are liable for any tax on items of income and gain earned by such corporation and such taxable amounts are reduced by any deductions and losses available to the corporation. When amounts are distributed from a corporation to its shareholders, the amount so distributed to the shareholders may be taxable to the

shareholders, giving rise to double taxation, *i.e.*, once at the corporate level and again at the shareholder level.

Partnerships, on the other hand, generally are not entities subject to income tax. Instead, partnerships are "pass-through" entities, and each partner is taxable on its allocable share of a partnership's items of income, gain, deduction, and loss. The partners are taxed on their allocable share of such items without regard to whether any income is actually distributed to such partners by the partnership. Limited liability companies with more than one member are, by default, classified as partnerships for U.S. federal income tax purposes, unless such companies make an election to be classified as a corporation. A limited liability company with only a single member is, by default, classified as a disregarded entity for U.S. federal income tax purposes, absent an election to be classified as a corporation. For U.S. federal income tax purposes, items of income, gain, loss, and deduction of a disregarded entity are treated as if earned or incurred directly by the owner of the disregarded entity.

Limited liability companies and partnerships are permitted to elect to be classified and taxed as corporations by making a so-called "check-the-box" election. If such election is made, the electing entity is treated as a corporation for U.S. federal income tax purposes and, accordingly, taxable on income and gain, reduced by any deductions or losses available to the entity; the members or partners of the electing entity are not taxed on the entity's income but only subject to tax on distributions they receive from the entity.

2.      Cancellation of Indebtedness Income

Under IRC, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD Income") realized during the taxable year. IRC Section 108 provides an exception to this general rule, however, if the cancellation of indebtedness occurs in a case under the Bankruptcy Code or when the taxpayer is insolvent. When indebtedness of an entity classified as a partnership for U.S. federal income tax purposes is discharged, the determination of insolvency under IRC Section 108 is made at the partner level. For example, if an insolvent limited liability company classified as a partnership realizes COD Income, a member of such limited liability company will be required to recognize and pay tax on that member's allocable share of the limited liability company's COD Income unless the member is itself insolvent.

When a taxpayer excludes COD Income, IRC Section 108 requires the amount of COD Income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer, *i.e.*, a member or partner of an entity classified as a partnership for tax purposes. The tax attributes that may be subject to reduction include net operating losses and net operating loss carryovers (collectively, "NOLs"), certain tax credits and tax credit carryovers, capital losses and capital loss carryovers, tax bases in assets, and passive activity loss carryovers. IRC Section 108 further provides that a taxpayer does not realize COD Income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction.

Under the Plan, Holders of certain Allowed Claims are expected to receive less than full payment in respect of their Claims, and Holders of Subordinated Claims and Disallowed Claims are expected to receive no payment. The Debtor's liability to the Holders of such Claims in excess

of the amount satisfied by Distributions under the Plan will be canceled, and therefore will result in COD Income to the Debtor. The owners of the equity interests in the Debtor generally will be required to recognize their respective allocable shares of COD Income of the Debtor unless such owners are themselves insolvent. If any such owners are insolvent, the exclusion of some or all of their allocable share of the COD Income will result in a reduction of certain tax attributes of such insolvent owners.

(c)    *Importance of Obtaining Professional Tax Assistance*

THE FOREGOING DISCUSSION IS:  (I) INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN; (II) NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL; AND (III) FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES TO EACH HOLDER ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT WITH SUCH HOLDERS' TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN.

## XI.    <u>RECOMMENDATION</u>

IN THE OPINION OF THEDEBTOR, THE PLAN IS SUPERIOR AND PREFERABLE TO ANY ALTERNATIVE.

ACCORDINGLY, THE DEBTOR, AS THE PLAN PROPONENT, RECOMMENDS THAT HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN AND SUPPORT CONFIRMATION OF THE PLAN.

Dated: April 24, 2024

225 BOWERY LLC

By: */s/ Nat Wasserstein*
     Nat Wasserstein, Chief Restructuring Officer

<u>**EXHIBIT A TO DISCLOSURE STATEMENT**</u>

**Third Amended Chapter 11 Plan of 225 Bowery LLC**
**Pursuant to Chapter 11 of the Bankruptcy Code**

**EXHIBIT B TO DISCLOSURE STATEMENT**

**Liquidation Analysis**

## EXHIBIT C TO DISCLOSURE STATEMENT

**Financial Projections**

# EXHIBIT D TO DISCLOSURE STATEMENT

**Ace Settlement and Amendment to Ace Settlement**

# EXHIBIT E TO DISCLOSURE STATEMENT

**Secured Lender Settlement Agreement**

## **EXHIBIT 2**

**Changed Pages Only Blackline**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| 225 BOWERY LLC,[1] | Case No. 23-10094 (TMH) |
| Debtor. | |

### DISCLOSURE STATEMENT FOR THE THIRD AMENDED CHAPTER 11 PLAN OF 225 BOWERY LLC PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**ALSTON & BIRD LLP**
Gerard S. Catalanello (admitted *pro hac vice*)
James J. Vincequerra (admitted *pro hac vice*)
Dylan S. Cassidy (admitted *pro hac vice*)
Kimberly J. Schiffman (admitted *pro hac vice*)
90 Park Avenue
New York, New York 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
Emails: Gerard.Catalanello@alston.com
James.Vincequerra@alston.com
Dylan.Cassidy@alston.com
Kimberly.Schiffman@alston.com

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Michael R. Nestor (No. 3526)
Matthew B. Lunn (No. 4119)
Ryan M. Bartley (No. 4985)
Andrew A. Mark (No. 6861)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Emails: mnestor@ycst.com
mlunn@ycst.com
rbartley@ycst.com
amark@ycst.com

*Counsel to the Debtor and Debtor in Possession*

Dated: April ~~18~~24, 2024

---

[1]   The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is 225 Bowery LLC (1333).  The location of the Debtor's service address is: 187 Chrystie Street, New York, New York, 10002

| Class | Claim | Status | Voting Rights | Projected Recovery Under Plan |
|---|---|---|---|---|
| 4 | Ace Secured Claim | Impaired | Entitled to Vote | 28.6% – 37% |
| 5 | Mechanic's Lien Bond Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 6 | Mechanic's Lien Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 7 | Union Claims | Impaired | Entitled to Vote | To be agreed upon by the Debtor and Union.[3] |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote | 27.5%[4] |
| 9 | Existing Equity Holder Interests in Debtor | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |

## II.      THE DEBTOR'S BUSINESS OPERATIONS, AND CORPORATE AND CAPITAL STRUCTURES

Additional information regarding the Debtor's business, its capital structure and the circumstances leading to the filing of this Chapter 11 Case is set forth in the *Declaration of Nat Wasserstein, Chief Restructuring Officer of 225 Bowery LLC, in Support of Debtor's Petition and First Day Motions* [D.I. 19] (the "First Day Declaration").

### (a)      *Corporate Structure*

The Debtor was incorporated in 2019 in Delaware.  The Debtor itself is wholly owned by 225 Bowery Group, LLC ("Bowery Group").  The Debtor is the owner a hotel property (the "Hotel") located at 223-225 Bowery, New York, New York.

---

[3]    Projected recovery to the Union is dependent upon, among other things, the Debtor and Union reaching an agreement with regard to the CBA and all claims related thereto. As of the date hereof, the Debtor and the Union are engaging in discussions regarding a potential resolution of their disputes, but no such agreement has been achieved.

[4]    Projected recovery to the holders of General Unsecured Claims assumes that (i) all Insider General Unsecured Claims that are currently included in Class 8 have been expunged, disallowed and/or subordinated to all other Claims in their entirety and (ii) the total amount of Allowed General Unsecured Claims will be less than or equal to $4,111,654.55, which is the Debtor's current estimate of the size of Allowed General Unsecured Claims.  The Plan provides that Class 8 (General Unsecured Claims) will receive Cash payments equal to the lesser of (a) $1,130,705, or (b) an amount sufficient to provide a twenty seven and one half percent (27.5%) recovery on account of each Allowed General Unsecured Claim, as described in Article III.C.8. of the Plan.

2.    <u>Ace Arbitration Award</u>

As previewed above, Ace Management opposed the Debtor's decisions to generate income through the City Use Agreement with the City and to partner with Airbnb. As a result, Ace Management sought legal recourse alleging several claims for breach of the Hotel Management Agreement.

Pursuant to the Hotel Management Agreement, the Debtor and Ace Management were required to arbitrate as a means of dispute resolution. Prior to the Petition Date, an arbitration was conducted before a fast-track International Chamber of Commerce panel in New York City with a "merits hearing" taking place on June 17, 20, 21 and 22, 2022. The arbitration panel ultimately found that the Debtor breached certain contractual obligations under the Hotel Management Agreement and, pursuant to a Final Award dated September 22, 20222, awarded Ace Management damages in the amount of $10,474,628.18 (the "<u>Arbitration Award</u>"). The Arbitration Award reflected the discounted present value of all of the management fees that Ace Management would have collected through the term thereof had the Hotel Management not been repudiated by the Debtor.

3.    <u>Unsecured Creditor Body</u>

In the ordinary course of business, the Debtor incurs general unsecured debt on account of operational costs, related to, for example, equipment leases, certain goods and services procured on credit, and other trade claims, such as a small business administration loan. The largest potential unsecured claims are disputed claims arising from pending litigations or arbitrations. The Debtor does not have funded unsecured debt. As of the Petition Date, the Debtor had scheduled $4,079,717.00 in unsecured, non-insider debt <u>and the Debtor's current estimate is that the size of the total amount of Allowed General Unsecured Claims will be $4,111,654.55</u>.

4.    <u>Union</u>

Prior to the Petition Date, the Debtor agreed to be bound by the Industry-Wide Agreement ("<u>IWA</u>"), the collective bargaining agreement (the "<u>CBA</u>") between the Hotel and Gaming Trades Council, AFL–CIO (the "<u>Union</u>") and the Hotel Association of New York City, Inc. In March 2020, the Debtor laid off all of its employees due to the COVID-19 global pandemic. Thereafter, the Debtor then began operating the Hotel without the employees. The Union subsequently demanded an arbitration against the Debtor. On June 7, 2022, prior to the Petition Date, the arbitrator issued an arbitration award against the Debtor and in favor of the Union. The award directed that the Hotel cease and desist from allowing outside contractors to perform duties which were performed by bargaining unit employees, to recall such employees, and to make them whole for lost earnings. The Hotel was also directed to provide the Union with relevant records to determine backpay.

As discussed more fully herein, on April 14, 2023, the Union filed proof of claim 17 ("<u>Proof of Claim No. 17</u>") in the amount of $1,609.084.88, plus an unliquidated contingent claim for such other amounts. Through Proof of Claim No. 17, the Union asserts that the basis for the filing of its claim is for violations of the CBA and non-compliance with the arbitration award.

Notwithstanding such fact, Culinary Depot did not file a proof of claim prior to the General Bar Date (as defined below).

6.     <u>Insider General Unsecured Claims</u>

Omnia Properties LLC ("<u>Omnia</u>"), an entity that has an interest in Bowery Group, filed a proof of claim in the Debtor's Chapter 11 Case in the amount of $30,501,127.61 (the "<u>Omnia Claim</u>"). Bowery Group, David Paz ("<u>Paz</u>"), an individual who has an indirect interest in Bowery Group, and VNAA, an entity that also has an interest in Bowery Group, each filed proofs of claim against the Debtor, each in an undetermined amount (such proofs of claim, together with the Omnia Claim, the "<u>Insider General Unsecured Claims</u>"). The Debtor reviewed the Insider General Unsecured Claims and determined that it had several bases to seek disallowance and/or subordination of some or all of said claims. As is also more fully discussed below, projected recoveries to the holders of General Unsecured Claims in a Reorganization assumes that all Insider General Unsecured Claims that are currently included in Class 8 have been expunged, disallowed and/or subordinated to all other Claims in their entirety. As is also more fully discussed below, the Debtor, Paz, Omnia and related parties (collectively, the "<u>Paz Parties</u>") are currently in discussions regarding, among other things, the Insider General Unsecured Claims and the treatment of such claims under and pursuant to a global resolution of disputes between the Debtor and the Paz Parties. If these discussions result in an agreement prior to the Confirmation Hearing (as defined below), the Debtor expects that such agreement will provide for the expungement and/or subordination of the Insider General Unsecured Claims. If, however, these discussions do not result in an agreement between the Debtor and the Paz Parties, the Debtor ~~expects~~<u>intends</u> to object to the Insider General Unsecured Claims by or prior to the Confirmation Hearing.

## III.   <u>EVENTS PRECIPITATING THE CHAPTER 11 CASE</u>

Despite the success and promise of certain initiatives aimed at positioning the Hotel for continued growth, a combination of legal setbacks and unfavorable macroeconomic conditions, including, at least initially, those most notably related to the COVID-19 global pandemic, an arbitration award in favor of Ace Management, and litigation centered on the Debtor's default under the BHI Loan Documents (as defined below), led to operational challenges that decreased revenue and increased costs for the Hotel. The Debtor was able to withstand these liquidity impacts for some time due, in part, to various cost-saving and revenue generating measures, but long-term could not continue without significant operational changes and capital. As a result, the Debtor began to consider strategic alternatives, including the potential filing of a chapter 11 case. Multiple factors contributed to the Debtor's need to commence the Chapter 11 Case.

(a)    <i><b>Continued Troubled Outlook for Hospitality in New York City</b></i>

Prior to the Petition Date and for some period of time thereafter, the Debtor found itself in an industry still recovering from the COVID-19 global pandemic. The hospitality industry in the City (and across the world) had not completely rebounded from the effects therefrom. Indeed, some of these affects are still presently felt. As the virus continued to spread, uncertain economic conditions persisted, and unrest in parts of the world played out, there was a dramatic shift in the hospitality industry's outlook that saw a decrease in consumer hotel bookings. Albeit

interim basis [D.I. 46]. On March 14, 2023, the Bankruptcy Court entered a final order approving the Cash Collateral Motion [D.I. 113] (the "Final Cash Collateral Order").

On October 18, 2023, the Debtor filed a motion for entry of an order seeking to supplement the Final Cash Collateral Order and granting additional adequate protection to the Secured Lender [D.I. 316] (the "Supplemental Cash Collateral Motion"). Prior to the Petition Date, the Debtor negotiated the consensual use of cash collateral with the Secured Lender's predecessor, BHI, in exchange for an adequate protection package. Following the Secured Lender's acquisition of the BHI Loan Documents, as discussed more fully above, a number of disputes arose between the Debtor and the Secured Lender with respect to, among other things, the amount of the Secured Lender's secured claim as of the Petition Date, the Secured Lender's entitlement to default interest, and whether the adequate protection package approved by BHI was sufficient under the circumstances. Following productive discussions regarding the ongoing use of cash collateral as part of a global resolution of all of their disputes and the potential structure for the Debtor's exit from the Chapter 11 Case, the parties reached an agreement to make an adequate protection payment in the amount of $1,000,000.00 to the Secured Lender (the "Adequate Protection Payment"). On November 2, 2023, the Bankruptcy Court entered an order approving the Supplemental Cash Collateral Motion [D.I. 332] (the "Supplemental Cash Collateral Order"), which authorized and directed the Debtor to make the Adequate Protection Payment.[5] Consistent with the Supplemental Cash Collateral Order, the Debtor made the Adequate Protection Payment to the Secured Lender on or about November 3, 2023.

On January 9, 2024, the Debtor filed a motion for entry of an order supplementing the existing cash collateral orders and granting the Secured Lender additional adequate protection [D.I. 397] (the "Second Supplemental Cash Collateral Motion"). Through the Second Supplemental Cash Collateral Motion, the Debtor requested that the Bankruptcy Court grant the Debtor the authority to make an additional adequate protection payment up to $4,000,000.00 (the "Second Adequate Protection Payment") *provided* that: (i) the Secured Lender submits a ballot accepting the Plan; (ii) the Secured Lender supports confirmation of the Plan; and (iii) the Debtor and the Secured Lender reach agreement on the Approved Loan Documents (or any such other loan documents necessary to implement the treatment of the Secured Lender Claim under the Plan) and such documents are filed with the Bankruptcy Court. On January 18, 2024, the Bankruptcy Court entered an order granting the Second Supplemental Cash Collateral Motion [D.I. 405] (the "Second Supplemental Cash Collateral Order"). Pursuant to the terms of the Secured Lender Settlement Agreement, on April 19, 2024, the Debtor ~~will waive~~waived certain of the conditions contained in the Second Supplemental Cash Collateral Order (as the Debtor was authorized to do) and ~~intends to remit~~made the Tranche 1 Payment (as defined in the Secured Lender Settlement Agreement) in the amount of $1,250,000.00 to the Secured Lender pursuant to the authority provided to it under the Second Supplemental Cash Collateral Order.

   **(c)**     ***Debtor's Preference Action Against Ace***

On the Petition Date, the Debtor also initiated an adversary proceeding by filing a complaint (the "Complaint") against Ace (the "Ace Preference Adversary Proceeding").

---

[5]   The Final Cash Collateral Order continues to remain in full force and effect except as specifically modified by the Supplemental Cash Collateral Order and the Second Supplemental Cash Collateral Order (as defined below).

| Claimant | Proof of Claim/Schedule[8] | Estimated Amount[9] |
|---|---|---|
| General Unsecured Creditors | Claim Nos. 2, 3, 4, 6, 7, 8, 9, 11, 12, 13, 14 15, and 21; Schedule E/F | $34,753,536.47[10] |
| Union | Claims No. 17 and 18 | $2,119,526.35 |
| | **Total** | **$130,697,581.77** |

The claims reconciliation process is ongoing. As discussed more fully above, the Debtor intends to object to the proof of claim of New York Erectors based upon, among other things, the fact that the NY Mechanic's Lien was discharged and that any claim would be a claim against the Predecessor Owners, who are non-Debtor entities. The Debtor also intends to object to the claim filed by Open AWD based upon the fact, among others, that Open AWD's mechanic's lien was discharged. As discussed more fully above, the Debtor ~~expects~~ intends to object to the Insider General Unsecured Claims by or prior to the Confirmation Hearing if discussions between the Debtor and the Paz Parties do not result in an agreement.

**(f)    Investigation of Insider Claims and Causes of Action**

The Debtor, through the CRO, determined early on in the Chapter 11 Case to investigate pre-Petition Date transactions involving the Debtor and insiders and/or affiliated entities or individuals (the "Investigation"), including, but not limited to (i) Omnia, (ii) Northwind, (iii) Paz, and (vi) Ran Eliasaf ("Eliasaf").  The Investigation has included a review of (a) the transfers identified on the Debtor's schedules of assets and liabilities and statement of financial affairs [D.I. 107, 115, and 156], (b) purported equity contributions and distributions, and (c) various loan transactions.   The Debtor's counsel and CRO assisted the Debtor in conducting the Investigation and made a number of requests for information to Omnia, Paz, Northwind, and Eliasaf.

       1.    Omnia and Paz

In terms of the Investigation as it relates to transactions involving the Paz Parties, the CRO reviewed documents and other information provided by such parties and analyzed various potential claims and causes of action that may exist arising therefrom. Thereafter, the CRO and the Paz Parties engaged in good faith, arm's length negotiations regarding a potential resolution of the disputes amongst them. The Debtor and the Paz Parties did, in fact, reach an agreement resolving their disputes, including an agreement to expunge and/or subordinate the Insider General Unsecured Claims, and that agreement was then memorialized in a term sheet, dated March 8, 2024 (the "Paz Parties Settlement Term Sheet"), and annexed as Exhibit "E" to the Debtor's prior disclosure statement

---

[10]    The amount listed above is inclusive of the Insider General Unsecured Claims described more fully herein. *See* Art. II, § (c)(6).  As applicable, the amount listed above also does not include amounts associated with withdrawn, previously satisfied claims, and/or unliquidated amounts.

Reorganized Debtor.  Pursuant to the Secured Lender Settlement Agreement, the Secured Lender shall receive 100% of the Net Proceeds related to any Retained Causes of Action on account of any Northwind Claims. The Secured Lender shall apply 100% of such Net Proceeds to principal, interest, and other charges, in its sole and absolute discretion, *provided* that such applications are consistent with the Secured Lender Settlement Agreement and the terms of the Approved Loan Documents, all as more fully set forth in Section 6 of the Secured Lender Settlement Agreement.

**(g)**   ***Post-Petition Negotiations with the Secured Lender***

Following the Secured Lender's acquisition of the Secured Lender Claim, the Debtor and the Secured Lender engaged in extensive discussions and negotiations regarding the consensual treatment of the Secured Lender Claim under a chapter 11 plan, resulting in the Debtor and the Secured Lender reaching an agreement in principle in September 2023 (the "Agreement in Principle"). To that end, given that the Debtor believed that the parties had made substantial progress in their negotiations, on December 15, 2023 and January 19, 2024, the Debtor filed its *Chapter 11 Plan of 225 Bowery Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 370] (the "Initial Plan") and its *First Amended Chapter 11 Plan of 225 Bowery LLC Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 406] (the "First Amended Plan"), respectively, each of which were substantially consistent with the Agreement in Principle.  Unfortunately, the parties were not able to finalize an agreement for the treatment of the Secured Lender Claim under the First Amended Plan and, in fact, had substantial disagreements regarding key terms and provisions of the restructuring. Consequently, negotiations between the parties effectively came to a standstill, thereby preventing the Debtor and the Secured Lender from finalizing the terms of a consensual plan and implementing the Agreement in Principle.  At the same time, the Debtor and the Paz Parties entered into the Paz Parties Settlement Term Sheet.  On March 8, 2024, the Debtor filed its *Second Amended Chapter 11 Plan of 225 Bowery Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 447] (the "Second Amended Plan"), which, among other things, implemented the terms of the Paz Settlement Term Sheet and which was inconsistent with the Agreement in Principle, because, among other things, the Debtor contemplated treatment of the Secured Lender Claim in the context of a "cram up" under section 1129(b)(2)(A) of the Bankruptcy Code through the Second Amended Plan. As noted earlier, in light of the terms and conditions of the Secured Lender Settlement Agreement, the Debtor is no longer able to proceed with an agreement with the Paz Parties consistent with the Paz Parties Settlement Term Sheet. Instead, the Debtor and the Paz Parties have re-engaged in discussions and negotiations focused on a global resolution of their disputes and the Debtor is hopeful that an agreement to that effect will be reached prior to the Confirmation Hearing.

In that regard, the Debtor determined at that time to move ahead with its efforts to confirm the Second Amended Plan notwithstanding the fact that the Secured Lender opposed the treatment of the Secured Lender Claim thereunder and advised the Debtor that it intended to object to confirmation of the Second Amended Plan, as well as take other actions, including requesting relief from the automatic stay, terminating exclusivity and seeking additional adequate protection of the Secured Lender Claim.  The Secured Lender also made it clear that it intended to object to the Fourth Exclusivity Motion and approval of the Second Amended Disclosure Statement.

Based upon the Bids received, the overall information gleaned from the marketing process run by Keen-Summit, as well as the aforementioned developments and progress made with regard to a Restructuring of the Debtor as provided for in the Secured Lender Settlement Agreement, the Debtor exercised its discretion and terminated the sale process as it was authorized to do under and pursuant to the Bidding Procedures.

**(j)      *Post-petition Negotiations with Ace***

Following the Petition Date, and continuing thereafter, the Debtor engaged in a process designed to develop an exit from the Chapter 11 Case with the support of the Secured Lender and Ace, particularly given the ongoing cost, delay and risk associated with the SNDA Adversary Proceeding and the Ace Preference Adversary Proceeding. After numerous discussions and negotiations, the Debtor and Ace ultimately reached an agreement for the consensual treatment of the Ace Secured Claim under the Plan, which provides for a global resolution of that Claim and all litigation related thereto, including the SNDA Adversary Proceeding and the Ace Preference Adversary Proceeding.

In relevant part, the Plan implements a  settlement by and between the Debtor and Ace (as amended, supplemented and modified from time to time, the "Ace Settlement") that provides that Ace will have an Allowed Secured Claim in the amount of $3,875,000 (the "Ace Secured Claim") for purposes of voting on the Plan and such Claim is satisfied in full in exchange for the following treatment: (a) $3,000,000.00 paid in cash on the Effective Date (the "Effective Date Payment"), (b) issuance of an unsecured subordinated promissory note (the "Ace Subordinated Note"), which (i) will be subordinated in all respects to satisfaction of all obligations of the Reorganized Debtor, (ii) will not accrue or be paid interest, and which will be paid from only from "Net Proceeds" (as defined in the Ace Settlement) upon the occurrence of a Trigger Event (as defined in the Ace Settlement). A copy of the Ace Settlement and amendment thereto is attached hereto as **Exhibit "D"**.

The Ace Settlement also provides, among other things, that the Plan shall: (i) contain mutual releases effective on the Effective Date by and between, among others, the Debtor, Reorganized Debtor, Ace, BHI and the Secured Lender; (ii) provide that to the extent not already terminated, termination of each of the Hotel Management Agreement and that certain Subordination, Non-Disturbance and Attornment Agreement, effective as of March 4, 2019, between BHI and Ace the on the Effective Date (the "SNDA"); and (iii) provide for the dismissal, with prejudice, of all pending actions in the New York State Supreme Court and the Bankruptcy Court involving, among others, the Debtor, Ace, BHI, the Secured Lender, and all other parties identified in such actions no later than ten (10) days following the Effective Date. Additionally, under the Ace Settlement, Ace agreed to (a) forbear, cease, and refrain from (i) moving to lift the automatic stay, (ii) exercising any remedies with respect to the Ace Secured Claim, and (iii) exercising any remedies against Debtor; and (b) the Debtor's continued use of cash collateral on the same terms and conditions in the Final Cash Collateral Order.  As discussed above, such cash collateral use has been further amended by the Supplemental Cash Collateral Order and Second Supplemental Cash Collateral Order.

If you have any questions about (a) the procedure for voting your Claim; (b) the Solicitation Package that you have received; or (c) the amount of your Claim, or if you wish to obtain, at your own expense (unless otherwise specifically required by Bankruptcy Rule 3017(d)), an additional copy of the Plan, the Disclosure Statement or any appendices or exhibits to such documents, please contact the Voting Agent at the address specified above.  Documents Filed in this Chapter 11 Case may also be examined between the hours of 8:00 a.m. and 4:00 p.m., Eastern Time, Monday through Friday, at the Office of the Clerk of the Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.

The Voting Agent will process and tabulate Ballots received by the Voting Agent for the Classes entitled to vote to accept or reject the Plan and will file a voting report in accordance with the Disclosure Statement Order.

## VII.    SUMMARY OF THE CHAPTER 11 PLAN

(a)    *Administrative Claims and Priority Tax Claims*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.    Administrative Claims

i.    **Administrative Claims**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtor or the Reorganized Debtor, as applicable, or to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Case, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the unpaid portion of such Allowed Administrative Claim in accordance with the following: (a) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than sixty (60) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtor or the Reorganized Debtor, as applicable; or (e) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. *See also* Art.II.c.4; Art. VIII.c.

31

### ii.        Professional Fee Escrow Account

As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtor will establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account will be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, Claims, or Interests will encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Account in any way.  Such funds will not be considered property of the Estate, the Debtor, or the Reorganized Debtor.

The amount of Professional Fee Claims owing to the Professionals will be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims become payable in accordance with the Interim Compensation Order or are Allowed by an order of the Bankruptcy Court; *provided*, that obligations with respect to Allowed Professional Fee Claims will not be limited nor deemed limited to the balance of funds held in the Professional Fee Escrow Account.  When all Allowed Professional Fee Claims have been irrevocably paid in full, any remaining funds held in the Professional Fee Escrow Account will promptly be paid to the Reorganized Debtor or Debtor, as applicable, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

### iii.        Professional Fee Reserve Amount

The Professionals will provide an estimate of their fees and expenses incurred in rendering services to the Debtor before and as of the Effective Date projected to be outstanding as of the Effective Date, and will deliver such estimate to the Debtor no later than five (5) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimate will not be considered an admission or limitation with respect to the fees and expenses of such Professional.  If a Professional does not provide an estimate, the Debtor may estimate the unbilled fees and expenses of such Professional, taking into account prior payments; *provided*, *however*, that such estimate will not be considered an admission or limitation with respect to the fees and expenses of such Professional.  The total aggregate amount so estimated as of the Effective Date will be utilized by the Debtor to determine the amount to be funded to the Professional Fee Escrow Account; *provided*, that the Reorganized Debtor, or Debtor, as applicable, will use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

### iv.        ~~Post-Confirmation~~Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtor or Plan Administrator will, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtor or the Reorganized Debtor, as applicable.  If the

###### i.        Class 1 — Other Priority Claims

(a)    *Classification*: Class 1 consists of Other Priority Claims.

(b)    *Treatment:* Except to the extent that the Holder of the Allowed Other Priority Claims agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for the Allowed Other Priority Claims, each Holder of the Allowed Other Priority Claims will receive~~, at the option of the Debtor or Reorganized Debtor, as applicable: (1)~~ payment in full of the unpaid portion of the Other Priority Claim on, or as soon as reasonably practicable thereafter, the latter of the Effective Date or such date that the Priority Claim becomes an Allowed Claim~~, or (2) such other treatment that will render the claim unimpaired in accordance with section 1124 of the Bankruptcy Code~~.

(c)    *Voting*: Class 1 is Unimpaired.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

*See also* Art.II.c.4; Art. VIII.c.

###### ii.        Class 2 — Other Secured Claims

(a)    *Classification*: Class 2 consists of Other Secured Claims.

(b)    *Treatment:* Except to the extent that the Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim will receive at the option of the Debtor or  Reorganized Debtor, as applicable: (i) payment in full in Cash of such Allowed Other Secured Claim on, or as soon as reasonably practicable thereafter, the latter of the Effective Date or such date that the Other Secured Claim becomes an Allowed Claim, (ii) the collateral securing such Allowed Other Secured Claim, (iii) reinstatement of such Allowed Other Secured Claim, or (iv) such other treatment that will render claim unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting*: Class 2 is Unimpaired.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Plan.

these factors should not be regarded as constituting the only risks present in connection with the Debtor's businesses or the Plan and its implementation.

**(a)** ~~*The Bankruptcy Court Declines to Approve the Secured Lender Settlement Agreement;*~~*If a Termination Event Occurs with Respect to the Secured Lender Settlement Agreement, Costly and Protracted Litigation May Ensue Which May Prevent Confirmation of the Plan*

As noted in Art. IV(g) herein, the Debtor and the Secured Lender have reached a settlement that provides, among other things, for the treatment of the Secured Lender Claim under the Plan, which is memorialized in the Secured Lender Settlement Agreement, a copy of which is attached hereto as **Exhibit "E"**. The Secured Lender Settlement Agreement ~~requires, among other things, the Bankruptcy Court's entry of the Settlement Approval Order (as defined in~~provides ~~)~~ the Secured Lender ~~Settlement). In the event that~~and the Debtor ~~is unable to obtain entry of the Settlement Approval Order, the Secured Lender has the right~~with certain rights to terminate the Secured Lender Settlement Agreement in accordance with ~~the terms thereof. In such event,~~Section 22 and/or Section 23 of the Secured Lender Settlement Agreement (any such termination a "Termination Event").  If a Termination Event occurs, then, among other things, (a) costly and protracted litigation between the Debtor and the Secured Lender concerning, among other things, the Exclusivity Termination Motion, Fourth Exclusivity Motion, Stay Relief Motion, and the Debtor's overall restructuring, ~~will, more likely than not, ensue. Likewise, if the Settlement Approval Order is entered, but a termination event occurs under~~may ensue, and (b) the Secured Lender ~~Settlement Agreement, such event may also result in litigation concerning the matters referenced immediately above~~may oppose the Plan in which event the Debtor may be prevented from confirming the Plan. The Debtor is hopeful that ~~the Bankruptcy Court will enter the Settlement Approval Order and that no termination event~~no Termination Event under the Secured Lender Settlement will occur, thereby enabling the Debtor to consummate the Plan and the transactions contemplated thereunder.

**(b)** *If Holders of General Unsecured Claims Vote to Reject the Plan, then the Debtor ~~Will~~May Not be Able to Implement the Reorganization*

If Class 8, Holders of General Unsecured Claims, reject the Plan, the Debtor ~~will~~may be compelled to liquidate, and it is currently anticipated that no payments will be made to General Unsecured Creditors in Class 8, as more fully set forth on the Liquidation Analysis attached hereto as **Exhibit "B"**.  Alternatively, if Class 8 votes to accept the Plan and the Debtor elects to proceed with the Reorganization, then each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of the GUC Reorganization Payments if the Plan is approved by the Bankruptcy Court. However, other factors beyond the acceptance of the Plan by Class 8 may impact whether the Reorganization is implemented.

**(c)** *The Debtor Does Not Reach an Agreement with the Union*

Absent an agreement between the Union and the Debtor regarding the mutual termination or modification of the CBA, and reconciliation and treatment of any and all claims arising or related thereto, the Debtor may have no choice but to proceed with a liquidation.

(a)      *The Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

**The Bankruptcy Court has scheduled the Confirmation Hearing to commence on June 11, 2024 at 10:00 a.m. (Eastern Time)**, before the Honorable Thomas M. Horan, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.  The Confirmation Hearing Notice, which sets forth the time, date and place of the Confirmation Hearing, has been included along with the Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or in a notice of rescheduled hearing in the agenda for the Confirmation Hearing Filed with the Bankruptcy Court.

Objections to Confirmation of the Plan must be Filed and served on the Debtor and certain other entities, all in accordance with the Confirmation Hearing Notice, so that they are actually received by no later than **May 29, 2024 at 4:00 p.m. (Eastern Time)**.  Unless objections to Confirmation of the Plan are timely Filed and served in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court.  For further information, refer to Article IX of the Disclosure Statement, "Confirmation of the Plan."

(b)      *Requirements for Confirmation of the Plan*

Among the requirements for the Confirmation of the Plan is that the Plan:  (a) is accepted by all Impaired Classes of Claims, or, if rejected by an Impaired Class of Claims, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Impaired Class of Claims; (b) is feasible; and (c) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtor believe that:  (a) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (b) the Debtor has complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (c) the Plan has been proposed in good faith.  Specifically, the Debtor believes that the Plan satisfies or will satisfy the following applicable Confirmation requirements of section 1129 of the Bankruptcy Code, along with any other such requirements:

•        The Plan complies with the applicable provisions of the Bankruptcy Code.

•        The Debtor has complied with the applicable provisions of the Bankruptcy Code.

•        The Plan has been proposed in good faith and not by any means forbidden by law.

•        Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment:

**IN THE OPINION OF THEDEBTOR, THE PLAN IS SUPERIOR AND PREFERABLE TO ANY ALTERNATIVE.**

**ACCORDINGLY, THE DEBTOR, AS THE PLAN PROPONENT, RECOMMENDS THAT HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN AND SUPPORT CONFIRMATION OF THE PLAN.**

Dated: April ~~18~~24, 2024

225 BOWERY LLC

By: */s/ Nat Wasserstein*_____
Nat Wasserstein, Chief Restructuring Officer